# UNITED STATES DISTRICT COURT
## Northern District of Indiana
## South Bend Division

HEARTLAND RECREATIONAL    )
VEHICLES, LLC,              )
        Plaintiff,        )
                            )
                            )
        v.               )     CASE NO.: 3:08-cv-490 TLS-CAN
                            )
FOREST RIVER, INC.,        )
        Defendant.      )

## HEARTLAND'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant Heartland Recreational Vehicles, LLC ("Heartland"), by counsel, pursuant to

Fed. R. Civ. P. 56 and Local Rule 56.1, supports its Motion for Summary Judgment with the

following Statement of Undisputed Material Facts:

## I.    THE PARTIES

1.    Forest River, Inc. ("Forest River") was formed in 1996.  Today, it is one of the

two largest manufacturers of Recreational Vehicle ("RV") products in the country.

2.    Heartland was formed by five individuals in 2003.  Since that time, it has grown

steadily and become an established manufacturer of RV products.

## II.    THE PROSECUTION OF U.S. PATENT NO. 7,278,650

3.    Gregory Cooper, a patent attorney with the law firm of Barnes & Thornburg,

prepared the provisional and utility applications for U.S. Patent No. 7,278,650 (the "'650 patent")

on behalf of Heartland.  (Cooper Dep., Exh. A,  p. 6, ll. 2-4; p. 14, ll. 15-17; *see* p. 21, ll. 16-25;

p. 22; p. 23, ll. 1-13.)

4.       The only Heartland named inventor with whom Gregory Cooper ever remembers communicating directly during the prosecution of the '650 patent is Scott Tuttle. (Cooper Dep., Exh. A, p. 17, ll. 20-25; p. 18, ll. 1-10.)

5.       To provide Gregory Cooper with information about the invention so that he could prepare a patent application, Scott Tuttle gave Cooper a detailed written description of the named inventors' design. (Cooper Dep., Exh. A, p. 15, ll. 9-25; p. 16, ll. 1-7); (B&T File, Exh. B, p. 276-77.)

6.       Tuttle's written description first described the problem caused by the advent of short bed pick-up trucks with extended cabs. "While the new short bed truck configurations with extended cabs offer increased seating capacity and comfort…[t]he shorter truck beds have resulted in a decreased distance between the cab of the truck and the front fiberglass cap of the 5th wheel they are towing. This has significantly diminished the turning radius of the truck when the 5th wheel is attached….Because of this diminished turning radius, there have been a number of incidents where 5th wheel owners who tow with short bed pick-up trucks have turned or backed up too sharply, causing the cab of their truck to hit the corner of their 5th wheel in the fiberglass front cap area – resulting in extensive damage to both the fiberglass cap of the 5th wheel and the cab of the truck." (B&T File, Exh. B, p. 276-77.)

7.       Tuttle next described Heartland's innovative solution to this problem. "Heartland Recreational Vehicles, LLC has engineered a unique new 5th wheel concept that dramatically improves the turning radius of today's short bed pick-up trucks with extended cabs when attached to a 5th wheel trailer. This revolutionary concept involves both rethinking how the steel frame of the 5th wheel is designed, as well as [] how the [] fiberglass front cap design flows in relationship to the frame… The first step was cutting off the corners of the upper front section of

the frame instead of extending them all the way out at a 90° angle, as is the case in a traditional 5th wheel frame design. By angling the frame back at the back at the corners, and incorporating a sweeping design in the fiberglass front cap that flows back and over that section of the frame where the void from cutting off the corner has been created, we have essentially 'cut off' the lower corners of the front of the 5th wheel, resulting in a 30%+ increased turning radius when attached to a short bed pick-up truck with an extended cab." (B&T File, Exh. B, p. 276-77.)

8.     Heartland was founded by Brian Brady, Scott Tuttle, Doug Lantz, John Rhymer, and Tim Hoffman. Cooper informed Scott Tuttle of what it means to be an inventor. Thereafter, Tuttle emailed him a list of inventors to include on the provisional application. That email instructed Cooper to include all five Heartland founders as inventors. (Cooper Dep., Exh. A, p. 20, ll. 16-25; p. 21, ll. 1-10;) (Tuttle Dep., Exh. C, p. 18, ll. 18-25, p. 19, ll. 1-20); (B&T File, Exh. B, p. 067.)

9.     Gregory Cooper provided the Heartland inventors with a draft of the provisional patent application prior to filing. A March 11, 2004 email sent on behalf of Gregory Cooper to Scott Tuttle enclosed both a letter and a draft of the provisional patent application. The letter informed Tuttle that "[e]ach inventor should review this draft for completeness and accuracy, and provide us with comments or suggestions concerning any changes deemed necessary or desirable." This is consistent with Cooper's normal practice of providing drafts of patent applications to clients for them to review. (B & T File, Exh. B, 041, 043); (Cooper Dep., Exh. A, p. 18, ll. 23-25; p. 19, ll. 1-6.)

10.    The provisional patent application was filed with the Patent Office in March of 2004.

11.     Gregory Cooper provided Heartland with a draft of the utility patent application prior to filing it.  In a March 25, 2005 email to Scott Tuttle, Cooper asked Tuttle to identify any "glaring errors or omissions" in the application and to provide him with any suggested revisions to the application. Tuttle testified as follows:  "I recall that as we sat in a room that different partners of mine were absolutely reviewing it and looking at it….They had it in their hands, they saw it, they read it." (B & T File, Exh. B, p. 080); (Cooper Dep., Exh. A, p. 29, ll. 2-11, 16-20); (Tuttle Dep., Exh. C, p. 213, ll. 18-23.)

12.     The utility patent application was filed with the Patent Office on March 28, 2005. (Cooper Dep., Exh. A, p. 22, ll. 10-11.)

13.     In a letter dated April 5, 2005, Gregory Cooper explained the concept of "prior art" to the Heartland named inventors and asked them to provide him with any examples of prior art.  Specifically, Cooper described prior art as "all patent and non-patent publications and other facts that a reasonable examiner may consider to be important to an assessment of patentability of the claimed invention.  Such other facts include public demonstrations or sales or offers of sale of products pertaining to the invention and information any of the inventors received from others prior to making the invention."  The letter further noted that "[e]ach person involved in the preparation and prosecution of the patent application has an obligation to disclose such publications and facts to the USPTO."  This is consistent with Cooper's standard business practice of explaining the concept of "prior art" to clients and requesting that they provide him with examples of prior art.  Finally, the letter informed the named inventors that "by signing the Declaration, you are declaring that you have reviewed and understood the contents of the application including the patent claims." (B & T File, Exh. B, 143-144); (Cooper Dep., Exh. A, p. 31, ll. 6-19.)

4

14.     Sometime after the filing of the utility patent application, a conflict arose between Heartland and another Barnes & Thornburg client, Keystone RV.  Because of this conflict, Gregory Cooper had to withdraw his representation of Heartland with respect to the '650 patent. Specifically, Gregory Cooper withdrew from the case sometime between the time the utility patent application was filed and the time that the Information Disclosure Statement was filed. (Cooper Dep., Exh. A, p. 35, ll. 20-25; p. 36, ll. 1-25; p. 165, ll. 21-25; p. 166, ll. 1-13.)

15.     In June of 2005, Barnes & Thornburg transferred the prosecution file to Gerard Gallagher at Baker & Daniels.  Gerard Gallagher is currently a partner with the law firm of Barnes & Thornburg.  During the prosecution of the '650 patent, Gallagher was a partner with the law firm of Baker & Daniels.  After Barnes & Thornburg withdrew its representation of Heartland in connection with the '650 patent, Gallagher took over the prosecution of the '650 patent on behalf of Baker & Daniels.  Gallagher was employed with Baker & Daniels throughout the entire patent prosecution process.  (Cooper Dep., Exh. A, p. 35, ll. 20-25; p. 36, ll. 1-25;) (Gallagher Dep., Exh. D,  p. 5, ll. 22-25; p. 6, ll.1-18; p. 10, ll. 7-10.)

16.     Scott Tuttle continued to serve as the primary liaison between Heartland and its attorneys after Gerard Gallagher took over the prosecution.  (Gallagher Dep., Exh. D, p. 13, ll. 17-21; p. 14, ll. 3-5.)

17.     When he assumed the prosecution of the '650 patent, Gerard Gallagher told the named Heartland inventors that "anything that was out there, prior patents, publications, products, you know, that were similar to this or achieve a similar purpose or that, you know, someone might consider material, you know, to their invention, it should be brought to our attention and that they should err on the side of disclosing more to us, not less, and then we'll – I

BDDB01 5894840v1

could sort out whether or not something actually needed to be disclosed." (Gallagher Dep., Exh. D, p. 25, ll. 4-23.)

