# Tab A

1    A.   Barnes & Thornburg.

2    Q.   And have you been an attorney with Barnes & Thornburg

3         your entire career as an attorney?

4    A.   Yes.

5    Q.   And did you work prior to becoming a -- work

6         full-time prior to becoming an attorney?

7    A.   Yes.

8    Q.   What did you do?

9    A.   Um --

10    Q.   And let's focus on after college.

11    A.   After college, I worked for Bayer Corporation in an

12         iron oxide lab, and I wrote a couple of books.

13    Q.   And during the time that you've been an attorney with

14         Barnes & Thornburg obviously, what has been your

15         practice?

16    A.   Intellectual property.

17    Q.   And do you prepare and prosecute patent applications?

18    A.   Yes.

19    Q.   Is that a regular part of your job?

20    A.   Yes.

21    Q.   Has it been a regular part of your job since you've

22         been with Barnes & Thornburg?

23    A.   Yes.

24    Q.   Have you done -- could you estimate for us how many

25         patent applications you've prosecuted, either

1       vis-a-vis a pickup truck, short bed pickup truck, and

2       the structure in the -- the head.  I don't know what

3       the term is now, um, in the cap of the fifth wheel

4       having recesses to allow greater turn radius.

5   Q.  Did you discuss prior art at that time with

6       Mr. Tuttle?

7           MR. LADUE:  At what time?

8   BY MR. IRMSCHER:

9   Q.  At the time that you were preparing the provisional

10      application?

11  A.  I don't recall.

12  Q.  Okay.  What was your understanding of how this

13      invention was different from the prior art?

14  A.  Are you asking my understanding?

15  Q.  Yes.  Well, you prepared the provisional application,

16      correct?

17  A.  Right.  Yes.

18  Q.  That's what I'm asking.

19  A.  My -- my understanding -- I just didn't hear the

20      first part, sorry.  My understanding was that the

21      prior art didn't have, in the cap, did not have these

22      indentations.  They were squared off.

23  Q.  Could you look at what's been marked --

24          MR. IRMSCHER:  And let me, before we get into

25      this, for the record, can we just make that

1    Cooper Exhibit 2, and we'll just consider all of the

2    pages to be that exhibit to be 1 to -- what is the

3    last page, 636?

4              THE WITNESS:  Correct.

5              MR. IRMSCHER:  Okay.

6              (Whereupon, Plaintiff's Exhibit 2 was

7         marked for identification.)

8    BY MR. IRMSCHER:

9    Q.   Would you take a look at the page that's been marked

10        B&T 276 and 277?

11   A.   (Doing as indicated.)  Okay.

12   Q.   Would you take a minute to review page 276, and let

13        me know when you have done that.

14   A.   (Doing as indicated.)  Okay.

15   Q.   Is page 276 and 277, is that the writing that you

16        were referring to that you received from Mr. Tuttle

17        in connection with preparing the provisional

18        application?

19   A.   Yes.

20   Q.   Okay.  And is this the material that you used, in

21        part, to prepare -- to prepare the provisional

22        application?

23   A.   Yes.

24   Q.   And did you discuss the material in pages 276 and 277

25        with Mr. Tuttle after you reviewed his writing?

1   A.   Yes.

2   Q.   Can you tell us what you discussed, as best you

3        recall?

4   A.   I don't have any specific recollections.  This would

5        be, what, 2004?  Um, but it would be the subject

6        matter here, the improved turn radius and then the

7        structure on how that's accomplished.

8   Q.   Do you recall discussing with Mr. Tuttle the Glendale

9        product?

10  A.   No.  I see that here, and I don't recall.  No, I

11       don't recall at this time what that -- what that was.

12  Q.   Okay.  Did you ever see the Glendale product that you

13       can recall?

14  A.   No, not that I recall.

15  Q.   Would it be fair to say that Mr. Tuttle's writing

16       characterizes the design or the invention as a change

17       in the frame and a change in the end cap?

18  A.   As I read it here, it does say revolutionary concept

19       involves both rethinking how the steel frame of the

20       fifth wheel is designed, and how the fiber --

21       fiberglass front cap is designed.

22  Q.   And after you received 276 and 277, and the

23       photographs and drawings that you talked about, that

24       was the material that you used, along with your

25       discussions with Mr. Tuttle, to prepare the

```
 1         provisional application; is that -- is that correct?

 2         Is that a complete list?

 3    A.   Complete list, I don't know if I can warrant complete

 4         list, but it's -- it's the materials that I recall.

 5    Q.   Yeah.  I mean, I'm not trying to be unfair to you.

 6    A.   No.

 7    Q.   I'm just trying to ask --

 8    A.   I understand.  I just, you know, it is the basic

 9         materials, this written materials, the photographs,

10         drawings, our discussions, typically what --

11    Q.   And the -- the photographs and drawings that you're

12         talking about, I assume are the ones that were

13         incorporated into the provisional, or ones like it,

14         that showed the improved turning radius of the end

15         cap in the truck; is that right?

16    A.   Correct.

17    Q.   And were there also frame drawings as part of that

18         disclosure?

19    A.   I don't recall.  Possibly, but I'd have to look.

20    Q.   At any point in your work for Heartland, did you ever

21         speak with or have any direct communication with

22         Brian Brady?

23    A.   Direct communication, not that I recall.

24    Q.   Okay.  How about with Doug Lantz?

25    A.   Not that I recall.
```

1   Q.   How about with Tim Hoffman?

2   A.   Not that I recall.

3   Q.   How about John Rhymer?

4   A.   Not that I recall.

5   Q.   And those people were the other people that have been

6        named as inventors in this app -- in the utility

7        application.  So it's your testimony that you don't

8        remember any direct communication with any of them,

9        except Mr. Tuttle, correct?

10  A.   Correct.

11  Q.   And I may have asked this, and if I have, I

12       apologize.  Did you have any other contact with

13       anybody at Heartland, other than Mr. Tuttle, in

14       connection with your work?

15  A.   Not that I recall.

16  Q.   Okay.  And did anybody here at Barnes & Thornburg

17       assist you in your work, or did you do it all

18       yourself?  And when I say assist, I mean like a

19       lawyer, not a --

20  A.   Okay.

21  Q.   Yeah.  Were there any other lawyers involved?

22  A.   No, not that I recall.

23  Q.   Okay.  Could I direct your attention to pages B&T 41?

24  A.   Okay.

25  Q.   Does B&T 41 indicate that you provided a draft of the

1    provisional application to Mr. Tuttle for his review?

2  A.  Yes.  That's what it -- this indicates.

3  Q.  And is it your normal practice to provide drafts of

4       patent applications, either provisional or utility,

5       to your clients for them to review?

6  A.  That's correct.

7  Q.  And this would indicate that in this case you in fact

8       did that, correct?

9  A.  Correct.

10  Q.  And looking just a little further back in that same

11       list of pages, would it be fair to say that pages 48

12       through 66 are that draft provisional application, as

13       best you can tell?

14  A.  Not including the reporting letters.

15  Q.  Yeah.  I'm just trying to look at the -- what was in

16       fact the application.

17  A.  Okay.  Keep these in order.

18  Q.  Yeah, please do.

19  A.  48?

20  Q.  48 through 66, I believe is the draft application.  I

21       want you to tell me that.

22  A.  Yes, that appears to be correct.

23  Q.  Okay.  Do you recall any input that you received from

24       Mr. Tuttle with respect to the draft application?

25             MR. LADUE:  At what time?

```
 1   BY MR. IRMSCHER:

 2   Q.  In revising the draft application to prepare it to be

 3       actually filed with the patent office?

 4   A.  Oh, I don't recall.  There could have been.

 5   Q.  Okay.

 6   A.  Well, actually, it does show here that there is no

 7       inventors, so there would be.

 8   Q.  Could you look at B&T page 67?

 9   A.  (Doing as indicated.)

10   Q.  What does that page show?

11   A.  That appears to be the list of inventors.

12   Q.  And is it your testimony that Mr. Tuttle provided you

13       the list of the inventors, and that's what you used

14       for filing the provisional application?

15   A.  Correct.

16   Q.  Did you have any discussions with Mr. Tuttle, or

17       anyone else at Heartland, about what it took to be an

18       inventor?

19   A.  Specific discussions?

20   Q.  Yep.

21   A.  I don't recall that -- well, I don't recall them

22       specifically, but we would have, in order to get this

23       document.

24   Q.  What would you have done?

25   A.  Simply just discussing what an inventor was.  This is
```

1       a provisional application, so there is no claims.

2       Typically an inventor is one who contributes to the

3       invent of concept of the claimed invention.  We are

4       not there yet, so it would just be simply

5       contributing to the subject matter described in the

6       application.

7    Q.  So you would have communicated with Mr. Tuttle that

8       requirement, and he gave -- gives you this list back,

9       is that the way you under -- you recall it going?

10   A.  Correct.

11   Q.  Okay.  Do you remember having any discussion about

12      any particular one of the people on that list, or is

13      it just the list comes back, and that's what you

14      used?

15   A.  I don't recall any discussion.

16   Q.  After the provisional application is filed, how long

17      do you have to file your utility application?

