# Tab C

1    that we had enough combined net worth to

2    guarantee the products that we were gonna be

3    building and selling on a -- on a large scale.

4    They believed that we were going to be

5    successful.

6        So, we were given a list of names from one

7    of the partners at Crowe Chizek of potential

8    investors.  And Doug Lantz and myself interviewed

9    Brian Brady.  And Brian decided that he wanted to

10   be a part of our team and invest with us for, you

11   know, 51 percent control of the company.

12       Towards the end of the negotiations with

13   Shadow Cruiser, a liability issue came up that

14   Shadow Cruiser didn't want to be liable for what

15   they had built.  They wanted us to be liable for

16   it.  We didn't -- that was a -- you know, it

17   ended the negotiations.

18       And at that point we decided that we would

19   just start from scratch and build our own

20   product.  And at that point it was myself, Tim

21   Hoffman, Doug Lantz, Brian Brady.  And Rod Lung

22   was not able to put in the amount of money that

23   it required for our seed money.

24       So, Rod and I decided that he could just

25   focus on Livin' Lite.  He was my partner there.

1    And he would run Livin' Lite and -- and I would

2    continue to move forward with the Heartland

3    concept.

4    We needed an engineer. We interviewed a

5    couple of engineers. I turned to John Rhymer a

6    couple times for, you know, who -- who can we

7    get. He sent us after his protégé. That didn't

8    work out.

9    And then one day I said to John Rhymer, "You

10    know --" well, John Rhymer said to me, "What you

11    really need is somebody that can do engineering

12    and run production." And I said, "Where am I

13    gonna find somebody like that?"

14    And he turned around and walked away and

15    raised his hand. And I said, "Are you messing

16    with me?" And he said, "No." And, so, John

17    became our fifth partner. And that's when we

18    started Heartland.

19  Q  When did you start Heartland, approximately?

20  A  That was the fall of 2003.

21  Q  And how long did you look at Shadow Cruiser and

22    all of that? How long did that take?

23  A  That was started in the spring of 2003. And Doug

24    and I were over there a lot over the summer of

25    2003.

1    owners, we took on most of the responsibility and
2    we carried the burden as long as we could.  And
3    then once we were way past maybe we should've
4    been, we finally hired somebody to take it over,
5    that that was their expertise.
6  Q  When did Mr. Lantz leave the company again?
7  A  I'm thinking it was sometime in 2004.
8  Q  Okay.  And describe for me why he left.
9  A  He was terminated by Brian Brady.
10 Q  Did you agree with that decision?
11 A  No, I did not.
12 Q  Tell me what you understand the reasons were for
13    why he was terminated.
14 A  Personality conflict between Brian and Doug.
15 Q  What personality conflict are you referring to?
16 A  Doug would say what he thought, and he wouldn't
17    back down.  And that didn't go over well.  I
18    think some of us, as owners, would have a
19    tendency just to be quiet if there was something
20    that we didn't necessarily agree with.  Doug was
21    that not way.  He was very vocal.
22 Q  Did you tell Brian you didn't agree with his
23    decision to terminate Mr. Lantz?
24 A  I don't recall.  I mean, I was just informed of
25    it.  I think I was more in shock than anything.

1    selling. He's not Tim Hoffman. And he couldn't

2    do better than what Tim did with more salesmen.

3         So, I don't think it should've surprised

4    anybody that in that timeframe we didn't get to

5    three. But it obviously was -- it was what was

6    used to justify the termination of Doug Lantz.

7  Q  Is it your understanding that Brian was the only

8    one that could terminate any of the owners?

9  A  Yes.

10 Q  Tell me about how you left the company.

11 A  We had been purchased by Catterton Partners in

12   2007, for which we received a good amount of

13   money. As 2007 went on, it became more and more

14   apparent that -- that Brian and myself didn't

15   necessarily get along. And it was difficult.

16        In December of 2007 and early January of

17   2007, we produced a lot of brochures in a very

18   short period of time, lot of late hours, got them

19   all shipped to the dealers for the first shows in

20   January. Well, one dealer called Coley, Brian's

21   son, and said that he didn't get his brochures.

22   And Coley called Brian. And Brian called me,

23   very unhappy.

24        I called the shipping company, tracked down

25   the shipment. And it actually was shipped and

1   delivered.  And called Coley to confirm that.
2   And he said yeah, the dealer called him back and
3   he had found it.  But Brian called me and said a
4   few things, personal things, did some swear
5   words.

6       And I was just to the point where I was
7   done.  And I told him that if -- if my
8   performance was so bad, that he should just fire
9   me.  I texted that to him.  And he texted me
10  back, "I accept your resignation."

11      I texted him back, "No.  It's not that easy.
12  You're gonna have to fire me and you're gonna
13  have to tell everybody why you fired me."

14      At that point, we went into a couple days of
15  just no communication.  And I turned in a
16  resignation.  Tim and John took me out to eat,
17  said that I should reconsider, you know.

18      I said to Brian the next day, "You know, I'm
19  gonna think about it."  And then later that day I
20  decided that I was -- I was gonna leave.  And I
21  decided that I would stay for the rest of the
22  month to work with my replacement.  So I stayed,
23  you know, two and a half weeks extra and worked
24  with my replacement.  I made offers to help with
25  a lot of other things.

1      But that -- that incident on the phone was

2  just a culmination of a multiple -- a multitude

3  of incidents between Brian Brady and myself

4  where, in my opinion, he didn't think that I

5  brought anything to the company.  He didn't think

6  I did anything for the company.  He never really

7  thought that advertising and marketing was a

8  full-time job.

9      So, I mean, that was -- that had caused a

10  lot of the riff, I guess, between him and I over

11  the -- the years.  But, obviously, I put up with

12  it because we were riding a horse that was, you

13  know, at 280 million when I left after four

14  years.  So, I could put up with some personality

15  conflicts for that.

16           MR.  IRMSCHER:  Why don't we take

17           a break.  We're about to run out of

18           tape.

19           THE WITNESS:  Okay.

20           THE VIDEOGRAPHER:  Off the record

21           at 11:05.

22               (A break was taken at

23                this time.)

24           THE VIDEOGRAPHER:  Back on the

25           record at 11:20.  Please continue.

1   A   Yes.

2   Q   Is Mr. Fountain your attorney?

3   A   No.

4   Q   When did you first meet Mr. Fountain?

5   A   Earlier this year.

6   Q   Can you tell me when?

7   A   I'm gonna say March maybe.  Maybe April.

8   Q   Was it -- can you relate it to when you sued?

9       Was it before or after you sued Heartland?

10  A   I do not know.

11  Q   Okay.  But you think March of this year, correct?

12  A   Yeah.

13  Q   And had you ever spoken to Mr. Fountain or met

14      Mr. Fountain before that time in any context at

15      all?

16  A   No.  I don't think so.

17  Q   Okay.  Tell me how it was that you happened to

18      speak to or meet with Mr. Fountain for the first

19      time this year.

20                  MR. FOUNTAIN:  I would caution

21              you on one thing.  As it relates --

22                  MR. IRMSCHER:  You don't --

23                  MR. FOUNTAIN:  I do have a right

24              to do this.  If you seek advice from

25              an attorney --

1          MR. IRMSCHER:  No.

2          MR. FOUNTAIN:  -- you are

3      entitled to protect that advice under

4      the attorney-client privilege.  If

5      you're simply talking to an attorney

6      and not seeking advice, that's not

7      privileged.