18. During the prosecution of the '650 patent, Gerard Gallagher and Brian Brady discussed whether Brady was aware of any prior art related to the '650 patent. (Gallagher Dep., Exh. D, p. 15, ll. 2-7; p. 20, ll. 16-19.)

19. During the prosecution of the '650 patent, Gerard Gallagher and John Rhymer discussed whether Rhymer was aware of any prior art related to the '650 patent. (Gallagher Dep., Exh. D, p. 17, ll. 2-12; p. 20, ll. 16-19.)

20. During the prosecution of the '650 patent, John Rhymer states that he was aware of the duty of candor and good faith placed upon patent applicants, including the duty to provide information to the USPTO. For Rhymer, that meant that the inventors needed to disclose "[a]nything that we seen that was related to what we were trying to do." Rhymer believes that the inventors complied with that duty. (Rhymer Dep., Exh. E, p. 11, ll. 24-25; p. 12, ll. 1-16.)

21. Scott Tuttle was responsible for collecting all prior art known to the named inventors. John Rhymer had discussions with Tuttle in which he would tell Tuttle what he knew regarding prior art, but ultimately it was Tuttle's task to complete. Doug Lantz, Tim Hoffman, and Brian Brady were never present at these meetings between Tuttle and Rhymer. Rhymer does not know whether Tuttle met with Lantz, Hoffman, and Brady separately to gather information regarding prior art. (Rhymer Dep., Exh. E, p. 212, ll. 17-25; p. 213, ll. 1-23; p. 215, ll. 10-18; p. 223, ll. 6-19); (Tuttle Dep., Exh. C, p. 68, ll. 5-11.)

22. Scott Tuttle informed Heartland's attorneys of one instance of prior art in his written description to Cooper: the Glendale Titanium fifth wheel. Tuttle informed Cooper of a prior art trailer aimed at improving turning radius. "There is a Canadian RV manufacturer

6

named Glendale who makes the Titanium 5th wheel.  They have received a patent on their design of a coach that actually goes over the cab of the short bed truck.  The crux of their patent…is the fact that they go over the cab of the truck with their unit…It is a strange looking unit, but the fact that they received a patent specifically to help improve the turning radius of their units attached to short bed pickup trucks should add to the legitimacy of our case for getting a patent on our design to accomplish the same thing.  The problem is the same – **but our approach to the solution and designs are very different.**"  (B&T File, Exh. B, p. 276-77) (emphasis added); (Rhymer Dep., Exh. E, p. 12, ll. 23-25; p. 13, ll. 1-7.)

23.     Forest River's Pete Liegl sent a letter dated July 11, 2005 to Heartland counsel Gerard Gallagher.  In the letter, Liegl did not specifically identify any prior art allegedly material to the prosecution of the '650 patent.  Instead, the letter merely stated that "quite a few years ago there was a certain recreational vehicle product that had a similar design to the one in question" and suggested that Gallagher "do some historical checking" to locate this "certain recreational vehicle product."  (Exh. F.)

24.     There were a total of fourteen patents included in Barnes & Thornburg's file for the prosecution of the '650 patent.  Cooper could not recall how those patents were found, but testified that they either came from Heartland or were found in a formal or informal prior art search.  (Cooper Dep., Exh. A, p. 39, ll. 7-25; p. 40, ll. 1-22.)

25.     Gallagher directed a paralegal to prepare an Information Disclosure Statement for the '650 patent application.  This Statement is used to bring to the attention of the patent examiner information which could potentially be material to patentability.  Gallagher stated that there were patents in the file that he had obtained from Barnes & Thornburg, and that it appeared a search had been done or that prior art had been gathered from somewhere.  Gallagher

instructed the paralegal to include the patents that were in the Barnes & Thornburg file in the Information Disclosure Statement.  The Information Disclosure Statement included all fourteen patents from the Barnes & Thornburg file.  (B&D File, Exh. G, p. 685-86); (Gallagher Dep., Exh. D., p. 31, ll. 5-25; p. 32, ll. 1-6.)

26.     Michael Stabley served as the patent examiner with respect to the '650 patent application.  Heartland provided fourteen (14) patents to the Patent Office in the Information Disclosure Statement.  The patent examiner found three additional references.  All seventeen (17) references were available to the examiner.  (Gallagher Dep., Exh. D, p. 35, ll. 10-25; p. 36, ll. 1-2); (Exh. H., p. 1.)

27.     In March of 2005, Scott Tuttle sent an e-mail to Greg Cooper seeking information about the defensibility of the potential patent.  Tuttle stated that he felt they had a good shot at receiving a patent based on the improved turning radius design "where we cut back the frame and also remolded the cap design to take advantage of that void in the frame."  (B&T File, Exh. B, p. 219.)

28.     Gerard Gallagher sent Scott Tuttle an e-mail which included the formal drawings for the patent.  Tuttle responded to this email by identifying different changes that he thought needed to be made and then approved the remaining drawings.  At no time did Gallagher ever have the sense that Tuttle did not understand what the invention was.  Tuttle never told Gallagher that he did not understand what the invention was.  (B&D File, Exh. G, p.  545-557); (Gallagher Dep., Exh. D, p. 41, ll. 16-25; p. 42, ll. 1-23; p. 43, ll. 14-21.)

29.     Gerard Gallagher discussed with Scott Tuttle the prior art relied upon by the examiner in rejecting some of the patent claims. That prior art included a horse trailer with a vertical gooseneck adapter and a travel trailer.  Tuttle's view was that the horse trailer and the

travel trailer identified by the examiner were not particularly relevant or applicable to the patent application (Gallagher Dep., Exh. D, p. 54, ll. 21-25; p. 55, ll. 1-4); (*see also* B&D File, Exh. G, p. 486.)

30.      The Patent Office allowed three of the more than thirty (30) claims in the '650 patent application. Gerard Gallagher discussed with Scott Tuttle the nature of the allowed claims. It appeared to Gallagher that Tuttle understood what the claims covered and what the issues were. (B & D File, Exh. G, p. 523-540, 587-591); (Gallagher Dep., Exh. D., p. 55, ll. 18-25; p. 56, ll. 1-17.)

31.      In an email exchange on July 30, 2007, Gerard Gallagher and Scott Tuttle discussed what the three allowed claims covered – Heartland's notched trailer frame. Gallagher and Tuttle had further discussions about filing a continuation application to seek other claims. Ultimately, Heartland filed a continuation patent seeking other claims. (Gallagher Dep., Exh. D, p. 55, ll. 8-23); (B&D File, Exh. G, p. 484.)

## III.    HEARTLAND AND ITS ATTORNEYS' LACK OF KNOWLEDGE OF ALLEGED PRIOR ART

### Brian Brady

32.      Brian Brady is one of the five inventors named on the '650 patent. (Exh. H, p. 1.)

33.      Brian Brady understands the invention of the '650 patent to be a frame that enables the owner of a Fifth Wheel to turn the truck tightly. When asked what specifically about Heartland's invention enables a tight turning radius, Brady stated that he would have to defer to his engineer, John Rhymer, and that he personally could not answer that question because he did not know. (Brady Dep., Exh. I, p. 188, ll. 12-15; p. 190, ll. 6-15.)

BDDB01 5894840v1

34. During his deposition, Brian Brady could not recall whether other frames have allowed people to turn a trailer tightly. (Brady Dep., Exh. I, p. 188, ll. 16-24.)

35. Brian Brady does not consider himself to be mechanically inclined. (Brady Dep., Exh. I, p. 67, ll. 9-11.)

36. Brian Brady does not recall ever sitting down with the respective named inventors and discussing all prior art of which the named inventors were aware during the prosecution of the '650 patent. (Brady Dep., Exh. I, p. 221, ll. 22-25.)

37. Brian Brady does not know whether the "Shadow Cruiser" had a tapered front end. He also cannot remember whether the "Shadow Cruiser" once competed with the trailers of his former company, Holiday Rambler. (Brady Dep., Exh. I, p. 189, ll. 19-25; p. 190, ll. 1-5.)

38. When shown a photograph of a Holiday Rambler trailer, the Crown Imperial, Brian Brady could not remember having seen the trailer or a trailer like it. (Brady Dep., Exh. I, p. 236, ll. 13-19.)

39. When shown a photograph of the frame of a fifth-wheel trailer manufactured by Cherokee Industries, Brian Brady stated that he had no recollection of seeing such a frame before. In fact, Brian Brady is not aware that he has ever been in competition with Cherokee Industries, and he does not know that he has ever seen a trailer manufactured by Cherokee Industries. (Brady Dep., Exh. I, p. 237, l. 25; p. 238, ll. 1-13, 20-24.)