18   A.  One year.

19   Q.  And is it Barnes & Thornburg's regular practice to

20      provide letters reminding the client about the

21      conversion date?  Is that -- do you call it a

22      conversion date?

23   A.  It's not truly a conversion.  I think there is a

24      difference, but --

25   Q.  Well --

```
 1    A.   -- informal discussions, yes, we would.
 2    Q.   So you would provide regular communication to your
 3         client, Heartland in this case --
 4    A.   (Witness nods head.)
 5    Q.   -- about the impending date by which they have to
 6         file the utility application; is that correct?
 7    A.   Correct.
 8    Q.   And that happened here, didn't it?
 9    A.   I believe so.
10    Q.   And the -- the application, utility application, was
11         filed on March 28th, 2005.  Do you recall when it
12         was, or approximately when it was you actually began
13         having conversations with Mr. Tuttle about the
14         utility application?
15    A.   No, I don't recall when we started the discussions.
16         I believe the letters come out, and you guys may know
17         more now than I do, but usually nine months after the
18         provisional filing, so it would be sometime, I
19         assume, shortly after that, is when those discussions
20         happened.
21    Q.   Okay.  And can you tell us, as best you can, what
22         communications you had with Mr. Tuttle?  And again,
23         just to be clear, I'm asking you now about the
24         preparation of the utility application.  Were all
25         your communications with Heartland through Mr. Tuttle
```

1              --

2    A.   Yes.

3    Q.   -- in that time period?

4    A.   Yes.

5    Q.   Okay.  And -- so tell me about what communications

6         you had with Mr. Tuttle, as best you can recall, in

7         connection with preparing the utility application?

8    A.   I don't recall specific discussions, but the

9         discussions we must have had, since it was on file,

10        would be obviously requesting does he want to convert

11        and any details with that.  Often times, and this

12        case would be no different, whether there is anything

13        new to add.  Um, those sorts of -- of discussions.

14   Q.   Do you recall Mr. Tuttle telling you anything in

15        particular, was there something new to add, or any of

16        those type things?

17   A.   I don't recall in particular.  There might have been.

18        I -- I think there may have been more photographs

19        possibly, but again, they would be in the stack.

20   Q.   Could you take a moment and look at B&T 219 and 220,

21        please?

22   A.   (Doing as indicated.)

23   Q.   And just read those for a moment, and let me know

24        when you have done that.

25   A.   (Doing as indicated.)  All set.

1   A.   Yes.

2   Q.   Would you take a look at B&T 80, please.

3   A.   (Doing as indicated.)

4   Q.   And is that -- does B&T 80 appear to be your

5        communication of the draft application?

6   A.   Repeat the question specifically.  I'm sorry.  I was

7        --

8   Q.   I'm just trying to make sure I understand.  Is -- is

9        this the record that shows that you provided the

10       draft application to Mr. Tuttle of Heartland?

11  A.   That's what it appears, yes.

12  Q.   And would you take a moment to look, I believe pages

13       81 through 115 are actually the draft application.

14       Can you verify that for us, please?

15  A.   (Doing as indicated.)  It appears to be the draft.

16  Q.   Okay.  In -- on B&T 80, that page where you provided

17       this material, this draft utility application to

18       Mr. Tuttle, you asked him to let you know if he had

19       any revisions or changes, correct?

20  A.   Correct.

21  Q.   Did you receive any revisions or changes from

22       Mr. Tuttle?

23  A.   That I don't recall.

24  Q.   Okay.  If you had, what -- what would you have done

25       with them?

1    A.   Preparing, yes.  Authorization, no.

2    Q.   Okay.  So what was a little different here, was maybe

3         the authorization came late in the process; is that

4         right?

5    A.   That's my recollection.

6    Q.   Okay.  Would you take a look at B&T pages 143 and

7         144.  And let me know when you have had a chance to

8         review them.

9    A.   (Doing as indicated.)  Okay.

10   Q.   What is B&T 143 and 144?

11   A.   This looks like a reporting letter of the filing of

12        the patent application.

13   Q.   Okay.  And does it, in the text of this letter, tell

14        the inventors and Heartland to provide you with

15        information about prior art?

16   A.   Yes.

17   Q.   Is that a standard practice in your -- in your

18        business to do that?

19   A.   Yes.

20   Q.   Okay.  Did you receive any prior art information from

21        Heartland that you can recall as a result of this

22        letter?

23   A.   Not that I recall.

24   Q.   Okay.  And was the application somewhat incomplete as

25        it was filed?

1    BY MR. IRMSCHER:

2    Q.   Could you review Mr. Brady's signature?  Didn't he

3         sign it on July 2nd?  I think you said the 4th.

4    A.   Did I say that wrong?  Oh, you're correct.  It's

5         July 2nd, '04.

6    Q.   And then pages 156 -- well, page 156 is your

7         response, where you're providing -- filing missing

8         parts; is that correct?  Can you tell me which pages

9         go with 156, how far back it goes?

10   A.   I believe it would be to BT 172, including all the

11        transmittal forms, the whole package.

12   Q.   And that package of material was the material that

13        you filed in order to provide the materials that were

14        missing when you filed the original utility

15        application; is that right?

16   A.   The declaration, correct.

17   Q.   Was there anything else that was missing at that

18        point?

19   A.   That appears it.

20   Q.   Okay.  And at some point after the utility

21        application was filed, you, Barnes & Thornburg,

22        stopped representing Heartland in this matter; is

23        that correct?

24   A.   Correct.

25   Q.   Tell us the circumstances of how that came about.

1   A.   My understanding was that a conflict arose between

2        Heartland, our client, and another client, and

3        because of that conflict, I had to withdraw --

4   Q.   Okay.

5   A.   -- representation.

6   Q.   Would you take a look at B&T 135, and let me know

7        when you have done that?

8   A.   (Doing as indicated.)  Okay.

9   Q.   Does that refresh your recollection that the conflict

10       that you had was with Keystone?

11  A.   Correct.

12  Q.   And that was the conflict you were just referring to

13       as to why it was that Barnes & Thornburg ceased

14       prosecuting this patent, correct?

15  A.   Correct.

16  Q.   Is that the only reason that you know of as to why

17       Barnes & Thornburg stopped prosecuting this patent?

18  A.   Yes.

19  Q.   And at this point, or about this time, in May, June

20       of 2005, you transferred the file to Mr. Gallagher at

21       Baker & Daniels; is that right?

22  A.   That's correct.

23  Q.   Did you have any discussions with Mr. Gallagher in

24       connection with doing that?

25  A.   Yes.

1    Q.  Would you take a look at page 276, B&T 276.

2    A.  (Doing as indicated.)

3    Q.  That's a document we looked at earlier today, and I

4        just want to be certain.  That two-page document came

5        to you from Mr. Tuttle; is that correct?

6    A.  Correct.

7    Q.  All right.  During the break, I asked you to take a

8        look at the prior art, or patents rather, that are

9        included.

10   A.  Take one step back.

11   Q.  Uh-huh.

12   A.  I just wanted to --

13   Q.  Yep.

14   A.  -- see there is some drawings in front.  Okay.  Yes,

15       sorry.

16   Q.  Do you need to clarify or change your testimony?

17   A.  No.

18   Q.  Okay.

19   A.  No.

20   Q.  Again, during the break, I asked you to look through

21       your file and identify the patents that are included

22       in the file.  And have you listed them all out by

23       number?

24   A.  Yes.

25   Q.  And how many patents are included?

 1    A.   14.

 2              MR. IRMSCHER:  And could you make that

 3         Cooper Exhibit 3, please.  Just give you a sheet of

 4         paper.

 5              (Whereupon, Plaintiff's Exhibit 3 was

 6          marked for identification.)

 7    BY MR. IRMSCHER:

 8    Q.   And is Cooper Exhibit 3 the list of the patents that

 9         were included in your file?

10    A.   That we wrote out, correct.

11    Q.   Yeah.  Where did those patents come from?

12    A.   I don't recall where these patents actually came

13         from.

14    Q.   What are the potential sources?

15    A.   The potential sources are either from the client,

16         Mr. Tuttle, or there could be a -- a search that was

17         -- that could have been performed, either a formal

18         search, which I don't think I saw any notification,

19         or reporting out letter that one was done, so that's

20         unlikely, or an informal search, where we were having

21         a discussion, and we looked something up.  Those

22         would be the -- the sources, I think, in this case.

23    Q.   Do you have any recollection of receiving any prior

24         art from the client?

25    A.   I don't have a specific recollection.  We have some,

1    but I don't have a specific recollection.

2    Q.   And I want to be fair to you, but I want to make sure

3         I understand.  You're saying to me, I don't know

4         where these patents that are in the file came from,

5         and these are the sources that are possible; is that

6         -- is that what you're saying?

7    A.   What I said I don't know is I don't recall, being so

8         many years later, I think is a more fair statement.

9    Q.   And they could have come from the client, from a

10        search, or from an informal search?

11   A.   Right.

12   Q.   Okay.  And did you -- do you have any recollection at

13        all of receiving any prior art from any of the

14        competitors of Heartland?

15   A.   No.

16   Q.   Did you ever discuss with anyone withholding any

17        references from the patent office?

18   A.   No.

19   Q.   Did you ever discuss with anyone in characterizing

20        any references in any particular way with respect --

21        with respect to the prosecution of this patent?