8          So, if you don't wish to tell him

9      about any advice you sought from me,

10      you don't have to.  If you were just

11      talking to me about something that you

12      were not seeking advice from, you

13      would have to tell him what you

14      remember.

15          THE WITNESS:  Uh-huh.

16          MR. FOUNTAIN:  Okay.

17  BY MR. IRMSCHER:

18  Q  Tell me about how you first came to speak with

19      Mr. Fountain.

20  A  He called me.  And my name was on the patent that

21      was -- there was an issue between Forest River

22      and Heartland.  And he just asked me if I had

23      knowledge of any prior art.

24  Q  What did you tell him?

25  A  Well, I guess I wasn't really sure what prior art

1  meant definitely, you know. And then when I
2  understood that prior art was any units or
3  pictures or things that I had seen, I discussed
4  what I had thought would be considered prior art.
5  Q  And what did you tell Mr. Fountain about the
6  prior art in that first conversation?
7  A  That I had seen units, such as fifth wheels, that
8  had "V" front ends and horse trailers that had
9  "V" front ends.
10  Q  Anything else?
11  A  Not that I recall, that first conversation.
12  Q  How long did the conversation last?
13  A  Ten or fifteen minutes maybe.
14  Q  Okay. Did you subsequently have additional
15  conversations or meetings with Mr. Fountain?
16  A  At one point, I -- I asked for, you know, some
17  advice about this whole deal with Heartland. I
18  became aware that, you know, Heartland was filing
19  things with the patent office with my name on it.
20  And that concerned me a little bit.
21  Q  Let's try and -- we'll come to that in a minute.
22  But let's talk first about your additional
23  conversations with Mr. Fountain.
24      You had this one phone call with him. Can
25  you tell me what the next communication was with

1      make sure I follow up on this.

2          During your time at Heartland, were you

3      always the one that was responsible for working

4      with lawyers?

5   A  I was typically the liaison between the team and

6      the attorneys.

7   Q  Okay.

8   A  I would carry information back and forth, you

9      know.  I would be the one that would send e-mails

10     of questions from Brian or Tim or John and, you

11     know, they would typically go through me.

12  Q  Okay.  And you had -- let's go back to this

13     conversation with Mr. Fountain that you have here

14     in March or so of this year.

15         You talk about prior art and you talk to him

16     a little bit about some horse trailers and

17     fifth -- I think you said fifth wheels and horse

18     trailers with "V" front ends.  Is that right?

19  A  Yeah.

20  Q  Did you talk about any other products or items of

21     any type?

22  A  At that time, I do not think so.

23  Q  Did you have subsequent conversations with

24     Mr. Fountain?

25  A  We -- I had subsequent conversations with

1  A  I'm sure by default it was in there.

2  Q  So, you understand that if a patent would issue

3     from this earlier application, you don't own it,

4     Heartland owns it, correct?

5  A  Yes.  I understand.

6  Q  Okay.

7  A  I mean, you know, I'll be honest.  There may be

8     some gray area in my understanding between what

9     ownership and what inventor, you know --

10  Q  Sure.

11  A  -- rights and things there are.  But --

12  Q  Did you talk to anybody from Forest River, any

13     employee, former employee, from Forest River in

14     connection with this case?

15  A  No.

16  Q  Okay.  Did you provide any documents to anybody

17     at Forest River at any point?

18  A  No.

19  Q  Tell me about your last conversations with

20     Mr. Rhymer and Mr. Hoffman.  When did you last

21     talk to those two gentlemen?

22  A  Last conversation with Mr. Rhymer was maybe

23     two months ago, and it was just of a personal

24     nature.  And it was the same with Hoffman.

25     Hoffman was maybe a month and a half ago.

1    some of the things that are -- that are going on

2    with Heartland in -- in their process of filing

3    for patents, that -- that there's -- there's

4    maybe some questionable information in there

5    and -- and stuff that I just -- you know, I had

6    told Ryan that I don't -- I don't want to be a

7    part of anything that's not aboveboard.

8        You know, the reason that Doug and I had him

9    basically -- we tried to get our nose in -- in

10   there a little bit.  Like if our name's gonna be

11   on this, you know, let us know what's going on.

12   And --

13  Q  Well, there's a big difference between saying,

14     you know, "I want to know what's going on," and

15     having a formal document that you signed and

16     theoretically submitted to the patent office and

17     all of that.

18        So, can you tell me how it was you went from

19     having a concern to having this document in front

20     of us here today?  How did that happen?

21  A  Conversations with Mr. Fountain about, you know,

22     what is going on in the -- in the process of

23     filing a patent.

24  Q  Who wrote Exhibit 102?

25  A  Mr. Fountain.

1   Q  Did he write all of it?

2   A  As far as I know.

3   Q  Okay.  And when did you first see it?

4   A  Couple weeks ago, I think.

5   Q  Okay.  And did you read it?

6   A  Did not read it in detail, no.

7   Q  Okay.  Why not?

8   A  I was busy.

9   Q  What did Mr. Fountain tell you it was?

10                  MR. FOUNTAIN:  Wait.  Stop.

11              Before the -- if that discussion took

12              place in the context of your seeking

13              legal advice from an attorney, you

14              have the right to keep that

15              confidential.  If it did not, you need

16              to answer his question.

17  A  Well, I absolutely was seeking legal advice at --

18                  MR. FOUNTAIN:  Then you have the

19              option of answering or not answering.

20  A  Okay.

21  BY MR. IRMSCHER:

22  Q  So, are you refusing to answer my question?

23  A  Yes.

24  Q  And you're doing that why?

25  A  Because I don't know that it's in my best

1    A    Just from discussions with Mr. Fountain.

2    Q    Who told you what the crux of that document was?

3    A    Mr. Fountain.

4    Q    Can you tell us what he told you as to what the

5         crux of that document was?

6    A    That basically we were pointing out that the --

7         the process that I went through and led as the

8         liaison at Heartland was not as detailed as it

9         should've been; that the whole issue of -- of

10        prior art and all these things were not made --

11        were not explained to us; that, you know, my name

12        is on a patent that obviously -- I mean, I think,

13        my opinion is, we shouldn't have received.

14            There's -- there's plenty of prior art out

15        there that -- that, you know -- including other

16        prior art that's come to my attention since then,

17        you know, that's on this exhibit.  But --

18   Q    So, you weren't aware of the two documents marked

19        Exhibits 40 and 41 prior to meeting with

20        Mr. Fountain; is that right?

21   A    That's correct.

22   Q    Okay.  Did you intentionally lie to the patent

23        office?

24   A    No.

25   Q    Did you intentionally deceive the patent office

1     in any way?

2  A  No.

3  Q  Did you intentionally withhold any -- any

4     references of any type from the patent office?

5  A  No.

6  Q  Did any of the inventors, to your knowledge, do

7     that?

8  A  No.  I -- I -- it's, you know, my position that

9     we were never ever questioned about prior art and

10    what we knew and what we saw and what was out

11    there.  I mean, it was so obvious, these -- some

12    of these things, that we obviously would've said

13    it, you know.