40. Brian Brady does not recall having seen the Eliminator fifth wheel trailer, which is depicted at page six of Forest River's Amended Answer, Defenses, and Counterclaims (the "Amended Answer"). (Brady Dep., Exh. I, p. 233, ll. 5-9); (Am. Answer, Exh. K, p. 6); (Exh. J.)

41.     Brian Brady does not recall having seen the Roadmaster trailer frame, which is depicted at page seven of the Amended Answer.  Brady also does not know if Roadmaster was ever a competitor with any company he worked for, and he has no recollection of ever seeing any trailers made by Roadmaster.  (Brady Dep., Exh. I, p. 233, ll.18-22; p. 234, ll. 7-16); (Am. Ans., Exh. K., p. 7); (Exh. L.)

42.     During the winter of 2008-2009, Forest River's counsel provided Heartland's counsel with prior art that Forest River believed to be material to the '650 patent.  Heartland's attorneys had not uncovered the prior art during the prosecution of the patent.  Upon learning of this prior art, Brian Brady and Heartland decided to abandon their infringement claims against Forest River and to file a covenant not to sue. (Brady Dep., Exh. I, p. 183, ll. 15-25; p. 185, ll. 22-25; p. 186, ll. 1-18.)

43.     Brian Brady does not know if anyone at Heartland has expertise concerning the "prior art" related to the invention.  In Brady's opinion, if anyone were to have that expertise, it would be John Rhymer, who works in Heartland's engineering department.  (Brady Dep., Exh. I, p. 144, ll. 4-11).

**John Rhymer**

44.     John Rhymer is one of the inventors named on the '650 patent. (Exh. H, p. 1.)

45.     John Rhymer did not consider himself to be an expert in evaluating prior art and did not believe he could tell Scott Tuttle whether a particular reference constituted prior art. (Rhymer Dep., Exh. E, p. 215, ll. 10-15.)

46.     While John Rhymer is aware of the Shadow Cruiser Company, he has no recollection of the top-view of a Shadow Cruiser trailer having an inclined angle.  (Rhymer Dep., Exh. E, p. 53, ll. 2-11.)

11

47.     John Rhymer has never seen an RV similar to the Roadmaster trailer depicted at page 7 of Forest River's Amended Answer.  Rhymer does not think that the Roadmaster constitutes prior art because it is a cargo trailer. (Rhymer Dep., Exh. E, p. 305, ll. 11-23; p. 307, ll. 1-10); (Am. Ans., Exh. K, p. 7); (Exh. L.)

48.     John Rhymer considers travel trailers and fifth-wheels to be completely different products.  Rhymer did not collect drawings of travel trailer frames to provide to the Patent Office. (Rhymer Dep., Exh. E, p. 114, ll. 12-25; p. 115, ll. 1-4.)

49.     John Rhymer does not consider cargo trailers to be prior art because they are not RVs.  While cargo trailers may have living quarters, they do not have "bedroom slides" like Heartland's product.    Furthermore, Rhymer has never seen a cargo trailer with short bed truck clearance.  Also, you cannot stand up in the bed area of a cargo trailer. For Rhymer, the ability to stand up in the bed area is the hallmark of a conventional fifth-wheel.  (Rhymer Dep., Exh. E, p. 267, ll. 7-25; p. 268, ll. 1-25; p. 269, ll. 1-14.)

50.     Rhymer does not consider horse trailers to be prior art because they are not RVs. (Rhymer Dep., Exh. E, p. 267, ll. 7-17.)

51.     Rhymer cannot recall having ever seen a Cherokee brand "V" nose trailer. (Rhymer Dep., Exh. E, p. 313, ll. 4-7.)

52.     Prior to reviewing Forest River's Original Answer in this matter, Rhymer was not familiar with the Eliminator cargo trailer.  He had once seen an "Eliminator cargo trailer going by one time," but because it was going the other way, he did not know what the front end looked like.  (Rhymer Dep., Exh. E, p. 313, ll. 9-25; p. 314; p. 315, ll. 1-4.)

BDDB01 5894840v1

53.     Rhymer has never heard of a "Sunrise Friend" trailer.  When he worked at Gulf Stream, he was not aware that Cobra Industries was a competitor in the fifth-wheel market.  (Rhymer Dep., Exh. E, p. 324, ll. 10-22.)

54.     Rhymer does not believe that SAE turning radius standards for travel trailers are relevant to Heartland's invention creating an increased turning radius for fifth-wheels.  There are no SAE turning radius standards for fifth-wheels.  (Rhymer Dep., Exh. E, p. 328, ll. 8-14; p. 330, ll. 18-25.)

### Scott Tuttle

55.     Scott Tuttle is one of the five inventors named on the '650 patent.  Tuttle is no longer employed by Heartland.  (Exh. H, p. 1.); (Tuttle Dep., Exh. C, p. 46, ll. 10-25; p. 47, p. 48, ll. 1-15.)

56.     During the patent prosecution, Scott Tuttle did not think that the Space Craft fifth-wheel, V-nose horse trailers, or horse trailers were relevant to Heartland's invention. (Tuttle Dep., Exh. C, p. 147, ll. 15-25; p. 148, ll. 1-10; p. 149, ll. 20-22; p. 150, ll. 1-3.)

57.     During the patent prosecution, Mr. Tuttle was not aware of the Forest River Cardinal product created by Quality Frames.  Mr. Tuttle did not become aware of the product until Forest River's counsel, Ryan Fountain, showed him the product sometime after March of 2009.  (Tuttle Dep., Exh. C, p. 156, ll. 14-25; p. 157, ll. 1-5.)

58.     Scott Tuttle did not even think about the Shadow Cruiser being prior art when Heartland filed the patent application.  (Tuttle Dep., Exh. C, p. 194, ll. 4-9.)

59.     Scott Tuttle did not even think about the Trail Bay fifth wheel being prior art when Heartland filed the patent application.  Tuttle considers the Trail Bay model to be a traditional fifth wheel.  (Tuttle Dep., Exh. C, p. 196, ll. 23-25; p. 197, ll. 16-25; p. 198, ll. 1-8.)

BDDB01 5894840v1

60.     Scott Tuttle is not aware of any products by Weekend Warriors that would have been relevant prior art at the time the patent application was filed.  (Tuttle Dep., Exh. C, p. 203, ll. 3-17.)

61.     In the context of trailers, the phrase "bull nose" does not mean anything to Scott Tuttle.  (Tuttle Dep., Exh. C, p. 203, ll. 18-25; p. 204, ll. 1-5.)

62.     At the time the patent application was filed, Scott Tuttle did not think that the angled front ends of cargo trailers and horse trailers were relevant to the patent application or the patent itself.  (Tuttle Dep., Exh. C, p. 204, ll.13-25; p. 205, ll. 1-11.)

63.     According to Scott Tuttle, everyone in the RV industry knows that travel trailers and fifth wheels are completely different products.  Travel trailers are typically bumper pull, while fifth wheels typically go in the bed of a truck.  (Tuttle Dep., Exh. C, p. 235, ll. 17-25; p. 236, ll. 1-22.)

64.     In March of 2009, Forest River's counsel, Ryan Fountain, contacted Scott Tuttle and asked him whether he had knowledge of any prior art related to the '650 patent.  Tuttle told Fountain that he was not certain he knew what "prior art" meant.  (Tuttle Dep., Exh. C, p. 61, ll. 4-19; p. 62, ll. 18-25; p. 63, ll. 1-4.)

**Doug Lantz**

65.     Doug Lantz is one of the five inventors named on the '650 patent.  Doug Lantz is no longer employed by Heartland.  (Exh. H, p. 1); (Tuttle Dep., Exh. C, p. 42, ll. 6-21.)

66.     Doug Lantz did not intentionally withhold any prior art from the Patent Office.  Doug Lantz did not intentionally misrepresent any prior art to the Patent Office.  (Lantz Dep., Exh. N, p. 124, ll. 4-12.)

BDDB01 5894840v1

67.     When asked what important prior art had been withheld from the Patent Office during his deposition, Lantz said that he did not know.  (Lantz Dep., Exh. N, p. 250, ll. 18-23.)

**Timothy Hoffman**

68.     Tim Hoffman is one of the five inventors named on the '650 patent.  (Exh. H, p. 1)

69.     According to Tim Hoffman, there is a difference between a travel trailer and a fifth wheel.  Travel trailers are pulled by a bumper pull.  Fifth wheels are pulled from inside the truck bed over the axle.  (Hoffman Dep., Exh. O, p. 39, ll. 1-10.)