22   A.   What do you mean by characterizing?

23   Q.   Did you make any effort to characterize any

24        particular prior art reference in the process of

25        preparing this application?

1    A.   With these in the file, we may have discussed these,

2         but having a recollection of that, I don't.

3    Q.   Okay.  Did you commit inequitable conduct in

4         connection with the prosecution of this patent?

5    A.   As I understand it, no.

6    Q.   And did you ever mislead or mischaracterize any fact

7         to the patent office in connection with the patent,

8         this patent application?

9    A.   Not that I know of, no.

10   Q.   Did you ever discuss, in connection with the

11        prosecution of this patent for Heartland, a reference

12        called The Eliminator reference?

13   A.   I don't know what that is.

14   Q.   How about a Roadmaster reference, same question?

15   A.   No.  I don't -- I think I have heard the word before,

16        but I don't know what that is.

17   Q.   Okay.  Did you ever discuss any V or bullnose, or

18        otherwise tapered trailers, in connection with this

19        patent application?

20   A.   Theirs, Heartland's --

21   Q.   Any other --

22   A.   -- front cap.

23   Q.   Any others?

24   A.   Like a prior art?

25   Q.   Yes.

1    A.    No.

2    Q.    Did you ever discuss any products that were made by

3          Cobra in connection with this patent application, is

4          the same -- is the same question over and over again?

5    A.    No.  Well, and that being the case, it would be more

6          not that I recall for any of this.

7    Q.    Bison, same answer?

8    A.    Correct.

9    Q.    Aluminum Trailer Company?

10   A.    Not that I recall.

11   Q.    Okay.  Sundowner?

12   A.    No.

13   Q.    Do you recall any discussion of a Holiday Rambler

14         product in connection with the prosecution of this

15         patent?

16   A.    Not in connection.  I think I have heard that word

17         before, but I don't recall.

18   Q.    Thanks very much for your testimony.  I don't believe

19         I have any further questions at this time.

20   A.    Okay.

21                      CROSS-EXAMINATION

22   BY MR. FOUNTAIN:

23   Q.    Greg, I want to make sure you understand what the

24         stakes are here today.  Do you understand that the

25         attorneys involved in prosecuting the 650 patent have

1    Heartland case; did it not?

2    A.   It requires you to submit material -- material

3         information.

4    Q.   Yes.  So to do that, you have to know it's material,

5         right?

6    A.   You have to know what's potentially material, because

7         you could be right or wrong.  And if it's potentially

8         material, as you and every prosecutor knows, that

9         because you don't know that right line, you err on

10        the side of submitting it.

11   Q.   Okay.

12   A.   That's how --

13   Q.   In the context of the Heartland patent application,

14        what did you consider to be potentially material at

15        the time that you were handling the case?

16   A.   That -- well, according to the drawings in the

17        patent, the prior art that was submitted, or I'm

18        sorry, that is represented -- I guess I should say

19        admitted in the drawings -- that is what is material,

20        number one.  Number two, as I said before, I don't

21        recall the course of events with this reference.  And

22        three, I had to withdraw before I had a chance to

23        investigate that with an information disclosure

24        statement.

25   Q.   So are you saying you did not make that determination

1    during the course of your handling this case?

2 A.  Well, that's not what I said.  I said I don't recall

3    making the determination.  And that determination you

4    referenced, Rule 56, Rule 56 is the filing of the

5    information disclosure statement.  That comes at

6    first three months after the application is filed.

7    Two, that also continues throughout the prosecution

8    of the file.  I had to withdraw because of conflict

9    in the firm shortly after, whether it's one month,

10   two months, you guys would probably know better than

11   I.  But when you get to prior art, I had to withdraw,

12   so not only am I not sure, but I was not allowed to

13   participate in the process.

14 Q.  And submitting the prior art to the patent office

15   that you did, with regard to that application, you at

16   least made a materiality as to that prior art, right?

17   Materiality determination, right?

18        MR. IRMSCHER:  You talking about the prior art

19   that is in the specification?

20        MR. FOUNTAIN:  Yes.

21        THE WITNESS:  I didn't make a separate

22   materiality, but that's what the prior art was in the

23   situation, where, well, this is material, so I must

24   submit it.  We do that for an information disclosure

25   statement, as I said, that we submit after the filing

# Tab B

## Katt, Zellma

**From:** Scott Tuttle [scott@mail.heartlandrvs.com]
**Sent:** Monday, March 08, 2004 12:01 PM
**To:** Greg Cooper
**Subject:** Heartland Images and Text

**Attachments:** Photos2.pdf; Photos1.pdf; Drawings.PDF; AN IMPROVED 5TH WHEEL TR#16.doc

   

Photos2.pdf (741   Photos1.pdf (653   Drawings.PDF (136 AN IMPROVED 5TH
KB)                KB)                KB)        WHEEL TR#16.do...

Greg,

Thanks for all of your help.   Attached in this and possible subsequent emails
are pdf files, a word document and images for use in filing our provisional patent.

Let me know if anything needs to be resent.

Scott Tuttle

B&T 002



Top View



Side View



View from Below the Cap



Front View



Heartland's design allows for a wider, increased turning radius on shortbed extended cab pick-up trucks.



With other units this is the "crunch zone". With Heartland's improved turning radius, it is not an issue.



90° ANGLE ON CORNER

FRONT OF COACH

TYPICAL CONSTRUCTION

45° ANGLE AT CORNER

FRONT OF COACH

HEARTLAND CONSTRUCTION

HEARTLAND RV
21868 PAUL DRIVE
ELKHART, IN 46514

HEARTLAND PATENT INFORMATION

DRAWN BY: C. MYERS

DWG. NO. HFP-0001

REV. 1

LANDMARK

SHEET 1 OF 4

DATE:

DIMENSIONS ARE IN INCHES
TOLERANCES:
FRACTIONAL: ±
ANGULAR: MACH'S   BEND ±
TWO PLACE DECIMAL ±
THREE PLACE DECIMAL ±

THIS DOCUMENT CONTAINS
SECRETS, CONFIDENTIAL AND
PROPRIETARY INFORMATION.
ANY UNAUTHORIZED USE,
REPRODUCTION OR
DISCLOSURE OF INFORMATION
WITHOUT WRITTEN APPROVAL
FROM HEARTLAND RV
WILL MEAN LEGAL PROSECUTION.

NO.     BY     REV. DATE     DESCRIPTION          NEXT ASS'Y     USED ON

APPLICATION

B&T 005



90° ANGLE ON CORNER

FRONT OF COACH

TYPICAL CONSTRUCTION

CORNER NOTCHED BACK

FRONT OF COACH

HEARTLAND CONSTRUCTION

HEARTLAND RV
28168 PAUL DRIVE
ELKHART, IN 46514

HEARTLAND PATENT INFORMATION

DRAWN BY: C. MYERS

DWG. NO. HFP-0001

REV. 1

SHEET 2 OF 4

LANDMARK

DATE:

DIMENSIONS ARE IN INCHES
TOLERANCES:
FRACTIONALS:
ANGULAR MACH±1  BEND ±
TWO PLACE DECIMAL ±
THREE PLACE DECIMAL ±

THIS DOCUMENT CONTAINS
SECRET, CONFIDENTIAL AND
PROPRIETARY INFORMATION.
ANY DISCLOSURE OR USE,
REPRODUCTION OR
DISCLOSURE OF INFORMATION
WITHOUT WRITTEN APPROVAL
FROM HEARTLAND RV
WILL MAKE LIABLE REPRODUCTION

NEXT ASSY | USED ON

APPLICATION

BY | REV. DATE

DESCRIPTION

NO.

B&T 006



DIMENSIONS ARE IN INCHES
TOLERANCES:
FRACTIONAL ±
ANGULAR: MACH ± 1    BEND ±
TWO PLACE DECIMAL  ±
THREE PLACE DECIMAL  ±

THIS DOCUMENT CONTAINS
SECRETS, CONFIDENTIAL AND
PROPRIETARY INFORMATION.
ANY UNAUTHORIZED USE,
REPRODUCTION OR
DISCLOSURE OF INFORMATION
WITHOUT WRITTEN APPROVAL
FROM HEARTLAND RV
WILL HAVE LEGAL PROSECUTION.

HEARTLAND RV
28668 PHILL DRIVE
ELKHART, IN 46514

HEARTLAND PATENT INFORMATION

DRAWN BY  C. MYERS    DWG. NO.  HFP-0001    REV.  1

DATE:

LANDMARK

SHEET 3 OF 4

| NO. | DESCRIPTION | BY | REV. DATE | NEXT ASSY | USED ON |
|-----|-------------|----|-----------|-----------|---------|
|     |             |    |           |           |         |
|     |             | APPLICATION |    |    |    |

B&T 007



DETAIL A
SCALE 1 : 6

DIMENSIONS ARE IN INCHES
TOLERANCES:
FRACTIONAL ±
ANGULAR: MACH ±    BEND ±
TWO PLACE DECIMAL ±
THREE PLACE DECIMAL ±

THIS DOCUMENT CONTAINS
SECRETS, CONFIDENTIAL AND
PROPRIETARY INFORMATION
ANY UNAUTHORIZED USE,
REPRODUCTION OR
DISCLOSURE OF INFORMATION
WITHOUT WRITTEN APPROVAL
FROM HEARTLAND RV
IS SUBJECT TO PROSECUTION.