14        We all knew about SpaceCraft.  We all knew

15    about horse trailers, you know.  I think when we

16    went to file the -- the patent, it was pretty

17    broad-scoped and they kept narrowing it down and

18    narrowing it down.  But, you know --

19             MR. IRMSCHER:  Why don't we take

20           a break.  We're running out of tape.

21           THE VIDEOGRAPHER:  Off the record

22           at 12:12.

23            (A lunch break was taken at

24            this time.)

25           THE VIDEOGRAPHER:  Back on the

1   Q  Okay.

2   A  So, there was nothing that he shared with me

3      that, "This is similar."

4   Q  Did you review the provisional patent application

5      before it was filed?

6   A  Yes.  We all did.

7   Q  Okay.  All of the inventors reviewed it?

8   A  Yes.

9   Q  Okay.  How do you know that?  How do you recall

10      that?

11   A  I gave it to them.  I mean, like I said, I was

12      the liaison.  But when I received it, I came back

13      and -- and everybody reviewed it.

14   Q  Okay.  And why was everybody being, you know,

15      the -- the five named inventors?  Why were they

16      all named as inventors?

17   A  We felt that it was a team effort.

18   Q  John Rhymer, I think -- I think you've read his

19      deposition, you said?

20   A  Yeah.

21   Q  He testified basically that it seemed like you

22      were all owners and all in this together and you

23      ought to all be named or words to that effect.

24   A  Yes.

25   Q  Is that your recollection as well?

1   A  That is my recollection, that that was kind of

2       the feeling that we had.

3   Q  Okay.

4   A  And we were all there for the discussions when we

5       were trying to conceive this, you know, sitting

6       at a table and sketching and talking.  And, you

7       know, we felt like we all played a part.

8   Q  What part did you feel like you played?

9   A  Well, I mean, no more than I guess being a part

10      of the discussions about how can we do this.  And

11      I don't know if it was -- it probably was John

12      himself who said, "Why don't we do this, cut the

13      corner."  But it could've been Tim.  It could've

14      been Doug.  I -- I really don't remember.

15   Q  You remember it wasn't you, though, right?

16   A  It wasn't me.

17   Q  Okay.

18   A  I don't think.  I'd like to go back in time and

19      find out.

20   Q  Well, it certainly seems clear that with respect

21      to obtaining this patent, you had the

22      responsibility to try and make sure that you

23      shepherded everything through this -- through the

24      legal system, correct?

25   A  I don't know that I would say that I shepherded

1   A   No.  I have -- I have not been privy to that.

2   Q   Have you ever done that that you can think of?

3   A   No.

4   Q   So -- so, in the process of getting this --

5       the -- the -- the turning radius patent that

6       we're talking about, you don't recall ever

7       reviewing any other patents --

8   A   No.

9   Q   -- is that right?

10  A   No.  Not at all.

11  Q   And you don't recall, again, either discussing

12      with any of the other named inventors or

13      providing to your lawyers or anybody any other

14      patents, correct?

15  A   That's correct.

16  Q   Okay.  When you named all of the owners of

17      Heartland as inventors, you didn't do that to try

18      and deceive anybody, did you?

19  A   No.  I mean, we -- we felt like, you know, we had

20      an idea and that we were all putting our name on

21      it.

22  Q   And you read John Rhymer's deposition, right?

23  A   Yeah.

24  Q   Do you generally agree with his characterization

25      of how that came about that you all five were on

1  the patent?

2 A I haven't read it, you know, for -- seems like a

3  couple months.

4 Q Okay.

5 A So, I'm not sure. I mean, if you give me details

6  of how he generalized it, seems like --

7 Q He said basically he was the inventor of the

8  improved turning radius, but that it seemed like

9  you ought to all be on the patent because we're

10  all in this together. Is that generally --

11 A I -- okay. Now --

12 Q Is that generally the same as your recollection?

13 A I'm -- I'm -- I know that that's what he said.

14  I'm -- I'm gonna tell you that I don't agree with

15  that a hundred percent.

16 Q Okay. Well, what part was it that you don't

17  agree with?

18 A Well, I just -- I think that when you get four or

19  five guys around a table and you're all

20  discussing the problem and the solutions and

21  you're talking about different aspects of it and

22  you come to some sort of an agreement, for one

23  guy to say then because he, you know, drew it up

24  and executed it or maybe even had part of the

25  main suggestion, to say that it was really his I

1    think may be a little -- I don't know.

2  Q  Well, again, I mean, I'm not trying to repeat

3     testimony.  But it's clear in your mind that you

4     didn't come up with the idea of cutting off the

5     corner to improve the turning radius, correct?

6  A  I said I didn't think so.

7  Q  Okay.

8  A  You know.  I just -- I think it's -- if you had

9     to do it by -- here's the deal.  Instead of

10    trying to say a hundred percent one guy or

11    another, if you had to do it by percentages,

12    yeah, I could probably buy into the argument that

13    John was, you know, 50 percent and Tim was 35 and

14    Scott and Doug were -- you know what I mean?

15    That's what I would say.

16 Q  Okay.

17 A  We never worried about it, to be honest with you,

18    at the time.  We -- there was no self-interest,

19    you know, there.  I think we were trying to, you

20    know, have a consensus opinion about a solution

21    to a problem.

22 Q  Did anybody other than the draftsperson help John

23    figure out how exactly to make the frame and the

24    end cap so that it would work?

25 A  I'm gonna tell you that the fiberglass guys were

1   Q  At the top of the page there, third line down,

2      there's a sentence that reads, "As a result of

3      the failure of the prior attorneys to properly

4      communicate with these inventors."

5          And I assume that means you and Mr. Lantz.

6      Is that right?

7   A  I would assume it means all the inventors on the

8      patent --

9   Q  Okay.

10   A  -- application.

11   Q  "These inventors have been prevented from

12      complying with Rule 56."

13          What failure to communicate properly are you

14      referring to there, if you know?

15   A  I would say it's my understanding that just the

16      whole prior art concept. You know, in -- in

17      subsequent discussions with -- with Mr. Fountain,

18      you know, I've obviously learned a lot about

19      patents and applications and prior art. And, you

20      know, it was easy for me to say when someone

21      said, "Well, have you ever seen this before,"

22      "Well, yeah, I have."

23          Now, I didn't know that was relevant to what

24      we were doing and -- and my attorney at the time

25      didn't say, "Well, you needed to identify these

1    things if you knew them to exist."

2          Well, everybody new SpaceCraft existed.

3    Everybody knew horse trailers existed.  I guess

4    that's -- so, when I read this, that's -- you

5    know, that's what I think this is referring to.

6    Q  But at the time that the application for the

7    patent was filed, you didn't think that the

8    SpaceCraft or the "V" nose horse trailers or

9    anything of that was relevant to the invention,

10   did you?

11   A  I --

12                MR. FOUNTAIN:  First off, before

13                you answer --

14   BY MR. IRMSCHER:

15   Q  You -- you answer the question.

16                MR. FOUNTAIN:  Wait.

17                MR. IRMSCHER:  You object or not

18                object.

19                MR. FOUNTAIN:  Before you --

20                MR. IRMSCHER:  You object or not

21                object.

22                MR. FOUNTAIN:  Before you answer

23                the question --

24                MR. IRMSCHER:  I'm gonna call the

25                judge.

1      MR. FOUNTAIN:  -- let me make my

2    objection.