**Gregory Cooper**

70.     Gregory Cooper has no recollection of ever receiving any prior art examples from a competitor of Heartland.  (Cooper Dep., Exh. A, p. 41, ll. 12-15.)

71.     When asked whether he ever discussed a reference called "The Eliminator reference" in connection with the '650 patent application, Gregory Cooper stated that he did not know what that is. (Cooper Dep., Exh. A, p. 42, ll. 10-13.)

72.     When asked whether he had ever discussed a reference called the "Roadmaster reference" in connection with the '650 patent application, Gregory Cooper stated that he has heard that word before, but he does not know what it is.  (Cooper Dep., Exh. A, p. 42, ll. 14-16.)

73.     Gregory Cooper stated that he never discussed any V-nose, bull-nose, or otherwise tapered trailers in connection with the '650 patent. (Cooper Dep., Exh. A, p. 42, ll. 17-25, p. 43, l. 1.)

74.     Gregory Cooper does not recall ever discussing products made by Cobra, Bison, the Aluminum Trailer Company, or Sundowner in connection with the prosecution of the '650 patent.  (Cooper Dep., Exh. A, p. 43, ll. 2-12.)

BDDB01 5894840v1

75.     Gregory Cooper does not recall ever discussing a product by Holiday Rambler in connection with the prosecution of the '650 patent.  (Cooper Dep., Exh. A, p. 43, ll. 13-17.)

## IV.     <u>THE INVENTORSHIP OF THE '650 PATENT</u>

76.     In the early stages of Heartland's formation, John Rhymer believed that he was the inventor of the patent.  However, when the time came to list the inventors on the provisional patent application, Rhymer said, "it didn't seem right for just my name to be on there.  So when the question was asked to me, I answered 'Well, I think we should all been on there."  Rhymer believed that because it was a start-up company, all five Heartland partners should be named as inventors.  Rhymer does not know whether Scott Tuttle ever discussed the issue of who was an inventor with Heartland's patent attorneys.  (Rhymer Dep., Exh. E, p. 327, ll. 19-25; p. 328, ll. 1-7; p. 329, ll. 2-25; p. 330, ll. 13-16.)

77.     When asked whether he knew if Scott Tuttle had discussed the inventorship issue with Heartland's attorneys, Rhymer stated "Meaning having multiple names on there? …I mean, I don't know that was a problem." (Rhymer Dep., Exh. E, p. 330, ll. 8-12.)

78.     Scott Tuttle testified that Heartland was not trying to deceive anyone with the listing of its inventors.  Tuttle states that because all five of the partners sat around a table and worked on the idea together, that they all deserved to be considered inventors. Tuttle testified that all five owners were listed because "we felt it was a team effort….we were all there for the discussions when we were trying to conceive this…we felt like we all played a part."  The named inventors were never worried about inventorship, because, in Tuttle's words, "there was no self-interest" with respect to that issue.  (Tuttle Dep., Exh. C, p. 106, ll. 17-25; p. 107, ll. 1-14; p. 121, ll. 16-25; p. 122; p. 123, ll. 1-21.)

79.     Scott Tuttle also testified that "there may have been some gray area in my understanding between what ownership and what inventor, you know, rights and things are." (Tuttle Dep., Exh. C, p. 85, ll. 7-11.)

80.     Doug Lantz considers himself an inventor with respect to the improved turning radius due to his contributions during many product development meetings, his monetary investment in the firm, his development of the building where the fifth wheels were manufactured, his procurement of computer technology to facilitate the invention, his development of the bill of materials, and his procurement of insurance for Heartland's venture. (Lantz Dep., Exh. N, p. 82, ll. 14-25; p. 83; p. 84, ll. 1-9; p. 87, ll. 4-25; p. 88, ll. 1-14.)

81.     When Doug Lantz was asked whether he had any information indicating that any of the inventors were named as inventors to deceive anyone, Lantz said, "No."  (Lantz Dep., Exh. N, p. 126, ll. 20-23.)

82.     Shortly after the patent application was filed, the five named inventors each assigned their rights in the patent to Heartland Recreational Vehicles, LLC.  (*See* B&T File, Exh. B, p. 150-155.)

## V.     THE LACK OF INTENT TO DECEIVE THE PATENT OFFICE

83.     Scott Tuttle affirms that he did not intentionally lie to the Patent Office, that he did not intentionally deceive the Patent Office, and that he did not intentionally withhold any references of any type from the Patent Office.  (Tuttle Dep., Exh. C, p. 92, ll. 22-25; p. 93, ll. 1-5.)

84.     Scott Tuttle affirms his belief that none of the named inventors intentionally withheld references from the Patent Office.  (Tuttle Dep., Exh. C, p. 93, ll. 6-13.)

BDDB01 5894840v1

85.     Scott Tuttle says that the named inventors had no intention of deceiving anybody by listing all five partners as inventors.  (Tuttle Dep., Exh. C, p. 121, ll. 16-21.)

86.     Scott Tuttle has no knowledge of Heartland attempting to obtain an inflated value of the patent at issue.  He also has no knowledge that invalidation of the patent or denial of the patent's issuance would've brought about a financial collapse of Heartland.  (Tuttle Dep., Exh. C, p. 182, ll. 1-10.)

87.     Doug Lantz says that if he misled the Patent Office, he did it "inadvertently." (Lantz Dep., Exh. N, p. 124, ll. 13-22.)

88.     Doug Lantz has no information indicating that the inventors were named as inventors in order to deceive anyone.  (Lantz Dep., Exh. N, p. 126, ll. 20-23.)

89.     Gregory Cooper has no recollection of ever having a discussion with anyone about withholding any references from the Patent Office.  (Cooper Dep., Exh. A, p. 41, ll. 16-18.)

90.     Gregory Cooper states that he did not commit inequitable conduct in connection with the prosecution of the '650 patent.  (Cooper Dep., Exh. A, p. 42, ll. 3-5.)

91.     Gregory Cooper states that he did not mislead the Patent Office or mischaracterize any fact to the Patent Office in connection with the '650 patent application.  (Cooper Dep., Exh. A, p. 42, ll. 6-9.)

92.     Gerard Gallagher believes that neither he nor anyone else involved in the prosecution of the '650 patent committed inequitable conduct.  (Gallagher Dep., Exh. D, p. 8, ll. 21-25; p. 9, ll. 1-3.)

93.     According to Gallagher, there is art in the patent prosecution file that shows fifth wheel travel trailers or travel trailers.  If there is art in the file that shows travel trailers,

submitting another example of the same kind of travel trailer would be cumulative. (Gallagher Dep., Exh. D, p. 119, ll. 1-19.)

94.     Forest River's Vice President of Sales, Jeff Babcock, served as Forest River's 30(b)(6) corporate designee with respect to the issue of inequitable conduct. Babcock also served as the signatory on Forest River's Responses to Heartland's interrogatories. (Heartland's Amended Notice of Deposition to Forest River, Exh. P; Signature Page for Forest River's Responses to Heartland's First Set of Interrogatories, Exh. Q; Babcock Dep., Exh. R, p. 51, ll. 14-25; p. 52; p. 53, ll. 1-18; p. 55, ll. 3-25; p. 56, ll. 1-5; p. 157, ll. 4-20.)

95.     Jeff Babcock believes that John Rhymer is "very honest" and that Scott Tuttle is a "truthful" individual. (Babcock Dep., Exh. R, p. 154, ll. 23-25; p. 155; p. 156.)

96.     When asked whether he believed Scott Tuttle had intentionally lied to the patent office, Jeff Babcock replied that "Scott didn't intentionally go out and say 'We're gonna lie to the patent office here and try to prove something here.' I don't think that their scope was broad enough prior to filing that. Then they should have or their attorney should have caught that." He then said that he would give the same answer for John Rhymer. He later reiterated that he did not think they were trying to outright lie to the Patent Office. (Babcock Dep., Exh. R, p. 171, ll. 9-25; p. 172, ll. 1-10.)

97.     When asked to identify which specific named inventor withheld information from the Patent Office, Babcock said "Again, I think the inventors tried to patent something—again, after even listening to the deposition of Scott [Tuttle] yesterday, they were trying to, **not knowingly**, however at the same time were trying to get a patent for something they had no right in getting in simple laymen's terms…." (Babcock Dep., Exh. R, p. 158, ll. 18-25; p. 159, ll. 1-3) (emphasis added).

19

98.     When asked what information he had regarding Forest River's inequitable conduct claim, Jeff Babcock said: "I think what the—our stances on it is that they were trying to patent something that was already produced prior to and **they did not either at the time know that they were doing it, but at the same time they were doing it**, that there was other products out there prior to their patent that would actually not allow them to actually get a patent if it was provided."  (Babcock Dep., Exh. R, p. 157, ll. 24-25; p. 158, ll. 1-8) (emphasis added).