HEARTLAND RV
28860 PAUL DRIVE
ELKHART, IN 46514

HEARTLAND PATENT INFORMATION

DRAWN BY: C. MYERS

DWG. NO. HFP-0001

REV. 1

SHEET 1 OF 6

LANDMARK

DATE:

| NO. | REV./ DATE | DESCRIPTION | BY |
|-----|------------|-------------|-----|

NEXT ASSY    USED ON

APPLICATION

B&T 008

# AN IMPROVED 5TH WHEEL TRAILER:

## 1. ASSEMBLY FOR INCREASING THE TURNING RADIUS OF A FIFTH WHEEL TRAILER ATTACHED TO A TRUCK.

### THE PROBLEM:

In today's marketplace, short bed pick-up trucks with extended cab areas (also referred to as crew cabs) are becoming more and more popular. *(Note: The problem with the traditional long bed pick-ups is they have become so large, especially with extended cab areas, that they cannot fit into most residential garages, or even fit into most standard commercial size parking spaces. Because of this, 5th wheel owners would much rather own a tow vehicle that allows them to more easily navigate driving and parking when not attached to their unit. Thus, the growing popularity of the short bed pick-ups).* While the new short bed truck configurations with extended cabs offer increased seating capacity and comfort, they have become problematic when being used as tow vehicles for 5th wheel trailers.

The shorter truck beds have resulted in a decreased distance between the cab of the truck and the front fiberglass cap of the 5th wheel they are towing. This has significantly diminished the turning radius of the truck when the 5th wheel is attached or being towed.

Because of this diminished turning radius, there have been a number of incidents where 5th wheel owners who tow with short bed pick-up trucks have turned or backed up too sharply, causing the cab of their truck to hit the corner of their 5th wheel in the fiberglass front cap area – resulting in extensive damage to both the fiberglass cap of the 5th wheel and the cab of the truck.

Warnings and informative articles regarding this situation are now commonplace in industry publications, including Rving magazines and manufacturer's vehicle support materials.

### THE SOLUTION:

Heartland Recreational Vehicles, LLC has engineered a unique new 5th wheel concept that dramatically improves the turning radius of today's short bed pick-up trucks with extended cabs when attached to a 5th wheel trailer. This revolutionary concept involves both rethinking how the steel frame of the 5th wheel is designed, as well as the how the it's fiberglass front cap design flows in relationship to the frame.

The first step was cutting off the corners of the upper front section of the frame instead of extending them all of the way out at a 90° angle, as is the case in a traditional 5th wheel frame design. By angling the frame back at the corners, and incorporating a sweeping design in the fiberglass front cap that flows back and over that section of the frame where the void from cutting off the corner has been created, we have essentially "cut off" the lower corners of the front of the 5th wheel, resulting in a 30%+ increased turning radius when attached to a short bed pick-up truck with an extended cab.

*(GREG    Note: There is a Canadian RV manufacturer named Glendale who makes the Titanium 5th wheel. They have received a patent on their design of a coach that actually goes over the cab of a short bed truck. The crux of their patent – we have had this researched and examined by attorneys – is the fact that they go over the cab of the truck with their unit. While they are selling a lot of these units, no one here in the states has found a way around their patent. Why do I bring this up? They did this to improve the turning radius of a 5th wheel being towed by a short bed truck. It is a strange looking unit, but the fact that they received a patent specifically to help improve the turning radius of their units attached to short bed pick-up trucks should add to the legitimacy of our case for getting a patent on our design to accomplish the same thing. The problem is the same –but our approach to the solution and designs are very different.)*

## 2. A MULTI-PURPOSE UTILITY STATION ENCOMPASSED WITHIN ONE SINGLE COMPARTMENT.

**THE PROBLEM:**

5th wheel trailers typically have up to a dozen separate utility or systems access points and compartments located on the off-door side of the unit. These compartments house everything from outside showers, electrical receptacles, water fills, dump valves, cable jacks, phone jacks, water manifold distribution panels, water tank flush kits and more. With today's 5th wheels featuring two to three slide-out rooms on the off-door side of the unit, these utility/systems doors and compartments are spread out even more - being placed at numerous, hard to reach locations across the off-door sidewall. Because the 5th wheel owner must access most, if not all, of these different compartments and doors to properly utilize their 5th wheel during their camping experience, their varying locations and locking mechanisms have become both problematic and inconvenient. In this particular aspect of 5th wheel living, today's 5th wheels are more inconvenient and user-unfriendly than ever.

**THE SOLUTION:**

Heartland Recreational Vehicles, LLC has engineered a unique new single door utility area that incorporates nearly all of the systems and access points needed to properly utilize a 5th wheel trailer during the camping experience, dramatically improving the convenience level for our owners. Systems and access points incorporated in the Heartland 5th wheel single door utility area include a hot and cold water manifold distribution center, 110V and 12V electrical power centers, cable TV hook-up, satellite hook-up, phone jack, CAT-5 jack, water fill, tank flush system, quick disconnect water sprayer, pull handles for all holding tanks, liquid soap dispenser, paper towel holder, disposable rubber glove dispenser, a 12V light and more – all in one, conveniently located and accessible compartment! No longer with 5th wheel owners have to get down on their hands and knees to access or operate their coach systems.

*(GREG – Note: This concept has been accomplished in some higher end Class A motorhomes (motorized units), but never before in a fifth wheel or travel trailer (towables) unit.)*

**Katt, Zellma**

| | |
|---|---|
| **From:** | Greg Cooper |
| **Sent:** | Monday, March 08, 2004 2:21 PM |
| **To:** | Diane Fulton |
| **Subject:** | Fwd: Heartland Images and Text |

**Attachments:** Photos2.pdf; Photos1.pdf; Drawings.PDF; AN IMPROVED 5TH WHEEL TR#16.doc

   

Photos2.pdf (741   Photos1.pdf (653   Drawings.PDF (136   AN IMPROVED 5TH
KB)                KB)                KB)                WHEEL TR#16.do...

please print in color.   Thanks

>>> "Scott Tuttle" <scott@mail.heartlandrvs.com> 03/08/04 12:01PM >>>
Greg,
Thanks for all of your help.   Attached in this and possible subsequent emails
are pdf files, a word document and images for use in filing our provisional patent.

Let me know if anything needs to be resent.

Scott Tuttle

B&T 011



Top View



Side View



View from Below the Cap



Front View



Heartland's better
maneuverability with
improved turning radius
and reduced exterior ...



With other units
this is the
"crunch zone".
With Heartland's
improved turning
radius, it is
not an issue.



FRONT OF COACH

90° ANGLE ON CORNER

TYPICAL CONSTRUCTION

FRONT OF COACH

45° ANGLE AT CORNER

HEARTLAND CONSTRUCTION

HEARTLAND RV
28868 PAUL DRIVE
ELKHART, IN 46514

HEARTLAND PATENT INFORMATION

DRAWN BY: C. MYERS     DWG. NO. HFP-0001     REV. 1

DATE:     LANDMARK     SHEET 1 OF 4

DIMENSIONS ARE IN INCHES
TOLERANCES:
FRACTIONAL ±
ANGULAR MACH ±    BEND ±
TWO PLACE DECIMAL ±
THREE PLACE DECIMAL ±

THIS DOCUMENT CONTAINS
SECRETS, CONFIDENTIAL AND
PROPRIETARY INFORMATION.
ANY UNAUTHORIZED USE,
DISCLOSURE OR INFORMATION
REPRODUCTION OR
WITHOUT WRITTEN APPROVAL
FROM HEARTLAND RV
WILL WARRANT PROSECUTION.

| NO. | DESCRIPTION | BY | REV. DATE | NEXT ASSY | USED ON |
|---|---|---|---|---|---|
| | | | | | |
| | | | APPLICATION | | |

B&T 014



90° ANGLE ON CORNER

FRONT OF COACH

TYPICAL CONSTRUCTION

CORNER NOTCHED BACK

FRONT OF COACH

HEARTLAND CONSTRUCTION

HEARTLAND RV
2305685 PAUL DRIVE
ELKHART, IN 46514

HEARTLAND PATENT INFORMATION

DWG. NO. HFP-0001    REV. 1

LANDMARK

DRAWN BY: C. MYERS

DATE:

DIMENSIONS ARE IN INCHES
TOLERANCES:
FRACTIONAL ±
ANGULAR: MACH± BEND ±
TWO PLACE DECIMAL ±
THREE PLACE DECIMAL ±

THIS DOCUMENT CONTAINS
SECRETS, CONFIDENTIAL AND
PROPRIETARY INFORMATION
ANY UNAUTHORIZED USE,
REPRODUCTION OR
DISCLOSURE OF INFORMATION
WITHOUT WRITTEN APPROVAL
FROM HEARTLAND IS PROHIBITED.
WILL-AMERICA REPRODUCTION.

| NO. | DESCRIPTION | BY | REV. DATE | NEXT ASSY | USED ON |
|-----|-------------|----|-----------|-----------|---------|
| | | | | | |