3      MR. IRMSCHER:  You better make a

4    quick objection.

5      MR. FOUNTAIN:  I will object to

6    the form of your question --

7      MR. IRMSCHER:  Thank you.

8      MR. FOUNTAIN:  -- and offer to

9    explain it in more detail if you wish.

10     MR. IRMSCHER:  I don't need any

11    explanation.

12   BY MR. IRMSCHER:

13   Q  You can answer.

14   A  Can you repeat the question?

15     MR. IRMSCHER:  Can you read the

16    question back, please?

17   A  I think you were saying at the time of the patent

18    application did I think that was an issue or not.

19   BY MR. IRMSCHER:

20   Q  Did you think that the SpaceCraft, the "V" nose

21    trailer, and the other items you mentioned were

22    relevant to the invention?

23     MR. FOUNTAIN:  Once again, I will

24    object to the form of that question.

25     THE WITNESS:  Okay.

1    BY MR. IRMSCHER:

2    Q   Okay.  You can answer.

3    A   At the time, no, it was not in my thoughts.

4    Q   I want to move down on the same section of the --

5        of the second page.  You talk -- or this document

6        talks about, "Particularly as a result of Mr.

7        Lantz and Mr. Tuttle becoming aware of the

8        testimony of the other three named inventors

9        during their depositions."

10           You're talking about flaws here.  What flaws

11       did you become aware of?  What are you talking

12       about?

13   A   I'm gonna tell you that my understanding is it

14       has to do with a couple of things; what we

15       understood to be prior art, what relevance that

16       had to this patent application, whether or not we

17       should've even gotten the patent, and the -- I

18       think in this sentence the -- the reference to

19       flaws, I think it has to do with -- with my other

20       three partners all testifying that, you know,

21       they didn't really have anything to do with the

22       invention or they did have something to do with

23       the invention and how that is, you know,

24       applicable to a patent application.

25   Q   Okay.  On Page 3, there's a paragraph that

1   A  He showed me, yeah, in -- on paper.  He showed me

2      photos.

3                      MR. IRMSCHER:  Have I got

4                   everything you showed him in this

5                   conference room?

6                      MR. FOUNTAIN:  I don't know.

7                      MR. IRMSCHER:  Why wouldn't I?

8                      MR. FOUNTAIN:  I don't remember

9                   precisely what I showed him.

10                     MR. IRMSCHER:  Okay.

11                     MR. FOUNTAIN:  As he mentioned,

12                  there was a plethora of prior art.

13  BY MR. IRMSCHER:

14  Q  On the top of Page 4, you talk briefly about

15     Trial Exhibits 40 and 41.  That's the Cardinal

16     product.  Is that your recollection?

17  A  That's correct.

18  Q  And again, I think you've already testified to

19     this, but you weren't aware of that product at

20     the time this application was filed; is that

21     right?

22  A  That is correct.

23  Q  When did you first become aware of this product?

24     In your -- in your discussions with Mr. Fountain?

25  A  Yes.

1   Q   Okay.  And your understanding of what 40 and 41

2       show is what?  Can you tell us?

3   A   Frames that were built for the Cardinal product

4       years ago by a company called Quality Frames, I

5       think.

6   Q   Do you know Quality?

7   A   No.  I'm not personally familiar with them.

8   Q   Are you personally familiar with the Cardinal

9       product?

10  A   Yeah.

11  Q   Does it have an improved turning radius in the

12      front end cap?

13  A   Excuse me.  Currently, I don't know.

14  Q   Okay.  Did you do anything with respect to the

15      Cardinal product other than just look at these

16      pictures?  These drawings, I mean.

17  A   No.  I just saw the drawings.

18  Q   Okay.  Let me show you, Mr. Tuttle, what is a

19      transmittal form that includes the Information

20      Disclosure Statement that was filed in this

21      patent application and ask if you -- ask you to

22      take a quick look at the last page of this

23      document and see if you recall anything about any

24      of those patents that are listed there.

25          Do you recall any of those by name?

1  Q  Do you have any knowledge that Heartland was

2     trying to obtain an inflated value of the patent?

3  A  I was not involved in that at all.  I have no

4     knowledge of that.

5  Q  Okay.  And do you have any knowledge that

6     invalidation of the patent or denial of issuance

7     of the patent would've brought about a financial

8     collapse of Heartland?  Do you have any knowledge

9     of that?

10 A  No, I do not.

11 Q  I assume you're aware of what has been called in

12    this -- in this case the hotel incident.  Am I

13    correct in that assumption?

14 A  Yeah.

15 Q  Okay.  How did you become aware of the hotel

16    incident?

17 A  Through somebody in the industry.  I mean, it --

18    it spread pretty quickly through the industry.

19 Q  And I'm correct that the hotel incident took

20    place long after you had left --

21 A  Yes.  That is correct.

22 Q  -- Heartland, correct?

23 A  That is correct.

24 Q  Have you been told -- well, where did you get the

25    information you have about the hotel incident?

1    by that?

2  A  I took the picture, I outlined it, and I put it

3    on a background.  They were my client.

4  Q  What's the name of this product?

5  A  Shadow Cruiser.

6  Q  And did you consider this Shadow Cruiser product

7    to be relevant prior art when you filed the

8    patent application?

9  A  I didn't even think about it.  I'm --

10  Q  Okay.

11  A  Yeah.

12  Q  Can you draw for us -- I want to make sure I

13    understand how the Shadow Cruiser looks if you're

14    looking down on it.  Can you draw that for us?

15  A  Sure.  Witness Complying.  That's what I would

16    say the top view of a Shadow Cruiser fifth wheel

17    looks like.

18  Q  Can you -- can you give me a rough idea where the

19    hitch is in there?

20  A  Yeah.  The hitch is gonna be up here.

21  Q  I'm not understanding that as well as I --

22  A  Oh, this is a top view.

23  Q  So, where's -- where's the point where the hitch

24    actually connects to the truck?

25  A  The truck would be out here in front of it.

1  Q  And a side view of the Shadow Cruiser?

2  A  Yes.

3              MR. FOUNTAIN:  Excuse me.

4         Where's 109?

5              MR. IRMSCHER:  Right there.

6              THE WITNESS:  Right here.

7              MR. IRMSCHER:  That's the one I

8         gave you.

9              MR. FOUNTAIN:  I thought this was

10        107.

11             THE WITNESS:  109, 108, 107.

12             MR. FOUNTAIN:  I'm sorry.  I may

13        have --

14             MR. IRMSCHER:  Well, you've got

15        one of them, Ryan.  I gave it to you.

16             MR. FOUNTAIN:  Oh, I understand

17        now.  I'm sorry.

18             MR. IRMSCHER:  Are we square?

19             MR. FOUNTAIN:  Yep.  We are.

20             (Deposition Exhibit 111 marked

21              for identification.)

22 BY MR. IRMSCHER:

23  Q  Show you what's been marked for indication as

24     Exhibit 111 and ask if you can identify that for

25     us.

1  A  A Trail Bay fifth wheel by R-Vision.

2  Q  Okay.  And when were you first aware of this

3     product?

4  A  When they came out with it.  They were one of my

5     clients.  I was doing literature for it.

6  Q  And when did this come out?

7  A  I don't know.  I mean, I -- let me back up a

8     little bit.  There was like seven or eight Trail,

9     dash, something products that R-Vision had.  And

10    I did all their literature.  And I remember a

11    Trail Bay, you know, brochure that I did.  I

12    don't know about specifically the date.