## VI.     THE PETITION FILED BY SCOTT TUTTLE AND DOUG LANTZ WITH THE PATENT OFFICE

99.     Scott Tuttle and Doug Lantz filed with the Patent Office a "Petition for Acceptance of Revocation of Power of Attorney and Appointment of New Power of Attorney under 37 CFR 1.36, Including Request for Participation in the Patent Prosecution to Avoid a Continuing Fraud upon the USPTO" (the "Petition").  (Exh. S.)

100.     Neither Scott Tuttle nor Doug Lantz wrote the Petition.  Rather, Forest River's counsel of record in this litigation, Ryan Fountain, wrote the Petition.  (Tuttle Dep., Exh. C, p. 89, ll. 24-25; p. 90, ll. 1-2.)

101.     Prior to signing the Petition, Scott Tuttle did not read it in detail because he was busy.  (Tuttle Dep., Exh. C, p. 90, ll. 5-8.)

102.     Prior to having Doug Lantz sign the Petition, Ryan Fountain did not show Doug Lantz the original patent application.  As a result, Lantz did not realize that the original patent application included claims directed not only to the frame, but also to other aspects of the invention, including the cap. (Lantz Dep., Exh. N, p. 241, ll. 22-25; p. 242, l. 1, ll. 17-20; p. 243; p. 244, ll. 1-24; p. 246, ll. 16-21.)

103.    Though the Petition written by Ryan Fountain and signed by Doug Lantz claims that prior art had been withheld from the Patent Office, Lantz did not tell Fountain what prior art had been withheld.  When asked what important prior art had been withheld from the patent office during his deposition, Lantz said that he did not know.  (Exh. S; Lantz Dep., Exh. N, p. 250, ll. 2-23.)

## VII.    THE TESTIMONY OF PATENT PROSECUTION EXPERT JAY TAYLOR

104.    Jay Taylor is a retired patent attorney with over 40 years of experience in all aspects of patent prosecution and litigation.  He has handled litigation and prosecution matters in such diverse mechanical, chemical and electrical fields as, for example, computer software, heart pacemakers, urological stents, ceramic products and processes, data recording and transmission equipment, electronic musical instruments, high voltage transmission equipment, food processing equipment and processes, vending equipment, electronic games, railroad equipment, welding equipment and processes, and particle board manufacturing processes.  (Exh. T, ¶ 2).[1]

105.    Jay Taylor has been employed as a partner at the law firms of Kirkland & Ellis, Haight & Hofeldt, and Ice Miller.  He retired as an Ice Miller partner in 2008.  (Resume of Jay Taylor, Exh. A to Exh. T.)

106.    In preparation of his opinions, Jay Taylor reviewed and considered the '650 patent, the '650 file history, and each prior art reference cited in and exhibits attached to the '650 file history.  He also reviewed and considered the deposition testimony of Brian Brady, John Rhymer, Timothy Hoffman, Scott Tuttle, Douglas Lantz, Gregory Cooper, Gerard Gallagher, and Jeff Babcock.  He also considered the following documents and exhibits: Deposition

[1] In an effort to minimize the volume of documents filed in support of Heartland's Motion for Summary Judgment, Heartland has submitted an affidavit of Jay Taylor declaring under penalty of perjury that the information set forth in his Expert Report is true and correct.  (Exh. U.) This prevents the Court from needing to read both the Expert Report and a redundant affidavit setting out the exact same content.

Exhibits 1-34, 40-41, 43, 80, 81, 100-115, and 123-128, Cooper Dep. Exs. 1, 2 (B&T 001-636), and 3, and Gallagher Dep. Ex.1 (Heartland/FR 458-1049), the Amended Answer and Exhibits thereto, Letter dated July 11, 2005 from Liegl to Gallagher, and drawing entitled Fifth Wheel Section, FE138. (Exh. T, ¶ 4.)

107. In paragraph 47 of the Amended Answer, Forest River alleges that certain statements made at column 1, line 45-62 and Figure 9A of the drawings of the '650 patent were "false and incomplete and were misleading at the time that they were made," and that Heartland was aware of prior art "V" and "bull nose" trailers with tapered front ends which were not disclosed to the Patent Office. The prior art disclosed by Heartland to the Patent Office completely refutes these allegations. For example, U.S. Patent Nos. 6,343,830 – Ingram, et al.; 6,860,545 – Ingram, et al.; 6,170,903 -  Crean; and 5,746,473 - Crean, which were all disclosed in Heartland's Information Disclosure Statement, demonstrate that it was conventional to have a fifth wheel trailer with an upper deck with "a rectangular or parallel-shape footprint whose forward corner edges form right angles." (See, e.g., Figs 1 & 2 of the '830 and '545 patents, Figs. 1, 2A & 2B of the '903 patent and Figs. 5 & 6 of the '473 patent.) In the context of a patent, "conventionally" merely means known in the art. Hence, the statement at column 1, line 45-62 is not misleading. Moreover, the construction shown in Figure 9A of the '650 patent is very similar to the front edge construction shown in Figure 2 of U.S. Patent No. 6,860,545 and Figures 5 & 6 of U.S. Patent No. 5,746,473, thus showing that Figure 9A does depict prior art and was neither false nor misleading. Jay Taylor is aware of no reported case that has ever found a statement made in the specification of a patent about the state of the prior art to be the basis for inequitable conduct. (Exh. T, ¶¶ 20, 28); (Exhs. V-Y.)

108.     There is no legal or evidentiary support for Forest River's allegations in paragraph 48 of the Amended Answer that Heartland (1) filed an improper information statement with the United States Patent Office in that it failed to "admit" that the disclosed information was material to the patentability of any pending claim and (2) failed to identify any prior art frames actually made and sold within the industry of which the applicants allegedly had knowledge. There is no requirement by either the Patent Act or the Patent Office Rules that an applicant "admit" that disclosed information is either prior art or that it is material. Patent Office Rule 1.97 specifically states that:

> (g) An information disclosure statement filed in accordance with this section shall not be construed to be a representation that a search has been made.
>
> (h) The filing of an information disclosure statement shall not be construed to be an admission that the information cited in the statement is, or is considered to be, material to patentability as defined in § 1.56(b).

Moreover, Rule 1.98 provides that all the applicant needs to provide is "A list of all patents, publications, applications or other information for consideration by the office." There is no requirement under the rules that the listed items be either identified as prior art or material to patentability. Rule 1.98(a)(3)(i) only requires an explanation of relevance of any such listed patent, publication, application or other information where the "patent, publication, or other information that is not in the English language." None of the references cited are in a foreign language so there is no requirement under the PTO Rules for any explanation of relevance. The Information Disclosure Statement submitted by Heartland fully complies with Rules 1.97 and 1.98, and therefore, cannot be the basis for a claim of inequitable conduct. Rule 1.56 clearly states that "the duty to disclose all information known to be material to patentability is deemed to

be satisfied if all information known to be material to patentability of any claim issued in a patent was cited by the Office or submitted to the Office in the manner prescribed by §§ 1.97(b)-(d) and 1.98."  (Exh. T, ¶ 29.)

109.    There is no clear and convincing evidence that Heartland or its patent attorneys failed to disclose all material non-cumulative information of which they had knowledge in the Information Disclosure Statement that they filed with the Patent Office.  (Exh. T, ¶ 30.)

110.    The Federal Circuit has held that when a reference was before the examiner, whether through the examiner's search or the applicant's disclosure, it cannot be deemed to have been withheld from the examiner.  (Exh, T, ¶ 30) (citing *Molins PLC v. Textron, Inc.,* 33 USPQ 2d 1823, 1832 (Fed.Cir. 1995).