APPLICATION

B&T 015



HEARTLAND RV
28868 PAUL DRIVE
ELKHART, IN 46514

HEARTLAND PATENT INFORMATION

DIMENSIONS ARE IN INCHES
TOLERANCES:
FRACTIONAL±
ANGULAR: MACH± BEND ±
TWO PLACE DECIMAL ±
THREE PLACE DECIMAL ±

THIS DOCUMENT CONTAINS
SECRETS, CONFIDENTIAL AND
PROPRIETARY INFORMATION.
ANY UNAUTHORIZED
REPRODUCTION OR
DISCLOSURE OR INFORMATION
WITHOUT WRITTEN APPROVAL
FROM HEARTLAND RV
INCLUDING AND REPRODUCTION

DRAWN BY: C. MYERS

DWG. NO. HFP-0001

DATE:

LANDMARK

REV. 1

SHEET 2 OF 4

NEXT ASSY USED ON
APPLICATION

NO    DESCRIPTION    BY    REV. DATE

B&T 016



DETAIL A
SCALE 1 : 6

HEARTLAND RV
23868 PAUL DRIVE
ELKHART, IN 46514

HEARTLAND PATENT INFORMATION

DRAWN BY: C. MYERS

DWG. NO. HFP-0001

REV. 1

SHEET 1 OF 1

LANDMARK

DATE:

DIMENSIONS ARE IN INCHES
TOLERANCES:
FRACTIONAL ±
ANGULAR: MACH ± BEND ±
TWO PLACE DECIMAL ±
THREE PLACE DECIMAL ±

THIS DOCUMENT CONTAINS
SECRET, CONFIDENTIAL AND
PROPRIETARY INFORMATION
ANY UNAUTHORIZED USE,
REPRODUCTION OR
DISCLOSURE OF INFORMATION
WITHOUT WRITTEN APPROVAL
FROM HEARTLAND RV
WILL HARM HEARTLAND ASSOCIATION.

| NO. | | BY | REV. | DATE | NEXT ASSY. | USED ON | DESCRIPTION |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

APPLICATION

B&T 017

# AN IMPROVED 5TH WHEEL TRAILER:

## 1. ASSEMBLY FOR INCREASING THE TURNING RADIUS OF A FIFTH WHEEL TRAILER ATTACHED TO A TRUCK.

### THE PROBLEM:

In today's marketplace, short bed pick-up trucks with extended cab areas (also referred to as crew cabs) are becoming more and more popular. *(Note: The problem with the traditional long bed pick-ups is they have become so large, especially with extended cab areas, that they cannot fit into most residential garages, or even fit into most standard commercial size parking spaces. Because of this, 5th wheel owners would much rather own a tow vehicle that allows them to more easily navigate driving and parking when not attached to their unit. Thus, the growing popularity of the short bed pick-ups).*
While the new short bed truck configurations with extended cabs offer increased seating capacity and comfort, they have become problematic when being used as tow vehicles for 5th wheel trailers.
The shorter truck beds have resulted in a decreased distance between the cab of the truck and the front fiberglass cap of the 5th wheel they are towing. This has significantly diminished the turning radius of the truck when the 5th wheel is attached or being towed.
Because of this diminished turning radius, there have been a number of incidents where 5th wheel owners who tow with short bed pick-up trucks have turned or backed up too sharply, causing the cab of their truck to hit the corner of their 5th wheel in the fiberglass front cap area – resulting in extensive damage to both the fiberglass cap of the 5th wheel and the cab of the truck.
Warnings and informative articles regarding this situation are now commonplace in industry publications, including Rving magazines and manufacturer's vehicle support materials.

### THE SOLUTION:

Heartland Recreational Vehicles, LLC has engineered a unique new 5th wheel concept that dramatically improves the turning radius of today's short bed pick-up trucks with extended cabs when attached to a 5th wheel trailer. This revolutionary concept involves both rethinking how the steel frame of the 5th wheel is designed, as well as the how the it's fiberglass front cap design flows in relationship to the frame.
The first step was cutting off the corners of the upper front section of the frame instead of extending them all of the way out at a 90° angle, as is the case in a traditional 5th wheel frame design. By angling the frame back at the corners, and incorporating a sweeping design in the fiberglass front cap that flows back and over that section of the frame where the void from cutting off the corner has been created, we have essentially "cut off" the lower corners of the front of the 5th wheel, resulting in a 30%+ increased turning radius when attached to a short bed pick-up truck with an extended cab.

*(GREG   Note: There is a Canadian RV manufacturer named Glendale who makes the Titanium 5th wheel. They have received a patent on their design of a coach that actually goes over the cab of a short bed truck. The crux of their patent – we have had this researched and examined by attorneys – is the fact that they go over the cab of the truck with their unit. While they are selling a lot of these units, no one here in the states has found a way around their patent. Why do I bring this up? They did this to improve the turning radius of a 5th wheel being towed by a short bed truck. It is a strange looking unit, but the fact that they received a patent specifically to help improve the turning radius of their units attached to short bed pick-up trucks should add to the legitimacy of our case for getting a patent on our design to accomplish the same thing. The problem is the same –but our approach to the solution and designs are very different.)*

## 2. A MULTI-PURPOSE UTILITY STATION ENCOMPASSED WITHIN ONE SINGLE COMPARTMENT.

**THE PROBLEM:**

5th wheel trailers typically have up to a dozen separate utility or systems access points and compartments located on the off-door side of the unit. These compartments house everything from outside showers, electrical receptacles, water fills, dump valves, cable jacks, phone jacks, water manifold distribution panels, water tank flush kits and more. With today's 5th wheels featuring two to three slide-out rooms on the off-door side of the unit, these utility/systems doors and compartments are spread out even more - being placed at numerous, hard to reach locations across the off-door sidewall. Because the 5th wheel owner must access most, if not all, of these different compartments and doors to properly utilize their 5th wheel during their camping experience, their varying locations and locking mechanisms have become both problematic and inconvenient. In this particular aspect of 5th wheel living, today's 5th wheels are more inconvenient and user-unfriendly than ever.

**THE SOLUTION:**

Heartland Recreational Vehicles, LLC has engineered a unique new single door utility area that incorporates nearly all of the systems and access points needed to properly utilize a 5th wheel trailer during the camping experience, dramatically improving the convenience level for our owners. Systems and access points incorporated in the Heartland 5th wheel single door utility area include a hot and cold water manifold distribution center, 110V and 12V electrical power centers, cable TV hook-up, satellite hook-up, phone jack, CAT-5 jack, water fill, tank flush system, quick disconnect water sprayer, pull handles for all holding tanks, liquid soap dispenser, paper towel holder, disposable rubber glove dispenser, a 12V light and more – all in one, conveniently located and accessible compartment! No longer with 5th wheel owners have to get down on their hands and knees to access or operate their coach systems.

*(GREG – Note: This concept has been accomplished in some higher end Class A motorhomes (motorized units), but never before in a fifth wheel or travel trailer (towables) unit.)*

## Katt, Zellma

**From:** Greg Cooper
**Sent:** Monday, March 08, 2004 5:33 PM
**To:** Tolar, Stacey
**Subject:** Fwd: Heartland Images and Text

**Attachments:** Photos2.pdf; Photos1.pdf; Drawings.PDF; AN IMPROVED 5TH WHEEL TR#16.doc

      

Photos2.pdf (741 KB)  Photos1.pdf (653 KB)  Drawings.PDF (136 KB)  AN IMPROVED 5TH WHEEL TR#16.do...

>>> "Scott Tuttle" <scott@mail.heartlandrvs.com> 03/08/04 12:01PM >>>
Greg,
Thanks for all of your help.   Attached in this and possible subsequent emails
are pdf files, a word document and images for use in filing our provisional patent.

Let me know if anything needs to be resent.

Scott Tuttle

B&T 020



Top View



Side View



View from Below the Cap



Front View

B&T 021



Heartland's design
allows for a major
increase in turning Radius
on shortbed extended cab
pick-up trucks.



With other units
this is the
"crunch zone".
With Heartland's
improved turning
radius, it is
not an issue.

90° ANGLE ON CORNER

FRONT OF COACH

TYPICAL CONSTRUCTION

45° ANGLE AT CORNER

FRONT OF COACH

HEARTLAND CONSTRUCTION

HEARTLAND RV
28868 PAUL DRIVE
ELKHART, IN 46514

HEARTLAND PATENT INFORMATION

DRAWN BY: C. MYERS

DWG. NO. HFP-0001

REV. 1

SHEET 1 OF 1

LANDMARK

DATE

DIMENSIONS ARE IN INCHES
TOLERANCES:
FRACTIONAL ±
ANGULAR: MACH'± BEND ±
TWO PLACE DECIMAL ±
THREE PLACE DECIMAL ±

THIS DOCUMENT CONTAINS
SECRET, CONFIDENTIAL AND
PROPRIETARY INFORMATION.
ANY UNAUTHORIZED USE,
REPRODUCTION OR
DISCLOSURE OF INFORMATION
WITHOUT WRITTEN APPROVAL
FROM HEARTLAND RV
MCLLC IS PROHIBITED.

| NO. | REV. DATE | BY | DESCRIPTION |
|-----|-----------|----|----|
| | | | |

| NEXT ASS'Y | USED ON |
|-----|-----|
| APPLICATION | |

B&T 023



90° ANGLE ON CORNER

FRONT OF COACH

TYPICAL CONSTRUCTION

CORNER
NOTCHED BACK

FRONT OF COACH

HEARTLAND CONSTRUCTION

HEARTLAND RV
28868 PAUL DRIVE
ELKHART, IN 46514

HEARTLAND PATENT INFORMATION

DRAWN BY: C. MYERS

DATE:

DWG. NO. HFP-0001

REV. 1

LANDMARK

SHEET 1 OF 4

DIMENSIONS ARE IN INCHES
TOLERANCES:
FRACTIONAL±
ANGULAR: MACH±    BEND ±
TWO PLACE DECIMAL  ±
THREE PLACE DECIMAL ±

THIS DOCUMENT CONTAINS
SECRET, CONFIDENTIAL AND
PROPRIETARY INFORMATION.
ANY UNAUTHORIZED USE,
REPRODUCTION OR
DISCLOSURE OF INFORMATION
HEREUNDER WITHOUT APPROVAL
FROM HEARTLAND RV
WILL VIOLATE REPRODUCTION.