13 Q  Were you aware of this product prior to the time

14    you filed the patent application?

15 A  I was aware of the Trail Bay product, yeah.

16 Q  And does this show anything other than a

17    conventional fifth wheel?

18 A  I guess, in my mind, I'm -- I'm gonna define

19    conventional fifth wheels as they're pretty

20    angular.  And this seems to have a more

21    pronounced curvature around the front.  So, I

22    mean --

23 Q  When you say pronounced curvature, which -- which

24    angle are you talking about?

25 A  Just from a side view.  The front -- the very

1      front nose of it sticks out a little more.  But,

2      yeah, I'd say it's a traditional fifth wheel.

3      It's a little sleeker than some.

4  Q   Okay.  And I assume your answer's going to be the

5      same as it has previously.

6          You didn't even consider disclosing that one

7      in the patent process?

8  A   No.  I mean -- yeah.

9                          (Deposition Exhibit 112 marked

10                          for identification.)

11 BY MR. IRMSCHER:

12 Q   Mr. Tuttle, let me show you what's been marked

13     for identification as Exhibit 112 and ask if you

14     wrote or prepared that.

15 A   I'm gonna say that this is -- seems to be a

16     duplication of an article that I had written for

17     a website, not this particular website.

18 Q   Okay.

19 A   And there seems to be areas of this that have

20     kind of been cut and pasted as well.

21 Q   Did you prepare the text of this or no?

22 A   Yes.  The original text that was on the original

23     website, I did prepare.

24          It does include obviously some of our

25     marketing angles that we took with our design.

1    Q   Okay.

2    A   If it's current or past or both.

3    Q   And are you familiar with Weekend Warrior's

4        products?

5    A   Somewhat.

6    Q   Do they make fifth wheels?

7    A   Yeah.  They did when they were in business.

8        They're out of business now.

9    Q   Are you aware of any of their products that

10       would've been relevant prior art at the time you

11       filed these patent applications?

12   A   Not that I know of.  I'm not real familiar with

13       their front cap designs and turn radius designs.

14   Q   As you sit here today, you're not familiar with

15       any of their products that would be relevant to

16       this case, as far as you know; is that right?

17   A   As far as I know, no.

18   Q   What's a bull nose?

19   A   A bull nose?

20   Q   Yeah.

21   A   I do not know.

22   Q   I thought that was --

23   A   I mean, I've heard it referred to in pliers where

24       it's --

25   Q   I used that phrase wrong?  I thought that was a

1   type of front end on a trailer.  Is that not

2   right?

3  A  Could be.

4  Q  Doesn't mean anything to you?

5  A  Not really.

6  Q  What's the front end of a typical cargo trailer

7   or horse trailer look like?  Can you describe it

8   for us?

9  A  Typical cargo trailer is just a blunt, flat front

10   end.  Somebody may call that a bull nose, I

11   guess.  Same with a typical fifth wheel cargo

12   trailer; flat, not very aerodynamic at all.

13  Q  Okay.  And are there other types -- or were there

14   other types of front ends on those cargo trailers

15   or horse trailers?

16  A  Oh, absolutely.

17  Q  And what kinds were there?  And I'm talking about

18   at the time that you filed this patent

19   application.

20  A  Angled front ends.  Fairly common.  I mean, been

21   around for 30 years.

22  Q  And -- I'm sorry.

23  A  Both on travel trailers and fifth wheels.

24  Q  Okay.  And if I'm understanding your testimony

25   correctly, you did not think that any of those

1       type of shapes were relevant to the patent

2       application or the patent; is that right?

3   A   At the time when we were filing for the patent

4       application, I guess I was under the assumption

5       that it would only apply to a fifth wheel

6       recreational vehicle.

7   Q   Okay.

8   A   And --

9   Q   And was that your understanding all the way

10      through the time you were with Heartland?

11  A   Yeah.

12                  MR. IRMSCHER:  Okay.  I thank you

13                  very much for your time.  I don't

14                  believe I have any further questions

15                  at this point.

16                  THE WITNESS:  Thanks.

17                  MR. FOUNTAIN:  Just a second.

18                  CROSS-EXAMINATION

19  BY MR. FOUNTAIN:

20  Q   I have a few questions for you.  Going back

21      through some of the things that you had explained

22      to Mr. Irmscher earlier today, he had asked you

23      how it came about that Brian Brady teamed up with

24      you.  And you started to say, "You want my

25      opinion of --" and then you stopped.

```
 1        just before it was filed --

 2   A    Uh-huh.

 3   Q    -- did you have an understanding as to what the

 4        claims meant?

 5   A    Not particularly, not beyond having a fifth wheel

 6        with an improved turning radius.

 7   Q    Did you ever have a situation where one of the

 8        attorneys at Barnes & Thornburg or Baker-Daniels

 9        at some point sat you down and said, "This is

10        what the claims mean."?

11   A    No.

12   Q    Okay.  Now, you said that you made sure the other

13        inventors reviewed the application; is that

14        right?

15   A    Yes.

16   Q    How did you do that?

17   A    By providing them copies of it.

18   Q    Did you actually see them read it?

19   A    I'm -- I recall that as we sat in a room that

20        different partners of mine were absolutely

21        reviewing it and looking at it.  To what depth, I

22        don't know.  But they -- they had it in their

23        hands, they saw it, they read it.

24   Q    And --

25   A    Some of them might have scanned it, you know.
```

1      Whatever.

2   Q  Why did you prepare it that way?

3   A  Because I was asked to.

4   Q  Who -- who asked you to?

5   A  Sales.

6   Q  Who in sales?

7   A  I don't recall.

8   Q  Okay.  And have you talked to Mr. Fountain about

9      this brochure prior to today?

10  A  Not that I recall, I haven't.

11  Q  Did you talk to him about it today outside of

12     this deposition?

13  A  I'm racking my head here.  We talked about it,

14     yeah, today outside of this deposition maybe

15     after it came up.  I'm not sure if it was before

16     or after it came up.

17  Q  One of the things that I want to make sure the

18     record is clear on is there are travel

19     trailers -- a travel trailer is a term that's

20     used commonly in the RV industry, right?

21  A  Yes.

22  Q  And what is a travel trailer?  What does that

23     encompass?

24        Does it include fifth wheels to some people

25     and to others it doesn't or how does that work?

1    A   Travel trailers are typically bumper pull.  Fifth

2        wheels are -- typically go in the bed of a truck.

3    Q   Are there some people --

4    A   They're two different products.

5    Q   Okay.  Are there some people that consider a

6        fifth wheel to be a type of travel trailer?

7    A   To my knowledge, that would only be the patent

8        office, I think, because I see that in the -- in

9        the in materials that we've, you know, received

10       from the patent office.  They called it a travel

11       trailer fifth wheel, which is greek to RV people

12       because they're two different products.  So --

13   Q   Okay.  So, your -- your testimony is in

14       general -- general terms --

15   A   Within the industry, everybody knows they're

16       different.

17   Q   Okay.

18   A   There's a travel trailer, and there's a fifth

19       wheel.

20   Q   And your testimony is a fifth wheel is not a type

21       of travel trailer in common use?