111.    There does not appear to be any clear and convincing evidence that the named inventors or the patent attorneys knew of the Eliminator fifth wheel trailer, recognized it as material prior art to their invention, and intentionally withheld it from either the attorneys or the Patent Office for deceptive purposes. Forest River's allegation that Heartland failed to disclose information about an "Eliminator" prior art trailer which was allegedly disclosed by a July 11, 2005 letter has no merit. There is nothing in the July 11, 2005 letter from Forest River's Mr. Liegl to Heartland's attorney, Mr. Gallagher, that either identifies the "Eliminator" by name or provides any information whatsoever about its identity or construction. The July 11, 2005 letter merely states that "[q]uite a few years ago there was a certain recreational vehicle product that had a similar design to the one in question." Mr. Liegl's letter suggests that Mr. Gallagher "do some historical checking" to see if he can find this alleged "certain recreational vehicle product."  This is not a sufficient disclosure of prior art to place any obligation on Mr. Gallagher to make a disclosure to the Patent Office. Further, to the extent to which this vague

24

reference is referring to a trailer with a "V" or "Bull" nose, that concept is disclosed by U.S. Patent No. 4,767,132 ("Avery"). To the extent to which this vague reference is referring to a fifth wheel trailer with curved front corners, that concept is shown by U.S. Patent Application No. 2002/0003341 ("Hall") and foreign publication DE 3321306 (the "Foreign Publication"), which were found by the examiner's search. Both the Avery and Hall references were cited by the examiner in rejecting certain of the claims. Thus, the examiner was fully aware of prior art showing "V" or "Bull" nosed and curved corner trailers, and fifth wheels and the Eliminator and other prior art showing the same concepts are merely cumulative and nonmaterial. (Exh. T ¶ 31); (Exhs. Z, AA, & BB.)

112.     There does not appear to be any clear and convincing evidence that anyone substantively involved with the prosecution of the '650 patent had knowledge of the Cherokee fifth wheel trailer before the patent issued, believed it to be material prior art to their invention, and intentionally withheld it from the Patent Office for deceptive purposes. Moreover, the Cherokee has both a "V" nose and curved front corners. Both of these concepts are disclosed by the Avery, Hall, and Foreign Publication references. (Exh. T ¶ 32); (Exhs. Z, AA, BB, & CC.)

113.     There does not appear to be any clear and convincing evidence that anyone substantively involved with the prosecution of the '650 patent had knowledge of the Holiday Rambler fifth wheel trailer before the patent issued, believed it to be material prior art to their invention, and intentionally withheld it from the Patent Office for deceptive purposes. Moreover, the Holiday Rambler has slanted or rounded front corners, which are disclosed in the Hall and Foreign Publication references. Thus, even if the Holiday Rambler fifth wheel trailer had been known to someone with a duty to disclose at a time during the prosecution of the '650

patent, it is merely cumulative of information already before the examiner and therefore not material. (Exh. T ¶ 33); (Exhs. DD, AA, & BB.)

114. There does not appear to be any clear and convincing evidence that anyone substantively involved with the prosecution of the '650 patent had knowledge of the Space Craft fifth wheel trailer before the patent issued, believed it to be material prior art to their invention, and intentionally withheld it from the Patent Office for deceptive purposes. Moreover, the Space Craft fifth wheel trailer has a "V" nose front, a feature disclosed in the Avery and Hall references. Thus, even if the Space Craft fifth wheel trailer had been known to someone with a duty to disclose at a time during prosecution of the '650 patent, it is merely cumulative of information already before the examiner and therefore not material. (Exh. T ¶ 34); (Exh. EE, Z, & AA.)

115. There does not appear to be any clear and convincing evidence that anyone substantively involved with the prosecution of the '650 patent had knowledge of the Roadmaster fifth wheel trailer frame before the patent issued, believed it to be material prior art to their invention, and intentionally withheld it from either the attorneys or the Patent Office for deceptive purposes. (Exh. T ¶ 35.)

116. There does not appear to be any clear and convincing evidence that anyone substantively involved with the prosecution of the '650 patent had knowledge of the Cardinal fifth wheel trailer frame before the patent issued, believed it to be material prior art to their invention, and intentionally withheld it from either the attorneys or the Patent Office for deceptive purposes. (Exh. T ¶ 35.)

117. There does not appear to be any clear and convincing evidence that anyone substantively involved with the prosecution of the '650 patent had knowledge of the Shadow

Cruiser fifth wheel, believed it to be material prior art to their invention, and withheld it with an intent to deceive the examiner. Moreover, the Shadow Cruiser has a V nose and sloped front surfaces. These characteristics are shown in Avery and in U.S. Patent Nos. 6,343,830 – Ingram, et al.; and 6,860,545 – Ingram, et al. Thus, even if the Shadow Cruiser had been known to someone with a duty to disclose at a time during prosecution of the '650 patent, it is merely cumulative of information already before the examiner and therefore not material. (Exh. T ¶ 36); (Exhs. FF, V, W, & Z.)

118. There does not appear to be any clear and convincing evidence that anyone substantively involved with the prosecution of the '650 patent had knowledge of the Catalina Coachmen fifth wheel, believed it to be material, and withheld it with an intent to deceive the examiner. Moreover, the Catalina Coachmen trailer has a lower portion of the front edge that is sloped or curved upwardly from a lower front edge that has square corners. Such construction is disclosed in U.S. Patent Nos. 6,860,545 – Ingram, et al.; 6,343,830 – Ingram, et al.; 6,231,115 – Crean; and 5,746,473 - Crean. (Exh. T ¶ 36); (Exhs. GG, HH, V, W, Y.)

119. There does not appear to be any clear and convincing evidence that anyone substantively involved with the prosecution of the '650 patent had knowledge of the Trail Bay Hauler fifth wheel toy hauler, believed it to be material, and withheld it with an intent to deceive the examiner. Moreover, the Trail Bay trailer has a lower portion of the front edge that is sloped or curved upwardly from a lower front edge that has square corners. Such construction is disclosed in U.S. Patent Nos. 6,860,545 – Ingram, et al.; 6,343,830 – Ingram, et al.; 6,231,115 – Crean; and 5,746,473 - Crean. (Exh. T ¶ 36); (Exhs. II, V, W, Y, & HH.)

120. Numerous allegations in paragraphs 52, 53, and 54 of the Amended Answer and Forest River's interrogatory responses involve events occurring after the issuance of the '650

27

patent, and in connection with the prosecution of a continuation application. Events occurring in

connection with the prosecution of a continuation application after the issuance of the parent

patent cannot, as a matter of law, render the parent patent unenforceable due to inequitable

conduct. (Exh. T ¶¶ 37, 39, 45) (citing *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537

F.3d 1357, 1370, n. 10 (Fed. Cir. 2008)); (Exh. K); (Exh. JJ, resp. to No. 3.)

  121. By law, patent applications are kept in confidence by the Patent Office, 35

U.S.C. §122, and "information concerning the filing, pendency, or subject matter of

an application for patent, including status information, and access to the application will

only be given to the public as set forth in §1.11 or in this section." (PTO Rule §1.14).

Rule 1.11 provides for access to a pending application only after publication of the application.

Further, proceedings before the United States Patent Office on pending applications, whether

published or not, are conducted *ex parte* which means that they are conducted only between

the Patent Office and the applicant without the direct knowledge of or participation by any

other party. The only participation permitted by third parties in pending published

applications is a third party submission of prior art patents or printed publications as

provided in Rule 1.99 which allows the submission of no more than ten such items of prior

art. No explanation by the third party of the submitted information is permitted. This is the

only participation by third parties permitted by the Patent Office in a pending patent

application. Hence, any allegation that Heartland did not allow Forest River to attend an

interview regarding the examination of continuation applications has no merit and cannot

form the basis of inequitable conduct. (Exh. T ¶¶ 37, 38.)

  122. It is completely legally permissible under the Patent Act and Patent Office Rules

for an applicant to file as many continuation applications from a pending parent application as

the applicant chooses and is willing to pay for. Further, it is completely legally permissible to file as many new claims in those continuing applications as the applicant wishes and is willing to pay for so long as those claims are supported by the written specification of the application. Filing a claim not supported by the specification is only a basis for rejection of that claim by the examiner and not a basis for a claim of inequitable conduct. The examiner is fully capable of determining whether the claims are supported by the specification based upon the information contained in the specification. No additional information need be disclosed to the examiner, and thus, no material information can be claimed to have been withheld from the examiner. (Exh. T ¶ 40.)

123. Forest River alleges that certain named inventors are not "co-inventors" within the meaning of the Patent Act, that the error did not arise without deceptive intent, and that Heartland's failure to inform the Patent Office of these alleged facts was material to the patentability of the claims. These allegations are not supported by the law or the evidence reviewed by Taylor. The Patent Act, 35 U.S.C. § 256, provides that the error of naming persons who are not inventors as co-inventors of a patent can be corrected by the Court if such an error arose without deceptive intent. Taylor's analysis of the evidence and pleadings leads him to conclude that

> [a]t worst, it appears that the decision to add the names of all five owners of the company as inventors was the result of a misunderstanding on the part of those owners as to the meaning of invention, inventorship and the consequences of misnaming inventors…it is clear that to the extent to which there is an error in inventorship, that error occurred as a result of mistake and without any deceptive intent on the part of any of the named inventors to add their names to the application…Thus, any error in inventorship that may exist was through mistake and can be corrected pursuant to 35 U.S.C. § 256 and cannot be the basis for claiming either

invalidity of the patent or inequitable conduct on the part of any of the named inventors.