USED ON

NEXT ASSY

APPLICATION

NO.    DESCRIPTION    BY    REV. DATE

B&T 024



HEARTLAND RV
20868 PLAX DRIVE
ELKHART, IN 46514

HEARTLAND PATENT INFORMATION

DRAWN BY: C. MYERS
DATE:

DWG. NO: HFP-0001
REV: 1
SHEET 1 OF 4

LANDMARK

DIMENSIONS ARE IN INCHES
TOLERANCES:
FRACTIONAL ±
ANGULAR: MACH ±   BEND ±
TWO PLACE DECIMAL ±
THREE PLACE DECIMAL ±

THIS DOCUMENT CONTAINS
SECRET, CONFIDENTIAL AND
PROPRIETARY INFORMATION.
ANY UNAUTHORIZED USE,
DISCLOSURE OF INFORMATION OR
REPRODUCTION OR
APPLICATION OF
WITHOUT WRITTEN APPROVAL
FROM HEARTLAND RV
WILL IMPLICATE PROSECUTION.

NO. | BY | REV | DATE | DESCRIPTION | NEXT ASSY | USED ON

APPLICATION

B&T 025



DETAIL A
SCALE 1 : 6

HEARTLAND RV
28868 PAUL DRIVE
ELKHART, IN 46514

HEARTLAND PATENT INFORMATION

| DRAWN BY: | C. MYERS | DWG. NO. | HFP-0001 | REV | 1 |
| DATE: | | | LANDMARK | SHEET 1 OF 1 |

DIMENSIONS ARE IN INCHES
TOLERANCES:
FRACTIONAL±
ANGULAR: MACH± BEND ±
TWO PLACE DECIMAL ±
THREE PLACE DECIMAL ±

THIS DOCUMENT CONTAINS
SECRET, CONFIDENTIAL AND
PROPRIETARY INFORMATION
ANY UNAUTHORIZED USE,
REPRODUCTION OR
DISCLOSURE OF INFORMATION
WITHOUT WRITTEN APPROVAL
FROM HEARTLAND RV
WILL BE ILLEGAL AND INVOLVE LEGAL ACTION.

| NO. | DESCRIPTION | BY | REV DATE | NEXT ASS'Y | USED ON |
| APPLICATION |

B&T 026

## 2. A MULTI-PURPOSE UTILITY STATION ENCOMPASSED WITHIN ONE SINGLE COMPARTMENT.

**THE PROBLEM:**

5th wheel trailers typically have up to a dozen separate utility or systems access points and compartments located on the off-door side of the unit. These compartments house everything from outside showers, electrical receptacles, water fills, dump valves, cable jacks, phone jacks, water manifold distribution panels, water tank flush kits and more. With today's 5th wheels featuring two to three slide-out rooms on the off-door side of the unit, these utility/systems doors and compartments are spread out even more - being placed at numerous, hard to reach locations across the off-door sidewall. Because the 5th wheel owner must access most, if not all, of these different compartments and doors to properly utilize their 5th wheel during their camping experience, their varying locations and locking mechanisms have become both problematic and inconvenient. In this particular aspect of 5th wheel living, today's 5th wheels are more inconvenient and user-unfriendly than ever.

**THE SOLUTION:**

Heartland Recreational Vehicles, LLC has engineered a unique new single door utility area that incorporates nearly all of the systems and access points needed to properly utilize a 5th wheel trailer during the camping experience, dramatically improving the convenience level for our owners. Systems and access points incorporated in the Heartland 5th wheel single door utility area include a hot and cold water manifold distribution center, 110V and 12V electrical power centers, cable TV hook-up, satellite hook-up, phone jack, CAT-5 jack, water fill, tank flush system, quick disconnect water sprayer, pull handles for all holding tanks, liquid soap dispenser, paper towel holder, disposable rubber glove dispenser, a 12V light and more – all in one, conveniently located and accessible compartment! No longer with 5th wheel owners have to get down on their hands and knees to access or operate their coach systems.

*(GREG – Note: This concept has been accomplished in some higher end Class A motorhomes (motorized units), but never before in a fifth wheel or travel trailer (towables) unit.)*

**Katt, Zellma**

| | |
|---|---|
| **From:** | Greg Cooper |
| **Sent:** | Monday, March 08, 2004 2:24 PM |
| **To:** | Diana Fulton |
| **Subject:** | Fwd: Heartland |

**Attachments:** SideView.jpg; FrontView.jpg; Below Cap.jpg

  

SideView.jpg (363    FrontView.jpg (368   Below Cap.jpg (251
    KB)        KB)        KB)

please print in color.   Thanks.

>>> "Scott Tuttle" <scott@mail.heartlandrvs.com> 03/08/04 12:11PM >>>
Photos alone

B&T 028

Side View

B&T 029



Front View

B&T 030



View from Below the Cap

B&T 031

**Katt, Zellma**

| | |
|---|---|
| **From:** | Greg Cooper |
| **Sent:** | Monday, March 08, 2004 2:28 PM |
| **To:** | Diana Fulton |
| **Subject:** | Fwd: Heartland |

**Attachments:** TopView.jpg; Truck2.jpg; Truck6.jpg

  

TopView.jpg (403   Truck2.jpg (319 KB)Truck6.jpg (385 KB)
KB)

please print in color.  Thanks

>>> "Scott Tuttle" <scott@mail.heartlandrvs.com> 03/08/04 12:31PM >>>

B&T 032

Top View

B&T 033



With other units this is the "crunch zone". With Heartland's improved turning radius, it is not an issue.

B&T 034



Heartland's design allows for a 30%+ Increase in Turning Radius on shortbed, extended cab pick-up trucks.

B&T 035

## Katt, Zelima

| | |
|---|---|
| **From:** | Greg Cooper |
| **Sent:** | Monday, March 08, 2004 2:26 PM |
| **To:** | Diana Fufton |
| **Subject:** | Fwd: Heartland - one more... |

**Attachments:** PinPlacement.jpg


PinPlacement.jpg
(442 KB)

        please print in color

>>> "Scott Tuttle" <scott@mail.heartlandrvs.com> 03/08/04 01:05PM >>>
Here is a new pin placement image with degree of angles noted.

ST

B&T 036



| | |
|---|---|
| **From:** | Greg Cooper |
| **Sent:** | Thursday, March 11, 2004 11:03 AM |
| **To:** | Diana Fulton |
| **Subject:** | Fwd: HEARTLAND |

**Attachments:** San. Door.jpg; SaniST.jpg

  

San. Door.jpg (227 SaniST.jpg (565 KB)
KB)

               please print these in color.   Thanks

>>> "Scott Tuttle" <scott@mail.heartlandrvs.com> 03/10/04 02:59PM >>>
Greg,
Attached are photos of our sanitation station.

Scott

**B&T 038**



B&T 039



B&T 040

**Katt, Zellma**

From:        Stacey Tolar [stolar@BTLaw.com]
Sent:        Thursday, March 11, 2004 4:19 PM
To:          scott@heartlandrvs.com
Subject:     Draft of Provisional Patent Application for Improved Fifth Wheel Trailer - Our Ref. 82757

Attachments:   Small Entity Statement - 82757.DOC; Letter sending draft application to Scott Tuttle - 82757.DOC; Fifth Wheel Provisional Application - 82757.DOC; Figures 1-15.zip

   

Small Entity   Letter sending draft   Fifth Wheel   Figures 1-15.zip
Statement - 82757..   applicati...   Provisional Applic...   (937 KB)

Attached are a letter, Small Entity Statement, draft application for the Improved Fifth Wheel Trailer, and Figures 1-15. Should you have any problems opening any of the attachments, please advise us of the same.