22   A   Yes.  That's my testimony.

23                   MR. IRMSCHER:  Okay.  I don't

24               think I have any further questions.

25               Thanks very much for your time.

# Tab D

1   A   I'm a partner at Barnes & Thornburg.

2   Q   Okay.  And how long have you been a partner at

3       Barnes & Thornburg?

4   A   Approximately one year.

5   Q   And can you briefly tell us about your

6       educational background and give us up to and

7       including the year you graduated from law school?

8   A   I attended Paul Harding High School in Fort

9       Wayne, Indiana.  I attended the University of

10      Notre Dame.  I graduated in 1989 with a B.S. in

11      Metallurgical Engineering.  And I graduated from

12      the Notre Dame Law School with a Jurist Doctorate

13      degree in 1992.

14  Q   And did you take full-time employment in 1992?

15  A   Yes, I did.

16  Q   What did you do?

17  A   I was an associate with Barnes & Thornburg.

18  Q   And, at that time, what were your job duties?

19  A   I was a first-year associate in the Intellectual

20      Property Department, you know, learning how to

21      practice patent and trademark law at that point.

22  Q   How long were you an associate with Barnes &

23      Thornburg?

24  A   I was an associate with Barnes & Thornburg until

25      January of 2000, I believe.

1 Q And did you take another job at that time?

2 A Yes, I did.

3 Q Where did you go?

4 A I became an associate with Baker & Daniels.

5 Q And how long were you an associate with Baker &
6 Daniels?

7 A I was an associate for one year.  Actually, a
8 little less than one year.

9 Q And what was your new title with Baker & Daniels?

10 A I became a partner in January, 2001, I believe.

11 Q And how long were you a partner with Baker &
12 Daniels?

13 A Until October 31, 2008.  Wait.  Yes, 2000 -- yes,
14 2008.

15 Q And at that time you became a partner --

16 A Partner with Barnes & Thornburg.

17 Q -- with Barnes & Thornburg?

18 A Exactly.

19 Q And during the dime that you've been a practicing
20 attorney since 1992, has your practice focused on
21 patent and trademark law?

22 A Yes.

23 Q And has a focus of that practice been the
24 prosecution of patent applications?

25 A You'd have to define focus for me.  I mean, I --

1    at Baker & Daniels?

2  A  Yes.

3  Q  What department was that?

4  A  The intellectual property team.

5  Q  You understand that this case involves

6     allegations of inequitable conduct against

7     Heartland and against Mr. Cooper and yourself; is

8     that correct?

9  A  Yes.

10 Q  What is your understanding of what inequitable

11    conduct is?

12 A  My understanding of inequitable conduct is when a

13    person associated with the prosecution of a

14    patent application intentionally withholds

15    information from the patent office or

16    intentionally presents false information with the

17    intent of -- I should say material false

18    information or material information with the

19    intention of misleading the patent examiner or

20    the patent office.

21 Q  You're aware that the patent in this case has

22    been called the .650 Patent, correct?

23 A  Yes.

24 Q  Did you commit inequitable conduct in the

25    prosecution of the .650 Patent?

1   A  No.

2   Q  Do you know of anybody else who did?

3   A  No.

4   Q  What did you do to prepare to come to testify

5      here today?

6   A  I reviewed the deposition transcript of

7      Mr. Tuttle.  I reviewed the deposition transcript

8      of Mr. Cooper.  I reviewed the prosecution

9      history, what I believe was the prosecution

10     history file that I was working with at Baker &

11     Daniels for the .650 Patent.  I reviewed certain

12     e-mails between myself and others relating to

13     that matter.  I reviewed certain provisions of

14     the MPEP and the CFR.

15   Q  Did you review the -- the provisional application

16     file?

17   A  Not that I recall.

18   Q  At this point, what I'd like to do is I'd like to

19     focus your attention on the actual case itself.

20   A  Okay.

21   Q  Can you tell us how you first became involved in

22     the prosecution of what became the .650 Patent?

23   A  Yes.  The application was originally being

24     handled by Barnes & Thornburg.  And it's my

25     understanding that Barnes & Thornburg had a

1    conflict that required them to withdraw -- or I

2    shouldn't say required.  They had a conflict of

3    some sort that resulted in the file being

4    transferred to Baker & Daniels.

5  Q  And I think the record's clear on this, but let's

6    be sure.

7       You were at Baker & Daniels all the way up

8    through the issuance of this patent; is that

9    right?

10 A  Yes.  I -- I believe that's correct, yes.

11 Q  And at the time that you became aware of this

12   conflict, can you tell us how the -- how the file

13   came to be in your possession or how the

14   responsibility for the prosecution came to be

15   yours?  Tell us about that.

16 A  I believe Jim Brotherson of Baker & Daniels

17   called or e-mailed or stopped by my office and

18   asked me if I could become involved in this

19   matter.

20 Q  And did you, in fact, get the file from

21   Mr. Cooper and Barnes & Thornburg?

22 A  I believe I did, yes.

23 Q  And, at that time, approximately what -- what

24   month, year?  Do you recall when that was?

25 A  I don't recall.

1   Q  Okay.  Would that have been your normal practice

2       to do that?

3   A  Yes.

4   Q  Okay.  And who was the person at Heartland that

5       was your contact, if there was such a person,

6       when you began working on this, what became the

7       .650 Patent?

8   A  Scott Tuttle.

9   Q  And what did you understand Mr. Tuttle's title to

10      be, if any?

11   A  I -- I don't -- I don't recall what his title

12      was.

13   Q  Was he the only contact you had in the -- from

14      Heartland in connection with the prosecution of

15      this patent?

16   A  That depends what you mean by contact.

17   Q  Well, what I'm trying to get at is, who was the

18      person that you were working with at the client

19      for direction and things like that to get the --

20      the prosecution handled?

21   A  Primarily Mr. Tuttle.

22   Q  Okay.  You said, "Primarily Mr. Tuttle."  Who

23      else did you have contact with on those issues?

24   A  I had contact with Mr. Brady on this matter, and

25      I had contact with Mr. Rhymer on this matter.  I

1    may have had contact with others, but those are

2    the three I recall.

3  Q  Would it be fair to say that Mr. Tuttle was the

4    one that you had, by far, the most contact with?

5  A  I believe that's the case.

6  Q  And did you take your direction from Mr. Tuttle?

7  A  If any of the three of them gave me direction, I

8    would've taken it.

9  Q  Can you tell us about what contacts you had with

10    Mr. Brady in connection with the prosecution of

11    the 6 -- what became the .650 Patent?

12  A  Yes.  I met with Mr. Brady at Heartland, I

13    believe, on at least three occasions.  I'm sure

14    there were at least two, might have been three,

15    might have been more.  I recall speaking to him

16    on the phone on at least one occasion.  There may

17    have been e-mails with Mr. Brady as -- as well.

18  Q  Can you tell us what the meetings were about on

19    these three occasions that you met with Mr. Brady

20    about the prosecution of the .650 Patent?

21  A  Generally speaking, yes.  We would have

22    discussed -- or we did discuss, I should say, the

23    status of the application.  We discussed the

24    subject matter being pursued in the application.

25    We discussed -- and I just want to make clear

1    this isn't necessarily all at the same meeting.

2        I'm just saying over the course of my

3    dealings with Mr. Brady, these are the topics we

4    -- we discussed.