(Exh. T ¶¶ 41-44.)

124.    There is no evidence to support a claim that Mr. Cooper knew that any of the named inventors had falsely and deceptively asserted his inventorship.  (Exh. T ¶ 48.)

125.    Forest River's claim that the prosecuting attorneys failed to gather and pass on information from the named inventors with respect to the nature of the invention has no evidentiary support or merit.  The evidence shows that Mr. Cooper took appropriate steps to gather and accurately pass on information from the named inventors regarding the nature of the invention.  Furthermore, there is no clear and convincing evidence that Mr. Cooper knew of any material information that was intentionally withheld from the Patent Office with deceptive intent. (Exh. T ¶ 50.)

126.    There is no clear and convincing evidence to support the claim that the named inventors did not read the application sufficiently to understand its content and claims, or that Mr. Cooper or Mr. Gallagher knew or should have known this alleged fact and prevented the application from being prosecuted.  Further, at least one reported case has found that an inventor's failure to read an application before executing the Declaration is not a sufficient basis for a finding of either invalidity or inequitable conduct.  (Exh. T ¶¶ 46, 47) (citing *Regents of the Univ. of California v. Howmedica, Inc.*, 530 F. Supp. 846 (D.N.J. 1981)).

127.    Forest River's allegation that the prosecuting attorneys failed to gather and pass on information from the named inventors regarding the known scope of the prior art within the industry is without evidentiary support or legal basis.  Further, there is no evidence to support a claim that either the named inventors or attorneys withheld any known material prior art.

Finally, to the extent to which it is Forest River's contention that the named inventors should have disclosed their entire knowledge of the commercially available products in the field of the invention, that contention has been found meritless by the Court of Appeals for the Federal Circuit. (Exh. T ¶ 51) (citing *Upjohn Co. v. Mova Pharmaceutical Corp.*, 225 F.3d 1306, 1315 (Fed. Cir. 2000)).

128.    With respect to the claim in Forest River's response to Heartland's Interrogatory 3 that the prosecuting attorneys failed to gather and pass on to the Patent Office information from the named inventors regarding the level of ordinary skill of those involved in the design of travel trailers and fifth wheels, this claim is without legal basis. First, Rule 1.56 only requires disclosure of material prior art information. Rule 1.56 does not require any disclosure of the level of ordinary skill in the art to which the invention pertains. Further, nothing in the Patent Act requires disclosure to the Patent Office of the level of ordinary skill in the art. Section 112 of the Patent Act merely provides that the specification shall contain adequate description of the invention so as "to enable any person skilled in the art to which it pertains ... to make and use" the invention. This is merely a technical requirement for the content of the specification and not a disclosure requirement. Similarly, Section 103 of the Patent Act sets forth the test of whether prior art renders an invention unpatentable as obvious depending on whether "the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." Once again this is a test to determine obviousness of an invention and not a disclosure requirement. Thus, there is no legal basis for a claim that the failure on the part of the attorneys to gather and pass on to the Patent Office information from the named inventors regarding the level of ordinary skill of those involved in the design of travel trailers and fifth wheels constitutes inequitable conduct.   To

31

Taylor's knowledge, there is no reported case that has ever found the failure to disclose the level of ordinary skill in the art to be a basis for inequitable conduct. (Exh. T ¶ 52.)

129.    With respect to the claim in Forest River's response to Heartland's Interrogatory No. 3 that the prosecuting attorneys failed to gather and pass on to the Patent Office information from the named inventors regarding the differences and similarities between the claimed invention and the prior art, this claim is without evidentiary support or legal merit. As discussed above, there is no requirement in the Rules that the named inventors or attorneys provide information regarding the "differences and similarities between the claimed invention and the prior art." The only requirement is that any known material information be disclosed to the Patent Office in the manner specified in Rules 1.97 and 1.98, and there is no requirement for that information to be "admitted" to be prior art or that it be discussed, described or differentiated in any way except as provided in Rule 1.98 (a)(3)(i) for prior art that is not in the English language. Further, there is no evidence that the named inventors did not pass on to the attorneys information they knew was material to the application or that the attorneys did not pass on all of the material prior information of which they had knowledge. (Exh. T ¶ 53); (Exh. JJ.)

130.    With respect to the claim in the response to Interrogatory 3 that the prosecuting attorneys failed to claim the real invention of the named inventors, did not comply with 35 U.S.C. § 112 by not particularly pointing out and distinctly claiming the subject matter which the named inventors regarded as their invention and for not enabling one of ordinary skill in the art to make and use that invention, this claim is without evidentiary and legal support. Forest River's contention appears to be that the named inventors didn't consider the configuration of the frame of the trailer as claimed in the '650 patent to be their "invention." However, the evidence demonstrates quite clearly that the named inventors considered the frame design to be a

32

significant aspect of the invention.  Furthermore, the claims of the '650 patent presumptively do distinctly claim that invention because they were allowed by the examiner after his review of those claims. One of the patent examiner's duties in examination of a patent application is to make a determination of whether the claims and specification meet the requirements of §112. Also, the specification is presumed to meet the enablement requirement of § 112 as all of the formal § 112 objections to the specification made by the examiner were corrected by the applicant during prosecution and the examiner allowed the patent to issue. Moreover, the written description and drawings adequately enable one of ordinary skill in the art to make and use the claimed invention. Further, Taylor knows of no reported case that has ever found a failure to comply with the enablement or claiming requirements of §112 to be inequitable conduct.  (Exh. T ¶ 54); (Exh. JJ.)

131.    There is absolutely no clear and convincing evidence on the record that anyone substantively involved with the prosecution of the '650 patent withheld any material non-cumulative information from the Patent Office with the intent to deceive the Patent Office. (Exh. T ¶ 55.)

132.    There is no evidence that either of the patent attorneys involved with the prosecution of the '650 patent application failed to disclose any material prior art of which they had knowledge during the prosecution of the '650 patent.  (Exh. T ¶ 56.)

## VIII.    THE HOTEL INCIDENT

133.    On or about October 22-23, 2008, Forest River, Inc. ("Forest River") held a private trade show (the "Trade Show") in Elkhart, IN.  (Babcock Dep., Exh. R, p. 56, ll. 9-12.)

134.    Approximately 260 Forest River RV dealers (the "Dealers") attended the Trade Show.  (Babcock Dep., Exh. R, p. 59, ll. 24-25; p. 60., ll 1-13.)

135.     95-97 % of the Forest River Dealers that attended the Trade Show sell other RV company products in addition to Forest River's products.  (Babcock Dep., Exh. R, p. 60, ll. 23-25; p. 61, l. 1.)

136.     Forest River's Vice President of Sales, Jeff Babcock ("Babcock"), served as Forest River's 30(b)(6) corporate representative on all topics related to the Hotel Incident.   Jeff Babcock admits that the Dealers know that Heartland and Forest River are separate entities.  (*See* Exh. P); (Babcock Dep., Exh. R, p 51, ll. 19-25; p. 52, ll. 1-24; p. 411, l. 25;  412, ll. 1-6.)

137.     On the evening of October 22, 2008, Heartland employees Bryan Walczak ("Walczak") and Eric Esch ("Esch") went to the hotels at which the Dealers were staying. (Walczak Aff., Exh. KK, ¶ 7.)

138.     Walczak personally went to the Springhill Suites, Courtyard, Varsity Club, and Hyatt Place hotels.  (Walczak Aff., Exh. KK, ¶ 7.)

139.     At the time he went to the hotels, Walczak was wearing a jacket with a Heartland "North Trail" logo.  (Walczak Aff., Exh. KK, ¶ 8.)

140.     At each hotel Walczak went to, he asked the hotel employees to distribute envelopes containing Heartland promotional materials. At the Springhill Suites, Courtyard, and the Hyatt Place, the employees gave Walczak the room numbers of RV dealers, and he slid the envelopes under the door of those rooms.  At the Varsity Club, the hotel agreed to distribute the envelopes, and he left them at the front desk.  (Walczak Aff., Exh. KK, ¶ 9.)

141.     Delivering packets to a hotel and having them placed under dealers' doors is a normal practice in the RV industry.  (Hoffman Dep., Exh. O, p. 281, ll. 18-24.)

142.     Forest River alleges that "[six to ten dealers were drawn to visit Heartland from the Forest River trade show as a result of the Hotel Action…Forest River and Heartland are in

34

direct competition over Heartland's entire product line.  Thus, any such purchases by a Forest River dealer under these circumstances is most likely to be at the expense of buying similar products from Forest River."  (Exh. JJ, Resp. to No. 8.)