Greg Cooper
260-425-4660
gcooper@btlaw.com

B&T 041

# BARNES & THORNBURG

http://www.btlaw.com

600 One Summit Square
Fort Wayne, IN 46802-3119

Switchboard: (260) 423-9440
Fax: (260) 424-8316
Direct Dial: (260) 425-4660
E-mail: gcooper@btlaw.com

Gregory S. Cooper

March 11, 2004

VIA E-MAIL: scott@hearlandrvs.com

Mr. Scott Tuttle
VP Marketing & Dealer Services
Heartland Recreational Vehicles, LLC
28868 Paul Drive
Elkhart, Indiana 46514

Re:     New U.S. Provisional Patent Application
        Title: "Improved Fifth Wheel Trailer"
        Our Ref.: 82757

Dear Scott:

Enclosed is a draft of a provisional patent application for the above-identified invention. Each inventor should review this draft for completeness and accuracy, and provide us with comments or suggestions concerning any changes deemed necessary or desirable. Please verify that all examples described in the application are accurate and operative and that the best mode contemplated of carrying out the invention is clearly set forth.

Please advise us of any necessary revisions or additions to the text or drawings of the enclosed provisional application. Filing a provisional application in the U.S. Patent and Trademark Office provides a filing date for the subject matter described in the provisional application. **Therefore, it is important that all available subject matter pertaining to the titled invention be included in this provisional application.**

Please provide us with the following information for each inventor:

1.      Full name (including middle name) of each inventor;

2.      Physical residence address of each inventor (i.e., street address, city, state and zip code);

Chicago    Elkhart    Fort Wayne    Grand Rapids    Indianapolis    South Bend    Washington, D.C.

B&T 043

3.     Residence mailing address of each inventor (if different from the physical residence address, e.g., a P. O. Box, etc.);

4.     The inventor's citizenship.

We will revise the application per each inventor's comments and suggestions and send you a revised draft. After your review and approval of the revised draft, the provisional application will be placed in final form and filed in the U.S. Patent and Trademark Office. Please read the important information about **Patent Office Filing Deadlines** and **Foreign Patent Protection** provided on the enclosed sheets.

Let us know as soon as possible if the application should be assigned and, if so, to what entity. Also, please let us know whether or not the application will be entitled to small entity status. To claim small entity status, please complete and sign the attached Small Entity Request Form and return it to us as soon as possible.

If you are interested in obtaining patent coverage in any foreign countries, please advise so that we may discuss the requirements and deadlines for doing so. We cannot initiate the filing of any foreign patent applications without your written authorization.

If you have any questions or comments regarding the enclosed draft provisional application, the obligations of an inventor, foreign filing, or the enclosed information sheets, please call. We look forward to receiving your comments soon.

Sincerely,

BARNES & THORNBURG

Gregory S. Cooper

GSC:set
Enclosure

FWDS01 GSC 181029_1

B&T 044

**Katt, Zellma**

Greg,
Here is our information for the names and addesses of those who need to go on the
invention trademark application.

ST

Brian R. Brady
22664 Weatherby Lane
Elkhart, IN 46514
U.S. Citizen

John Mitchell Rhymer
6462 W. 900 N.
Nappanee, IN 46550
U.S. Citizen

Douglas Martin Lantz
13562 Shavano Peak Dr.
Middlebury, IN 46540
U.S. Citizen

Timothy Arthur Hoffman
10819 Volinia Dr.
Osceola, IN 46561
U.S. Citizen

Scott James Tuttle
56830 Brightwood Blvd.
Elkhart, IN 46516
U.S. Citizen

**Katt, Zelima**

From:           Greg Cooper
Sent:           Friday, March 25, 2005 5:51 PM
To:             scott@heartlandrvs.com
Subject:        Draft Trailer Patent Application

Attachments:    193446_1.DOC; drawings.zip



193446_1.DOC     drawings.zip (562
(135 KB)              KB)

                              Scott:

Attached is a very rough draft of the trailer application along with the draft
drawings.  Please bear in mind the application still requires revision for both grammar
and content.  Simply review the application for any glaring errors or omissions.  Also,
you will note that figs. 14 and 15 are not labeled with reference numerals.  The final
version will be labeled appropriately.

As I mentioned, if you have any revisions, please feel free to email or fax them.  We
will however, be preparing the final application for filing on Monday.  Thus, all
changes must be received by 9:00AM on Monday.  As always, if you have any questions,
please do not hesitate to contact me.  Thank you.

Regards,
Greg


Greg Cooper
Barnes & Thornburg
600 One Summit Square
Fort Wayne IN 46802
(260) 425-4660
gcooper@btlaw.com

600 One Summit Square
Fort Wayne, IN 46802-3119 U.S.A.
(260) 423-9440
Fax (260) 424-8316

www.btlaw.com

Gregory S. Cooper
(260) 425-4660
Email: gcooper@btlaw.com

April 5, 2005

Mr. Scott Tuttle
VP Marketing & Dealer Services
HEARTLAND RECREATIONAL VEHICLES, LLC
28868 Paul Drive
Elkhart, Indiana 46514

   Re: New U.S. Utility Patent Application
     Title: "TRAVEL TRAILER HAVING IMPROVED TURNING RADIUS"
     Our Ref.: 36743/82922

Dear Mr. Tuttle:

Enclosed is a copy of the U.S. utility patent application for the above-identified invention as filed in the United States Patent and Trademark Office ("USPTO") on March 28, 2005. This application names Brian R. Brady, John Mitchell Rhymer, Douglas Martin Lantz, Timothy Arthur Hoffman, and you as inventors. We will send you a copy of the official filing receipt for this application after we receive it from the Patent Office.

Also enclosed is a Declaration and Power of Attorney for each inventor to sign and return to us for filing in the Patent Office. By signing the Declaration, you are declaring that you are an inventor of the claimed subject matter and that you have reviewed and understood the contents of the application including the patent claims.

## PRIOR ART DISCLOSURE TO PATENT OFFICE

The next action we need to take on this application is to file an Information Disclosure Statement with the USPTO which identifies all patent and non-patent publications and other facts that a reasonable examiner may consider to be important to an assessment of patentability of the claimed invention. Such other facts include public demonstrations or sales or offers of sale of products pertaining to the invention and information any of the inventors received from others prior to making the invention. Each person involved in the preparation and prosecution of the patent application has an obligation to disclose such publications and facts to the USPTO.

Please send us any published articles or other information that you believe may be pertinent to the claimed invention as soon as possible. We will then prepare an Information Disclosure Statement for filing with the USPTO within three months of the filing date.

B&T 143

Mr. Scott Tuttle
April 5, 2005
Page 2

We will keep you advised of all future developments regarding this application.

Sincerely,

BARNES & THORNBURG LLP

Gregory S. Cooper

GSC:zmg
Enclosure

FWDS01 GZC 193967_1

## ASSIGNMENT
### (World Wide Patent Rights)

For good and valuable consideration, the sufficiency and receipt of which is hereby acknowledged, as a below named inventor, we hereby sell, assign and transfer to Heartland Recreational Vehicles, LLC, a Domestic Limited Liability Company of the state of Indiana, having its principal office at 28868 Paul Drive, Elkhart, Indiana 46514, its successors and assigns or other legal representatives, all our rights, title and interest in and to the invention entitled

### Improved Fifth Wheel Trailer

invented by us and to any United States and foreign patents to be obtained therefore, as described in the application for United States Letters Patent therefore, the said interest being the entire ownership of the invention, said U.S. Letters Patent and any foreign Letters Patent when granted, to be held and enjoyed by said Heartland Recreational Vehicles, LLC, its successors, assigns or other legal representatives, to the full end of the term for which said Letters Patents may be granted, as fully and entirely as the same would have been held and enjoyed by us if this assignment and sale had not been made.

And we hereby agree to sign and execute any further documents or instruments which may be necessary, lawful, and proper in the prosecution of the above-named application or in the preparation and prosecution of any continuing, continuation-in-part, substitute, divisional, renewal, reviewed or reissue applications or in any amendment, extension, or interference

**B&T 150**

proceedings, as well as any papers necessary to procure foreign patents on said invention, or otherwise to secure the title thereto in said assignee.

And we do hereby authorize and request the Commissioner of Patents to issue said Letters Patent to said Heartland Recreational Vehicles, LLC.

Date _7-2-04_  Signature _____

Inventor ___Brian R. Brady___  Citizenship __U.S.A.__

Post Office Address ___22664 Weatherby Lane, Elkhart, Indiana 46514___

Residence Address ___22664 Weatherby Lane, Elkhart, Indiana 46514___

STATE OF INDIANA )
) SS:
COUNTY OF _Elkhart_ )

On this _27th_ day of _July_, 2004, before me, a Notary Public in and for the County and State aforesaid, appeared Brian R. Brady, to me personally known to be the same person whose name is subscribed to the foregoing instrument, and acknowledged that he executed said instrument as his free and voluntary act and for the uses and purposes therein expressed.

_____
Notary Public

___Elizabeth A. Schultze___
Printed Name

My Commission Expires: _January 11, 2009_

County of Residence: _Elkhart_

- 2 -

Date  7-2-04          Signature _____

Inventor          John Mitchell Rhymer          Citizenship    U.S.A.

Post Office Address     6462 W. 900 N. Nappanee, Indiana 46550

Residence Address     6462 W. 900 N. Nappanee, Indiana 46550

STATE OF INDIANA          )
                          ) SS:
COUNTY OF _Elkhart_       )

    On this _2nd_ day of _July_, 2004, before me, a Notary Public in and for the County and State aforesaid, appeared John Mitchell Rhymer, to me personally known to be the same person whose name is subscribed to the foregoing instrument, and acknowledged that he executed said instrument as his free and voluntary act and for the uses and purposes therein expressed.