5  Q  Uh-huh.

6  A  We discussed whether or not there was prior art

7    that he was aware of.  And we discussed potential

8    infringement of any claims that might issue.  And

9    we discussed the possibility of expediting

10    issuance of the patent.  And that's everything I

11    can recall.

12  Q  And all of those -- if I -- I want to make sure

13    I'm clear on this.  That was the at least three

14    meetings that you had with Mr. Brady during the

15    pendency of the .650 application; is that right?

16  A  I can't say for sure that all three occurred

17    during the pendency.  It's possible one occurred

18    after the .650 issued.

19  Q  Okay.

20  A  But at least some of those discussions would've

21    occurred during the pendency of the .650.

22  Q  And what about Mr. Rhymer?  What -- what -- well,

23    wait a minute.  Let me back up.

24        You said you spoke on the phone at least

25    once --

1       meetings that you had with Mr. Brady?

2   A  I don't know that he was present at all three of

3       them. I have a similar -- similar recollection.

4       I met with Mr. Rhymer, I believe, at least twice.

5       I believe Mr. Brady was present at at least one

6       of those meetings, possibly two. And it's

7       possible that I met with Mr. Rhymer more than --

8       more than twice; but there's at least two times

9       that I recall.

10   Q  Okay. And did you discuss the same topics then

11       with --

12   A  Yes.

13   Q  Okay. Tell us what you discussed with Mr. Brady

14       or Mr. Rhymer with respect to the status of the

15       application.

16       Can you give us an overview of what that

17       topic was?

18   A  Yes. They wanted to know how much longer it was

19       going to be until we could expect the application

20       to actually -- well, actually, they wanted to

21       know how much longer it's going to be until we

22       could expect to get any action from the Patent

23       and Trademark Office, as I recall. The

24       application was pending for some period of time

25       without an office action, and they were very

1    travel trailer that was configured such that it

2    would effectively with a -- with an extended bed

3    pickup truck or a pickup truck have a -- have a

4    better turning radius.

5        The cab of the truck would not hit the front

6    of the travel trailer as -- as the tow vehicle

7    and tow unit were -- were making a turn.

8  Q  Did that improved fifth wheel travel trailer --

9    did that include changes to the end cap as well

10   as the frame?

11 A  Yes.  That's my understanding.

12 Q  Okay.  And did -- in your mind, did Mr. Brady,

13   Mr. Rhymer, and Mr. Tuttle all have the same

14   understanding of what the invention was?

15 A  I -- I believe so.

16 Q  You mentioned that you also spoke with Mr. Brady

17   and Mr. Rhymer about the prior art that they were

18   aware of; is that correct?

19 A  Yes.

20 Q  Tell us what conversations you had with Mr. Brady

21   and/or Mr. Rhymer about the prior art they were

22   aware of.

23 A  Well, what I recall specifically, and there could

24   be additional conversations, but I recall at some

25   point in this process Mr. Fountain had sent a

1    Q   You can answer.

2    A   Not -- in my opinion, not that I recall.  There

3        was nothing unusual.

4    Q   I may have asked this.  And if I -- if I did, I

5        apologize.  But what did you tell Mr. Rhymer,

6        Mr. Brady, or Mr. Tuttle was the prior art that

7        you needed to be aware of or be made aware of in

8        connection with the prosecution of this patent?

9    A   Well, I mean, you can't identify specific pieces

10       of prior art that you're -- I can't identify

11       specific pieces of prior art that I'm unaware of.

12       So, I -- you know, I can't say to them, "I need

13       you to give me this piece of art."

14           You know, we discussed that, you know,

15       anything that was out there, prior patents,

16       publications, products, you know, that were

17       similar to this or achieve a similar purpose or

18       that, you know, someone might consider material,

19       you know, to their invention, it should be

20       brought to our attention and that they should err

21       on the side of disclosing more to us, not less,

22       and then we'll -- I could sort out whether or not

23       something actually needed to be disclosed.

24   Q   Did you have any discussions with Mr. Cooper in

25       connection with taking over the -- the case?

1    please?

2  A  85 and 86?  Yes.

3  Q  Yes, sir.

4  A  Okay.

5  Q  And what are 685 and 686?

6  A  This is an Information Disclosure Statement.

7     It's used to essentially bring to the attention

8     of the patent examiner information which could

9     potentially be material to patentability.

10 Q  And did you prepare this or have someone in your

11    office prepare it or do you recall?

12 A  I -- either I would've -- I most likely had my

13    paralegal prepare this at -- at my direction.

14 Q  And how did she determine what patents or

15    materials to be included in the information

16    disclosure statement?

17 A  Well, I don't -- I don't know that she did.  As I

18    recall, there were patents in the file.  It

19    appeared that a search had been done or -- or art

20    had been gathered from somewhere.  And I would've

21    instructed her to prepare an IDS including all

22    that information.

23 Q  And that's your recollection?  You told her to

24    put all the -- all the patents into the IDS?

25 A  Yes.

1    Q   Okay.  And if I -- I want to make confident --

2        strike that.

3            The patents that you put in this information

4        disclosure statement were already in the file

5        when you received it?  Is that your recollection?

6    A   That is my recollection.

7    Q   Could you take a look at Pages 680 to 681?  Let

8        me know when you've done that.

9    A   Okay.

10   Q   And what are those documents?

11   A   This is a Response to a Notice to File Missing

12       Parts of, I assume, this patent application.

13   Q   And can you tell us, did you file those missing

14       parts or did Mr. Cooper or can you tell?

15   A   Appears that Mr. Cooper did.

16   Q   Can you help us understand why the IDS would be

17       kind of in the middle of the stuff that Mr.

18       Cooper was filing?  Because you filed the IDS,

19       correct?

20   A   Yes.  I mean, I have to go back to the timing.  I

21       assume that before he filed the IDS, the file was

22       transferred to me.  I mean, I assume it was a

23       timing issue.  But I -- other than that, I can't

24       say.

25   Q   Well, let me ask a better question.  There was no

1     like it made some objection to the drawings and

2     the specification.

3  Q  And how did you respond to this office action?

4  A  As I believe -- as I recall, I believe the

5     response was to correct whatever informalities

6     there were with respect to the drawings and the

7     specification, cancel the rejected claims,

8     thereby seeking allowance of the allowed claims.

9     That's what I recall.

10 Q  And when you look at the Information Disclosure

11    Statement by Applicant and then Notice of

12    References Cited, Pages 611 and 612 --

13 A  Uh-huh.

14 Q  -- can you tell us what the significance of those

15    pages are?

16 A  That's the prior art that the examiner located in

17    his or her search and made of record in this

18    application, some of which I assume was used to

19    reject the claims that were rejected.  Yes.

20 Q  What is the significance of the examiner initials

21    being next to the art that was submitted by

22    Heartland, if any?

23 A  That means that the examiner considered those

24    references in the course of his or her handling

25    of this patent -- his.  It's Michael Stabley.  In

1    the course of his handling of this patent

2    application, his examination of it.

3  Q  Did you have any communication with Mr. Stabley

4    at any point?

5       Did you ever speak to him in connection with

6    this application?

7  A  I believe I did.

8  Q  And can you tell us on what occasion and about

9    what?