## The Alleged Misrepresentations

143.    Jeff Babcock admits that Forest River has no personal knowledge of what Walczak or Esch said to the employees at the hotels.  (Babcock Dep., Exh. R, p. 317, ll. 9-18)

144.    When he was at the hotels, Walczak did not say or do anything to indicate that he was affiliated with Forest River.  (Walczak Aff., Exh. KK, ¶ 10.)

145.    When he was at the hotels, Walczak did not say or do anything to indicate that the Heartland envelopes were from Forest River. (Walczak Aff., Exh. KK, ¶ 11.)

146.    When he was at the hotels, Walczak did not say or do anything to indicate that the envelopes had to be delivered right away because they were needed for a dealer meeting the next day. (Walczak Aff., Exh. KK, ¶ 12.)

147.    When he was at the hotels, Walczak never avoided any questions about his identity.  (Walczak Aff., Exh. KK, ¶ 13.)

148.    When he was at the hotels, Walczak never avoided any questions asking who the envelopes were from.  (Walczak Aff., Exh. KK, ¶ 14.)

149.    When he was at the hotels, Walczak never avoided any questions asking whether the guests were expecting the envelopes. (Walczak Aff., Exh. KK, ¶ 15.)

150.    When he was at the hotels, Walczak never said or did anything to indicate that he did not know what the envelopes were for.  (Walczak Aff., Exh. KK, ¶ 16.)

151.    In Heartland's Interrogatory No. 9, Heartland asked Forest River to "[i]dentify all misrepresentations or untruthful statements alleged to have been made by Heartland in

connection with the Hotel Action, including but not limited to, any misrepresentations or untruthful statements alleged to have been made by Heartland in an effort to obtain Forest River's customer list in connection with the Hotel Action."  (Heartland's First Interrog. No. 9, Exh. JJ.)

152.    In its answer to Heartland's Interrogatory No. 9, Forest River states that "Heartland told at least the receptionist at the Hyatt Place hotel that the packages were from Forest River and needed to be delivered right away to the dealers since they were important and were needed for a dealer meeting the next day."  But during Babcock's 30(b)(6) deposition, he could not identify the receptionist who allegedly told Forest River that a Heartland employee had made these statements.  (Forest River's Ans. to Heartland's Interrog. No. 9, Exh. JJ); (Babcock Dep., Exh. R, pp. 375, ll. 2-25; p. 376; p. 377, ll. 1-7.)

153.    In its initial and supplemental disclosures, Forest River has not specifically identified a single Hyatt Place employee as having discoverable information.  (*See generally* Forest River's Initial and Supplemental Disclosures, Exh. OO.)

154.    In its answer to Heartland's Interrogatory No. 9, Forest River states that "Heartland mislead the receptionist at Country Inn & Suites into thinking the packages were to go along with the Forest River party in part by his mannerisms and in part by having the specific dealer's name on the cover and asking for a call back to pick up the undeliverable packages." But during Babcock's 30(b)(6) deposition, he could not identify the Country Inn & Suites employee who Forest River alleges was misled by Heartland.  Furthermore, he could not identify an actual false statement or misrepresentation made at the Country Inn & Suites.  (Forest River's Ans. to Heartland's Interrog. No. 9, Exh. JJ; Babcock Dep., Exh. R, p. 375-392).

BDDB01 5894840v1

155.     In its answer to Heartland's Interrogatory No. 9, Forest River states that "Heartland mislead and made false statements to the receptionist at Residence Inn by asking for the room number of the named guests to be looked up and marked on the packages, then evading inquiry about his identity and who the packages were from and if the guests were expecting the packages, and then expressly denying that he knew what the packages were for."  But during Babcock's 30(b)(6) deposition, he could not identify the Residence Inn employee who allegedly informed Forest River that he or she had been misled by a Heartland employee.  (Forest River's Ans. to Heartland's Interrog. No. 9; Babcock Dep., Exh. R, p. 380, ll. 16-24.)

### The Dealers

156.     The only people at the Trade Show and the only people that received Heartland's promotional materials were dealers. (Babcock Dep., Exh. R, p. 411, ll. 14-24.)

157.     The envelopes distributed to the Dealers were marked with a large Heartland logo in the upper corner. (Babcock Dep., Exh. R, p. 74, ll. 2-4); (Walczak Aff., Exh. KK, ¶ 5).

158.     Babcock admits that when the Dealers received the promotional materials, they knew that the materials were from Heartland, not Forest River. (Babcock Dep., Exh. R, p. 412, ll. 7-10.)

159.     Babcock admits that promotional materials alone cannot sell product.  According to Babcock, giving a dealer promotional materials is "not all you have to do…You gotta sell them on the product…You have to talk to the dealer.  You have to go through the product.  You have to feature benefit the product.  You gotta convince that dealer that the product you have sitting in front of him is gonna make him money on his lot." (Babcock Dep., Exh. R, p. 410, ll. 11-19.)

160.    Babcock admits that Forest River has not even talked to its dealers about the Hotel Incident to determine whether they had received a packet, whether they had been confused, or whether they bought product from Heartland as a result of the Hotel Incident.  Babcock testified that Forest River had been busy and that it was "not gonna waste time on talking about that in the past."  (Babcock Dep., Exh. R, p. 399, ll. 6-23; p. 448, ll. 14-25, p. 449, ll. 1-5; p. 453, ll. 3-15.)

161.    During the relevant time period, only two dealers attending the Trade Show, Racetrack RV ("Racetrack") and Loveall RV's ("Loveall"), made purchases from Heartland. Heartland asked its office personnel to compile a list of all orders of Heartland products during the relevant time period.  Heartland then checked to see whether the dealers that had ordered Heartland products during that time period were on the list of dealers who had attended the Forest River Trade Show.  Of the dealers making orders during that time period, only Racetrack and Loveall were on Forest River's list of dealers attending the Trade Show.   (Hoffman Dep., Exh. O, p. 356, ll. 4-23); (Exh. KK.)

162.    Racetrack was a very happy customer of Heartland's prior to the Trade Show. Heartland had prospected Racetrack with respect to its Eagle Ridge line of products prior to the Trade Show, and Racetrack had indicated that they would like to do more business with Heartland.  (Hoffman Dep., Exh. O, p. 356, ll. 24-25; p. 357, ll. 1-21.)

163.    Kenny Maines, owner of Racetrack, came to Heartland's facility on Wednesday, October 22, 2008 before the envelopes were distributed to the hotels.  At that time, Bryan Walczak had a long-standing relationship with Mr. Haines. (Walczak Aff., Exh. KK, ¶ 17.)

164.    Heartland had been prospecting Loveall RV's for six months prior to the Trade Show.  Heartland had performed repeated "drive-bys" and visited Loveall RV's lot.  Loveall RV's

had shown strong interest in buying Heartland's products prior to the Trade Show. (Hoffman Dep., Exh. O, p. 358, ll. 9-25; p. 359, ll. 1-4.)

165.    Forest River's own 30(b)(6) corporate designee, Jeff Babcock, believes that the reason Loveall RV's purchased Heartland's products is because Heartland's prices were very good.  In a deposition, Heartland counsel David Irmscher asked Babcock "so, you believe—your information is that the reason Loveall's bought Heartland's products is because the prices were very—very good; is that right?"  Babcock responded, "Yes, I do believe that's a big part of it, yes."  Mr. Irmscher then immediately asked, "Any other reasons why they bought them?"  Babcock responded, "Price." (Babcock Dep., Exh. R, p. 401, ll. 11-20.)

166.    In early December, 2008, the annual National RV Trade Show was held in Louisville, Kentucky.  (*See* Brady Dep., Exh. I, p. 211, ll. 13-25; p. 212, ll. 1-2.)

BAKER & DANIELS LLP

By:    */s/ David P. Irmscher*
        David P. Irmscher (#15026-02)
        Abigail M. Butler (#22295-02)
        111 East Wayne, Suite 800
        Fort Wayne, Indiana  46802
        Tel: 260.424.8000
        Fax: 260.460.1700
        david.irmscher@bakerd.com
        abigail.butler@bakerd.com

        ATTORNEYS FOR PLAINTIFF,
        HEARTLAND RECREATIONAL
        VEHICLES, LLC

BDDB01 5894840v1

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned counsel for plaintiff Heartland Recreational Vehicles, LLC, hereby

certifies that a copy of the foregoing was served upon the following, this 21st day of December,

2009, by operation of the Court's electronic filing system:

>
> Ryan M. Fountain
> 420 Lincoln Way West
> Mishawaka, Indiana  46544-1902

>
>
> */s/ David P. Irmscher*
> David P. Irmscher

BDDB01 5894840v1