               _____
               Notary Public

               Elizabeth A. Smithey
               Printed Name

My Commission Expires: January 11, 2009

County of Residence: Elkhart

- 3 -

B&T 152

Date  7-2-04          Signature _____

Inventor        Douglas Martin Lantz        Citizenship    U.S.A.

Post Office Address    13562 Shavano Peak Drive, Middlebury, Indiana 46540

Residence Address    13562 Shavano Peak Drive, Middlebury, Indiana 46540

STATE OF INDIANA            )
                            ) SS:
COUNTY OF  Elkhart          )

    On this  24  day of  July  , 2004, before me, a Notary Public in and for the
County and State aforesaid, appeared Douglas Martin Lantz, to me personally known to be the
same person whose name is subscribed to the foregoing instrument, and acknowledged that he
executed said instrument as his free and voluntary act and for the uses and purposes therein
expressed.

                            _____
                            Notary Public

                            _____
                            Printed Name

My Commission Expires:  January 1, 2009
County of Residence:  Elkhart

- 4 -

Date ___7-2-04___ Signature _Timothy Arthur Hoff_

Inventor ___Timothy Arthur Hoffman___    Citizenship ___U.S.A.___

Post Office Address ___10819 Volinia Drive, Osceola, Indiana 46561___

Residence Address ___10819 Volinia Drive, Osceola, Indiana 46561___

STATE OF INDIANA        )
                          ) SS:

COUNTY OF ___Elkhart___     )

     On this _2nd_ day of ___July___, 2004, before me, a Notary Public in and for the County and State aforesaid, appeared Timothy Arthur Hoffman, to me personally known to be the same person whose name is subscribed to the foregoing instrument, and acknowledged that he executed said instrument as his free and voluntary act and for the uses and purposes therein expressed.

_Elizabeth A. Singh_
Notary Public

_Elizabeth A. Sue Hue_
Printed Name

My Commission Expires: _January 11 2009_

County of Residence: _Elkhart_

-5-

B&T 154

Date __7/2/04__ Signature _Scott J. Tuttle_

Inventor _Scott James Tuttle_ Citizenship _U.S.A._

Post Office Address _56830 Brightwood Boulevard, Elkhart, Indiana 46616_

Residence Address _56830 Brightwood Boulevard, Elkhart, Indiana 46616_

STATE OF INDIANA )
 ) SS:
COUNTY OF _Elkhart_ )

    On this _2nd_ day of _July_ , 2004, before me, a Notary Public in and for the County and State aforesaid, appeared Scott James Tuttle, to me personally known to be the same person whose name is subscribed to the foregoing instrument, and acknowledged that he executed said instrument as his free and voluntary act and for the uses and purposes therein expressed.

                               _Elizabeth A. Smith_
                               Notary Public

                               _Elizabeth A. Smith_
                               Printed Name

My Commission Expires: _January 11 2009_

County of Residence: _Elkhart_

FWDS01 GSC 181632_1

-6-

| From: | "Scott Tuttle" <scott@mail.heartlandrvs.com> |
|---|---|
| To: | <gcooper@btlaw.com> |
| Date: | 3/2/2005 11:16:03 AM |
| Subject: | Re: Heartland Turning Radius Patent |

Greg,

I was wondering if you could help me out with some of the questions my senior partner (Braidn Brady) has regarding our patent application.

The real part of this application that we are concerned about and feel we have a good shot at is the improved turning radius design where we cut back the frame and also remolded the cap design to take advantage of that void in the frame.

I have included Brian's reponse to me with some questions he has. One is, he is looking for some sort of assurance that is this concept is even defensible? And if we were to have to go to court over it, how much would we be looking at to defend it?

Call me when you can.
Thanks.

Scott Tuttle

———— Original Message ————
From: Bbirish74@aol.com
Date: Wed, 2 Mar 2005 09:35:46 EST

Scott:
The issue is whether or not the patent is defensible. We need some assurances from our attorney(s) that this will be the case. For example, does Cambridge infringe the patent as being applied for? Cost to defend patent?
Need more info.
BB
—
[This E-mail scanned for viruses by Data Constructs Company]


—
[This E-mail scanned for viruses by Data Constructs Company]

## AN IMPROVED 5TH WHEEL TRAILER:

**1. ASSEMBLY FOR INCREASING THE TURNING RADIUS OF A FIFTH WHEEL TRAILER ATTACHED TO A TRUCK.**

### THE PROBLEM:

In today's marketplace, short bed pick-up trucks with extended cab areas (also referred to as crew cabs) are becoming more and more popular. *(Note: The problem with the traditional long bed pick-ups is they have become so large, especially with extended cab areas, that they cannot fit into most residential garages, or even fit into most standard commercial size parking spaces. Because of this, 5th wheel owners would much rather own a tow vehicle that allows them to more easily navigate driving and parking when not attached to their unit. Thus, the growing popularity of the short bed pick-ups).* While the new short bed truck configurations with extended cabs offer increased seating capacity and comfort, they have become problematic when being used as tow vehicles for 5th wheel trailers.

The shorter truck beds have resulted in a decreased distance between the cab of the truck and the front fiberglass cap of the 5th wheel they are towing. This has significantly diminished the turning radius of the truck when the 5th wheel is attached or being towed.

Because of this diminished turning radius, there have been a number of incidents where 5th wheel owners who tow with short bed pick-up trucks have turned or backed up too sharply, causing the cab of their truck to hit the corner of their 5th wheel in the fiberglass front cap area – resulting in extensive damage to both the fiberglass cap of the 5th wheel and the cab of the truck.

Warnings and informative articles regarding this situation are now commonplace in industry publications, including Rving magazines and manufacturer's vehicle support materials.

### THE SOLUTION:

Heartland Recreational Vehicles, LLC has engineered a unique new 5th wheel concept that dramatically improves the turning radius of today's short bed pick-up trucks with extended cabs when attached to a 5th wheel trailer. This revolutionary concept involves both rethinking how the steel frame of the 5th wheel is designed, as well as the how the it's fiberglass front cap design flows in relationship to the frame.

The first step was cutting off the corners of the upper front section of the frame instead of extending them all of the way out at a 90° angle, as is the case in a traditional 5th wheel frame design. By angling the frame back at the corners, and incorporating a sweeping design in the fiberglass front cap that flows back and over that section of the frame where the void from cutting off the corner has been created, we have essentially "cut off" the lower corners of the front of the 5th wheel, resulting in a 30%+ increased turning radius when attached to a short bed pick-up truck with an extended cab.

*(GREG   Note: There is a Canadian RV manufacturer named Glendale who makes the Titanium 5th wheel. They have received a patent on their design of a coach that actually goes over the cab of a short bed truck. The crux of their patent – we have had this researched and examined by attorneys – is the fact that they go over the cab of the truck with their unit. While they are selling a lot of these units, no one here in the states has found a way around their patent. Why do I bring this up? They did this to improve the turning radius of a 5th wheel being towed by a short bed truck. It is a strange looking unit, but the fact that they received a patent specifically to help improve the turning radius of their units attached to short bed pick-up trucks should add to the legitimacy of our case for getting a patent on our design to accomplish the same thing. The problem is the same—but our approach to the solution and designs are very different.)*

B&T 276

## 2.  A MULTI-PURPOSE UTILITY STATION ENCOMPASSED WITHIN ONE SINGLE COMPARTMENT.

**THE PROBLEM:**
5th wheel trailers typically have up to a dozen separate utility or systems access points and compartments located on the off-door side of the unit.  These compartments house everything from outside showers, electrical receptacles, water fills, dump valves, cable jacks, phone jacks, water manifold distribution panels, water tank flush kits and more.  With today's 5th wheels featuring two to three slide-out rooms on the off-door side of the unit, these utility/systems doors and compartments are spread out even more -  being placed at numerous, hard to reach locations across the off-door sidewall.  Because the 5th wheel owner must access most, if not all, of these different compartments and doors to properly utilize their 5th wheel during their camping experience, their varying locations and locking mechanisms have become both problematic and inconvenient.  In this particular aspect of 5th wheel living, today's 5th wheels are more inconvenient and user-unfriendly than ever.

**THE SOLUTION:**
Heartland Recreational Vehicles, LLC has engineered a unique new single door utility area that incorporates nearly all of the systems and access points needed to properly utilize a 5th wheel trailer during the camping experience, dramatically improving the convenience level for our owners.  Systems and access points incorporated in the Heartland 5th wheel single door utility area include a hot and cold water manifold distribution center, 110V and 12V electrical power centers, cable TV hook-up, satellite hook-up, phone jack, CAT-5 jack, water fill, tank flush system, quick disconnect water sprayer, pull handles for all holding tanks, liquid soap dispenser, paper towel holder, disposable rubber glove dispenser, a 12V light and more – all in one, conveniently located and accessible compartment!  No longer with 5th wheel owners have to get down on their hands and knees to access or operate their coach systems.

*(GREG – Note: This concept has been accomplished in some higher end Class A motorhomes (motorized units), but never before in a fifth wheel or travel trailer (towables) unit.)*

B&T 277