10  A  I don't recall what the dates would be.  I

11    believe my only discussions with Mr. Stabley were

12    about the status of the application and when we

13    could expect to receive an action.  I don't

14    believe I had any substantive conversations with

15    him.

16  Q  Were those conversations part of the desire by

17    Heartland to get this patent issued more quickly?

18  A  Yes.

19  Q  Take a look at Pages 587 to 591 and tell us what

20    those are.

21  A  This is the response that was filed to the office

22    action we've just discussed.

23  Q  And this is the response that was made that

24    allowed the three claims that had been allowed to

25    issue and led to the continuation applications;

1   Q  There was some indication from the patent office

2      that it was gonna publish by a certain date, and

3      then it published actually a later date.

4          Do you recall anything like that?

5   A  I don't recall that.

6   Q  Do you recall any discussions with Mr. Tuttle

7      about when the application would publish?

8   A  Yes.  I have some recollection that we discussed

9      when it would publish.

10  Q  Can you tell us about the substance of those

11     recollections?

12  A  I know we talked about applications normally

13     publishing 18 months from their priority date.  I

14     don't recall what else we discussed on that

15     topic.

16  Q  Would you take a look at Pages 545 to 557, if you

17     would, please?

18  A  Sorry.  545 through 57?

19  Q  Yes, sir.

20  A  Okay.

21  Q  545 has on it an e-mail from you to Mr. Tuttle

22     including the formal drawings for the patent; is

23     that right?

24  A  Yes.

25  Q  And then at the top, Mr. Tuttle responds to you

1    and identifies different changes that he thinks

2    needs to be made and approves the remaining

3    drawings; is that correct?

4  A  Yes.

5  Q  Do you recall discussing with Mr. Tuttle these

6    drawings?

7  A  I don't --

8              MR. LADUE:  By these, you mean

9          the ones that are in this --

10              MR. IRMSCHER:  Yeah.  The ones

11          that are the --

12              MR. LADUE:  -- range?

13              MR. IRMSCHER:  -- 545 to 557.

14  A  You mean beyond the discussion that's contained

15    in the correspondence?

16  BY MR. IRMSCHER:

17  Q  Yes.

18  A  I don't recall discussing them with him.  It's

19    possible I did.

20  Q  Well, would it be fair to say that Mr. Tuttle

21    reviewed, made corrections to, and approved the

22    drawings?

23  A  Yes.

24  Q  And did anybody else at Heartland review and

25    approve the drawings, to your knowledge?

1    A    Not that I'm aware of.

2    Q    And why did you happen --

3    A    You're talking about this set of drawings?

4    Q    Yes.

5    A    Not that I'm aware of.

6    Q    And why did you happen to send this set of

7         drawings to Mr. Tuttle for his review and

8         approval?

9    A    I assume that the application was filed with

10        informal drawings or, alternatively, there was an

11        error in the drawings and new drawings needed to

12        be submitted.  But I don't recall exactly why

13        these were prepared.

14   Q    Did you have any sense at the time that you

15        were -- at any time that you communicated with

16        Mr. Tuttle that he did not understand what the

17        invention was?

18   A    No.

19   Q    Did Mr. Tuttle ever tell you he didn't understand

20        what the invention was?

21   A    No.

22   Q    Would you please take a look at Pages 542 and

23        543?

24   A    (Witness Complying.)  Okay.

25   Q    Why did you have your paralegal send these

1    A   Well, they're --

2    Q   Portions of it?

3    A   -- drawings sheets.  They're portions of it.

4    Q   Okay.  And why did you send that material to

5        Mr. Tuttle?

6    A   Well, one, I wanted to update him on the fact

7        that an office action had been issued and what

8        the results of that action were.  I also wanted

9        to show him what the patent examiner was relying

10       on to reject the claims that were rejected so

11       that we could discuss the prior art and the

12       rejections and the allowed claims and the -- the

13       office action.

14   Q   And did you, in fact, discuss those matters with

15       Mr. Tuttle?

16   A   It's my recollection that I did, yes.

17   Q   Would you take a look at Page 486, please?

18   A   Okay.

19   Q   Do you recall receiving this e-mail or --

20   A   I recall receiving this e-mail, yes.

21   Q   Okay.  Do you recall discussing with Mr. Tuttle

22       what the prior art relied upon by the examiner

23       disclosed?

24   A   Yes.

25   Q   Tell us about those discussions.

1  A  I believe -- as I recall, Mr. Tuttle's view was

2     that the horse trailer and the conventional

3     travel trailer weren't particularly relevant or

4     applicable.  We would've also discussed the

5     allowed claims.  And I assume around this time we

6     were probably having discussions about filing a

7     continuation application.

8  Q  Would you take a look at Page 484, please?

9  A  (Witness Complying.)  Okay.

10  Q  Do you recall having -- or receiving the e-mail

11     that's from Mr. Tuttle and your response to it?

12  A  Yes.

13  Q  Were there discussions beyond just this e-mail at

14     this time?

15  A  Yes.

16  Q  Tell us about those discussions.

17  A  Well, they're referenced in my response to

18     Mr. Tuttle.  We discussed what the claims that

19     were allowed cover.  We discussed filing a

20     further application, a continuation application,

21     to seek other claims.

22  Q  And is that, in fact, what happened?

23  A  Yes.

24  Q  Tell us what you can about your recollection of

25     discussing what the claims that were allowed

1     would cover with Mr. Tuttle at this time.

2          And, at this time, I'm talking about July of

3     2007.

4   A  As I recall the claims, three claims were

5     allowed.  One was an independent claim.  And they

6     related essentially to the travel trailer chassis

7     and the construction of the frame with sort of a

8     cut-out or notched or otherwise configured

9     corner.

10         And I recall discussing with Mr. Tuttle just

11    that; that this is -- this is the claim, this

12    is -- you know, if -- if something has these

13    elements, then this claim covers it.

14  Q  Did you have any under -- did it appear to you

15    that Mr. Tuttle understood what the claims

16    covered and what the issues were?

17  A  Yes.

18  Q  And who transmitted the decision to you to take

19    the claims that you could get and file a

20    continuation?

21  A  I believe it's in Mr. Tuttle's e-mail here.

22  Q  Did you discuss that with any of the other

23    inventors at that time?

24  A  I don't recall at this time if I discussed this

25    with Mr. Rhymer or Mr. Brady.  It's -- it's

1    Q   But in this case, you actually did that?  That's

2        your testimony, right?

3    A   I think I just answered that question.

4    Q   So, the answer's yes, isn't it?

5    A   Yes.  I actually sat down, and I read this

6        application.  And, to my recollection, nothing

7        came to mind when I was reading it that I

8        thought, oh, gee, you know, I'm aware of this

9        thing and this is similar and this ought to be

10       submitted; at least anything that would be, you

11       know, noncumulative.

12   Q   Anything that would be noncumulative?  What do

13       you mean by that?

14   A   Well, I believe there's art in the file that

15       shows, for example, fifth wheel travel trailers

16       or travel trailers.  If there's something that

17       shows three travel trailers, you know, submitting

18       yet another example of the same kind of travel

19       trailer would be cumulative.

20                   MR. FOUNTAIN:  Excuse me just for

21                   a minute.  Perhaps we could have that

22                   door shut -- or window shut.

23                   MR. LADUE:  Yeah.

24   BY MR. FOUNTAIN:

25   Q   You mentioned earlier you participated in the