# Tab H



US007278650B2

(12) **United States Patent**
Brady et al.

(10) Patent No.: **US 7,278,650 B2**
(45) Date of Patent: **Oct. 9, 2007**

(54) **TRAVEL TRAILER HAVING IMPROVED TURNING RADIUS**

(75) Inventors: **Brian R. Brady**, Elkhart, IN (US); **John Mitchell Rhymer**, Nappanee, IN (US); **Douglas Martin Lantz**, Middlebury, IN (US); **Timothy Arthur Hoffman**, Osceola, IN (US); **Scott James Tuttle**, Elkhart, IN (US)

(73) Assignee: **Heartland REcreational Vehicles, LLC**, Elkhart, IN (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 422 days.

(21) Appl. No.: **11/091,070**

(22) Filed: **Mar. 28, 2005**

(65) **Prior Publication Data**

US 2006/0038379 A2    Feb. 23, 2006

**Related U.S. Application Data**

(60) Provisional application No. 60/557,302, filed on Mar. 29, 2004.

(51) Int. Cl.
*B62D 53/06*    (2006.01)

(52) **U.S. Cl.** .................. 280/441.2; 280/783; 280/789; 296/168; 296/24.31; 296/182.1; 296/186.1

(58) **Field of Classification Search** ............. 280/441.2, 280/783, 789; 296/168, 24.31, 182.1, 186.1
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,767,132 | A * | 8/1988 | Avery ..................... 280/414.1 |
| 5,746,473 | A | 5/1998 | Crean |
| 6,170,903 | B1 | 1/2001 | Crean |
| 6,231,115 | B1 | 5/2001 | Crean |
| 6,343,830 | B1 | 2/2002 | Ingram et al. |
| 6,447,038 | B1 * | 9/2002 | Davis et al. ............. 296/26.05 |
| 6,502,894 | B1 | 1/2003 | Ingram et al. |
| 6,792,630 | B1 | 9/2004 | Palmatier et al. |
| 6,802,521 | B1 | 10/2004 | Boughton |
| 6,807,735 | B2 | 10/2004 | Crean |
| 6,808,195 | B2 | 10/2004 | Smith |
| 6,832,809 | B2 | 12/2004 | Wang et al. |
| 6,846,000 | B2 | 1/2005 | Grinde et al. |
| 6,860,545 | B1 | 3/2005 | Ingram et al. |
| 6,866,283 | B2 | 3/2005 | Alguera et al. |
| 6,866,330 | B2 | 3/2005 | Jones et al. |
| 2002/0003341 | A1 * | 1/2002 | Hall ........................ 280/423.1 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| DE | 3321306 | A1 * | 12/1984 |
| EP | 435759 | A1 * | 7/1991 |

* cited by examiner

Primary Examiner—George B. Nguyen
Assistant Examiner—Michael Stabley
(74) Attorney, Agent, or Firm—Baker & Daniels LLP

(57) **ABSTRACT**

A travel trailer configured to be coupled to and towed by a vehicle is provided. The travel trailer has a compartment that is attached to a chassis which includes a front end and a rear end. A plurality of wheels are attached to the chassis adjacent the rear end, and a hitch assembly is attached to the chassis adjacent the front end. The compartment at the front end of the chassis forms first and second corners. A recess, directed inwardly toward the interior of the compartment, is located at each corner of the compartment. Cavities formed by each recess may receive a portion of the vehicle while the vehicle is engaged in a turn.

**3 Claims, 11 Drawing Sheets**





FIG. 1



FIG. 2



FIG. 3



FIG. 4
PRIOR ART



FIG. 5



FIG. 6



FIG. 7

FIG. 8



FIG. 9





FIG. 13



FIG. 12



# TRAVEL TRAILER HAVING IMPROVED TURNING RADIUS

## RELATED APPLICATIONS

The present application is related to and claims priority to U.S. Provisional Patent Application Ser. No. 60/557,302, filed on Mar. 29, 2004, entitled IMPROVED FIFTH WHEEL TRAILER. The subject matter disclosed in that provisional application is hereby expressly incorporated into the present application.

## TECHNICAL FIELD

The present disclosure relates generally to travel and fifth wheel-type trailers. In particular, the present disclosure is related to the configuration of such trailers that are hitched to, and pivotable relative to, an attached towing vehicle.

## BACKGROUND AND SUMMARY

Travel trailers and fifth wheel trailers are commonly known and used as campers or used for hauling. Typically, fifth wheels are configured to be pivotably attached to pickup or similar type trucks. The bed of the pickup truck has a mating hitch attached thereto configured to receive a hitch located on the underside of the forward end of the fifth wheel. The fifth wheel often comprises an upper deck and a lower deck. The upper deck is typically located forward on the fifth wheel and is configured to extend over the rear of the pickup truck so the hitch can attach to the mating hitch on the truck's bed.

An issue that has arisen in recent years with fifth wheels, precipitated by the development and popularity of extended-cab pickup trucks. These extended-cab pickup trucks, which typically offer a second row of seating, extend the cab length often at the expense of the bed length. A consequence of this is that more pickup trucks now exist with shortened beds than in the past. Accordingly, the upper decks of conventional fifth wheels now occupy a greater portion of that shortened bed than in truck beds of the past. The less space that exists between the cab of a short bed truck and the forward end of the fifth wheel, the more impaired the turning radius of the truck can be.

Conventionally, the upper deck of a typical fifth wheel has a rectangular or parallelogram-shape footprint whose forward corner edges form right-angles. The compartment extending upward therefrom is similarly cubicle and includes right-angled corner edges as well. These right-angled corner edges of the fifth wheel have a propensity to hit the rear corner of the cab of a tow vehicle if the turning radius of that vehicle becomes too great. As a result, the driver of the tow vehicle is required to either take broader turns or engage specialty hitches that extend the distance between the cab and the fifth wheel. These are not always desirable options because often there may not be available space to make a broad turn, and specialty hitches are cumbersome and expensive. Typically, these hitches are engaged before the turn and disengaged after the turn. It would, therefore, be beneficial to provide an alternative design of fifth wheel or travel trailer that is configured to increase the turning radius of the vehicle.

Accordingly, an illustrative embodiment of the present disclosure provides a travel trailer characterized by a chassis assembly coupled to a wheel assembly. A compartment is provided having at least one side wall and a forward wall. A hitch assembly is located adjacent the chassis assembly, and

the forward wall. The hitch assembly is configured to couple to a mating hitch on a towing vehicle. The travel trailer also comprises a panel located between the side and forward walls. The panel forms an angle between itself and at least the side wall that is greater than 90 degrees.

In the above and other illustrative embodiments, the travel trailer may also comprise: the angle formed between the sidewall and the panel reduces any right-angled attachment between the side and forward walls to improve the towing vehicle's turning radius relative to the travel trailer; the panel forms an angle between itself and forward wall that is greater than 90 degrees; the panel eliminates any right-angle attachment between the side and forward walls; and the chassis assembly comprises a recess at edges adjacent the panel.

Another illustrative embodiment of the travel trailer comprises a chassis, a wheel assembly, a hitch assembly, and an outer coupling rail. The chassis includes a front end and a rear end. The chassis also includes a front outer frame rail located substantially perpendicular to a side outer frame rail. The wheel assembly is coupled to the chassis adjacent the rear end. The hitch assembly is attached to the chassis adjacent the front end. The outer coupling rail extends between the front and side frame rails. The outer coupling rail forms an angle between itself and at least the side frame rail at a front edge of the travel trailer that is greater than 90 degrees.

In the above and other illustrative embodiments, the travel trailer may also comprise: the coupling rail forming an angle between itself and the front frame rail that is greater than 90 degrees to improve the towing vehicle's turning radius relative to the travel trailer; the coupling rail eliminating a right-angle attachment between the side and front frame rails; and a compartment attached to the chassis at the front edge adjacent the outer coupling rail which comprises an inwardly oriented recess that extends from the chassis.

Another illustrative embodiment of the travel trailer comprises a chassis, a forward panel, at least one side panel, and a corner panel. The chassis assembly comprises a hitch assembly adjacent a front ends of the trailer and a plurality of wheels adjacent a rear end of the trailer. The forward panel is located at the front end. The corner panel joins the forward and side panels but does not form a right-angled vertex between the forward and side panels. This allows an increased turning radius for the trailer as compared to forward and the side panels that join to form a right-angled vertex.

In the above and other illustrative embodiments, the travel trailer may also comprise: the corner panel forming a recess at a front edge of the travel trailer; the chassis assembly comprising a frame assembly having a corner rail located at a front corner of the frame that does not form a right-angled vertex at the front corner of the frame; and a compartment having right and left front corners, each of which is recessed inwardly to allow an increased turning radius for the trailer as compared to front edges having a right-angled vertex.

Another illustrative embodiment of the travel trailer comprises a chassis, a compartment, and a corner panel portion. The chassis comprises a hitch assembly adjacent a front end of the trailer and a plurality of wheels adjacent a rear end of the trailer. The compartment comprises at least a forward panel portion located at the front end and at least one side panel portion. The corner panel joins the forward and the side panels and recesses inwardly toward the interior of the compartment to allow an increased turning radius for the travel trailer as compared to forward and the side panels that join to form a right-angled vertex.

Another illustrative embodiment is a travel trailer for use with a towing vehicle. The towing vehicle has a mating hitch coupled thereto and is configured to haul the travel trailer. The travel trailer further comprises a chassis and a hitch. The chassis itself comprises first and second longitudinally extending side frame members, forward and rearward cross-members, and a first brace. The first and second longitudinally extending side frame members are oriented substantially parallel to each other and located exteriorly on the chassis. The forward and rearward cross-members are oriented substantially perpendicular to the first and second side members. The forward cross-member is also located exteriorly on the chassis and whose end does not attach to a corresponding end of the first side member. The first brace is attached adjacent the ends of forward cross-member and the first side member, and is located exteriorly on the chassis, and is oriented non-parallel to both the forward cross-member and the first side member. The hitch is attached to a portion of the chassis and couples with the mating hitch on the towing vehicle.

In the above and other illustrative embodiments, the travel trailer may also comprise: the towing vehicle having a bed that has the mating hitch attached thereto, and wherein a portion of the chassis is located over the bed; a compartment attached to the chassis and at least one recessed corner edge located at a forward end of the trailer adjacent the first brace to allow an increased turning radius for the travel trailer; and a frame having angled corner edges adjacent the recesses at the front end of the compartment.

Another illustrative embodiment is a travel trailer configured to be coupled to, and towed by a vehicle. The travel trailer comprises, a compartment attached to a chassis that includes a front end and a rear end. A plurality of wheels is attached to the chassis adjacent the rear end and a hitch assembly is attached to the chassis adjacent the front end. The compartment at the front end of the chassis forms first and second corners. A recess is located at each corner edge of the compartment such that cavities formed by each recess may receive a portion of the vehicle while the vehicle is engaged in a turn.

Another illustrative embodiment is a travel trailer configured to be coupled to, and towed by a vehicle. The travel trailer comprises a compartment attached to a chassis that includes a front end and a rear end. A plurality of wheels is attached to the chassis adjacent the rear end and a coupling is attached to the chassis adjacent the front end. The front end of the chassis forms first and second corner edges that are recessed.

Another illustrative embodiment is a travel trailer configured to be coupled to, and towed by a vehicle. The travel trailer comprises a chassis assembly, a hitch, a compartment and a cap. The chassis assembly includes front and rear ends. The hitch is attached to the chassis assembly adjacent the front end. The compartment is attached to the chassis assembly. The cap is located at the front end of the chassis and attached to the compartment. The cap has at least one front corner edge that includes a recess directed inward toward the compartment.

In the above and other illustrative embodiments, the travel trailer may also comprise: the cap further comprising a second front corner edge that also includes a recess directed inward toward the compartment; the space formed by the recesses being configured to receive a portion of the vehicle when engaged in a turn; the cap being a monolithic structure; and the cap being a plurality of structures.

Additional features and advantages of the travel trailer will become apparent to those skilled in the art upon

consideration of the following detailed description of the illustrated embodiment exemplifying the best mode of carrying out the travel trailer as presently perceived.

## BRIEF DESCRIPTION OF DRAWINGS

The present disclosure will be described hereafter with reference to the attached drawings which are given as non-limiting examples only, in which:

FIG. 1 is front perspective view of an illustrative trailer including recessed front corners according to an illustrative embodiment of the present disclosure;

FIG. 2 is a top perspective detail view of a front corner edge portion of the trailer and a rear cab portion of a tow vehicle engaged in a turn;

FIG. 3 is another top perspective detail view showing the other front corner edge portion of the trailer and the other rear cab portion of the tow vehicle engaged in a turn;

FIG. 4 is a top schematic view of an illustrative tow vehicle and a prior art trailer;

FIG. 5 is a top schematic view of the illustrative tow vehicle of FIG. 4 and a trailer according to an illustrative embodiment of the present disclosure;

FIG. 6 is a perspective view of a trailer frame according to an illustrative embodiment of the present disclosure;

FIG. 7 is a perspective view of a portion of the trailer frame of FIG. 6;

FIG. 8 is a detail perspective view of a portion of the trailer frame about section A of FIG. 7;

FIG. 9a is a top view of a portion of a prior art trailer frame;

FIG. 9b is a top view of a portion of the trailer frame of FIG. 6;

FIG. 10 is a perspective view of a portion of a trailer frame according to another illustrative embodiment of the present disclosure;

FIG. 11 is a perspective view of the portion of the frame of FIG. 10 including a front cap assembly coupled thereto;

FIG. 12 is a perspective view of a portion of a trailer frame according to another illustrative embodiment of the present disclosure;

FIG. 13 is a perspective view of the portion of the frame of FIG. 12 including a front cap assembly coupled thereto;

FIG. 14 is a perspective view of a portion of a trailer frame according to another illustrative embodiment of the present disclosure; and

FIG. 15 is a perspective view of the portion of the frame of FIG. 14 including a front cap assembly coupled thereto.

Corresponding reference characters indicate corresponding parts throughout the several views. The exemplification set out herein illustrates embodiments of the travel trailer, and such exemplification is not to be construed as limiting the scope of the travel trailer in any manner.

## DETAILED DESCRIPTION OF THE DRAWINGS

A front perspective view of an illustrative fifth wheel or travel trailer 2 is shown in FIG. 1. The trailer shown in this view is commonly referred to as a fifth wheel trailer. This trailer 2, as well as other trailer designs, generally comprises a compartment 4 that sits on a frame chassis 6 (see, e.g., FIGS. 6 through 15) which are tied to a plurality of wheels 8. This trailer 2 includes a dual deck design having a step 10 located near the front end 12 of trailer 2. The step 10 allows the upper deck 16 of compartment 4 to extend over the bed of a tow vehicle 14 such as a pickup truck. (See also FIG. 2.) Attached to upper deck 16 of trailer 2 is a hitch assembly

18. This hitch assembly 18 is located adjacent the front end 12 of trailer 2, as well. The hitch assembly 18 is configured to engage a mating hitch assembly, typically located on bed 22 of the vehicle 14. (See, e.g., FIG. 2.)

The forward most end of the compartment comprises an illustrative forward end cap 24. In this illustrative embodiment, end cap 24 comprises a forward face 26, recessed corner edges 28, 30 and side panels 32, 34. Illustratively, the forward face 26 is bowed outwardly from compartment 4 with its apogee located near the vertical center of the same, as shown in FIG. 1. Also, as one illustrative embodiment, the recessed corner edges 28, 30 follow a similar contour as forward face panel 26. This allows a portion of the compartment to extend forward of the rear end of passenger compartment 36 of tow vehicle 14. (See, e.g., FIG. 5.) In addition, at least a portion of the front corners of the trailer 2 are occupied by the recessed corner edges 28, 30. Clearance provided by recessed corner edges 28, 30 is particularly useful for fifth wheels and other trailers that include an upper deck 16 similar to that shown herein. Since the portion of the compartment located over upper deck 16 is adjacent the rear end of passenger compartment 36 on vehicle 14, limited distance between the two structures may exist. It is this limited distance that inhibits the turning radius of the vehicle 14. As shown in FIG. 1, the space formed by the inward-directed, arcuate profile corners, can receive a portion of compartment 36, thus, creating enhanced turn radiuses, as compared to conventional right-angle vertex cornered edges of conventional trailers. The distinction between the two corner types is illustratively indicated by reference numeral 38. Thus, recessed corner edges 28, 30 are directed inwardly toward the interior of compartment 4, the effective turn radius available for the trailer can be enhanced over conventional fifth wheel or other travel trailers having standard 90 degree corner edges.

It is appreciated that alternative embodiments of forward end cap 24, may include any number of shapes having inward-directed corners. Cap 24 may also be manufactured from a plurality of panels, or may be a monolithic molded or formed structure. Illustratively, in one embodiment, forward face 26 may comprise a separate forward panel, separate recessed, and/or even separate angled panels attached thereto, along with separate side panels attached thereto. It is further appreciated that in other illustrative embodiments, the recessed corner edges can be of varying shape, depth, contour, and angle to accommodate and increase the turning radius of the attached vehicle.

A top perspective detail view of recessed corner edge 30 of trailer 2 coupled to vehicle 14 which is engaged in a turn, is shown in FIG. 2. A cavity 42 produced by the contour of recessed corner edge 30 receives at least a portion of corner 44 of vehicle 14. As shown in this view, mating hitch assembly 20 is attached to bed 22 of vehicle 14 and is engaged to hitch assembly 18 to pivotably attach trailer 2 to vehicle 14. (See, also, FIG. 3.) This view demonstrates how such a turn would not be possible without recessed corner edge 30. Side wall 34, if extended more forwardly on trailer 2, along with front face 26 extending its width, a conventional right-angle corner edge would be formed that would become crushed during such a tight turn shown therein. From this view it is appreciated that the recessed corner edge 30 can be contoured as desired, so its cavity 43 receives a portion of the corner of the cab of the vehicle having any unique or conventional configuration. (See FIG. 3.) It is contemplated herein that the invention is not limited to the specific size, shape, and contour of the recessed portion. It can further be seen from this view how the arcuate contour

of forward end cap 24 can increase the amount of available space in the compartment by being able to extend over at least a portion of passenger compartment 36 of vehicle 14. (See, also, FIG. 5.) This may be achieved either independently or in combination with recessed corner edges 28, 30.

Another top perspective detail view showing an opposite turn of vehicle 14 with respect to trailer 2, is shown in FIG. 3. This view demonstrates how recessed corner edge 28, similar to that shown with respect to recessed corner edge 30, can increase the turn radius of vehicle 14. Such a sharp turn, as depicted in this view, could not be achieved with a trailer having conventional right-angled corner edges.

To further illustrate, a top schematic view of tow vehicle 14 hitched to a prior art, conventionally-shaped trailer 46, is shown in FIG. 4. As vehicle 14 turns in direction 48, the corner 50 of prior art trailer 46 impacts rear corner 44 of passenger compartment 36 at a relatively shallow angle. This produces a relatively large crush zone as indicated by reference numeral 52 at impact 54. Because the forward corners of prior art trailer 46 include corners having right-angled edges as indicated by reference numerals 50 and 56, the turn radius is relatively small, as indicated by reference numeral 58.

In contrast, as shown in FIG. 5, the same vehicle 14 is shown making a turn with an illustrative embodiment of trailer 2 hitched thereto. As shown, when vehicle 14 turns in direction 48, the recessed corner edge 30 provides enough clearance to create a relatively large turn radius, indicated by reference numeral 60, and has a relatively small crush zone 62 at impact point 64. It is also appreciated from this view how the illustrative arcuate shape of forward end cap 24, as described with respect to FIG. 1, may enhance the available space within compartment 4. In this view it is shown that the forward edge 66 is recessed towards the interior of compartment 4 relative to the forward most point of forward end cap 24. In one illustrative embodiment this combination between the arcuate shape of forward end cap 24 and the recessed positioning of forward edge 66 of chassis 6 provides a compromise between increased interior space of compartment 4 and the enhanced turning radius as shown.

A perspective view of an illustrative embodiment of chassis 6 is shown in FIG. 6. Chassis 6 is illustratively a frame that the flooring and compartment are built upon. Such framing includes side frame members 68, 70 extending longitudinal from front to rear and are joined by additional side frame members 72, 74. In this illustrative embodiment, cross beams 76 extend between the side frame members 68 through 74. Shown in this illustrative embodiment are also slide-out frame members 78 and 80. As discussed with respect to FIG. 1, this trailer includes a step 10 that provides the upper deck 16, herein formed on the chassis by side frame members 82, 84 and structurally secured by cross beams 86. As shown herein, side frame members 82, 84 do not extend and attach directly to forward edge beam 88. Rather, angled braces 90 and 92 extend between frame members 82, 84 and forward edge beam 88 respectively, as shown herein. Angled braces 90, 92, thus, effectively eliminate the right-angled corner edges known to inhibit the turning radius of the vehicle relative to the trailer. It is contemplated that the precise angle formed between, for example, frame members 82 and angled brace 90, can be of any angle to allow a recess to form. As illustratively shown herein, the angle formed between the two structures is greater than 90 degrees. The same is illustratively the case with the angle between forward edge beam 88 and both

angled braces 90, 92 as shown herein. Also shown are illustrative forward brace members 94, 96 which serve to strengthen chassis 6.

A perspective view of a portion of chassis 6 is shown in FIG. 7. Specifically, shown is the upper deck portion 16 which includes side frame members 82, 84, and cross beams 86. Forward edge beam 88 is shown attached to angled braces 90, 92, which are themselves attached to side frame members 82, 84, respectively. A detail view of a forward corner of upper deck 16 is shown in FIG. 8. This view further illustrates the attachment of angled brace 90 forward edge beam 88, and side frame member 82. It can be appreciated from this view how beam 88 and side frame member 82 do not directly attach, thus eliminating the right-angle corner edge that would otherwise be formed by their attachment.

Top views of the upper deck of the travel trailer are shown in FIGS. 9a and b. Specifically, FIG. 9a is a prior art version of such an upper deck, whereas FIG. 9b depicts upper deck 16 as discussed with respect to FIGS. 6 through 8. Comparing the structure of 9a to the structure of 9b much is similar except for the forward corners and the forward edge beams. For example, the prior art upper deck 94 uses side frame members 96, 98 to attach to forward edge beam 100 to form corner right-angled edges 50, 56. (See, also, FIG. 4.) It is these corner edges that can limit the turning radius of vehicle 14 for the reasons previously discussed. By comparison, such corner edges have been removed from upper deck 16, as indicated by reference numerals 106A, 104 in FIG. 9b.

Perspective views of another illustrative embodiment of an upper deck frame 106 are shown in FIGS. 10 and 11. As shown in FIG. 10, many of the side frame members 82, 84, as well as cross beams 86, are the same or similar to that shown in the previous embodiments. Furthermore, forward edge beam 88 is also positioned in a comparable location as prior embodiments. This illustrative embodiment differs from the prior embodiments from the perspective that angled braces 90, 92 are attached to the ends of frame members and beams 82, 88 and 84, 88, respectively. For example, angled brace 90 is attached to the terminus 108 of side frame member 82. Similarly, angled brace 90 is attached to terminus 110 of forward edge beam 88. Angled brace 92 follows suit by attaching to side frame member 84 at terminus 112 and to forward edge beam 88 at terminus 114. In this embodiment cross beams 116 and 120 illustratively provide structural support to the forward corners.

The perspective view of upper deck frame 106 in FIG. 11 shows an illustrative embodiment of forward end cap 24 attached thereto. The angled braces 90, 92 accommodate the recessed corner edges 28, 30, as previously discussed. It is appreciated that the recessed corner edges may follow the contour of braces 90, 92, or they may, as shown herein, form a differently shaped recessed cavity. Further shown in this view are illustrative attachments 124, 126 which are configured to be used to attach end cap 24 with compartment 4. It is appreciated, however, that other means of attachment and/or sealing can be employed.

Perspective views of another illustrative embodiment of upper deck 130 of a trailer are shown in FIGS. 12 and 13. As shown in FIG. 12, upper deck 130 is similar in several respects to the prior embodiments, including side frame members 82, 84, as well as cross beams 86 extending there across. The distinction from the previous embodiments is that angled braces 90, 92 are removed completely which illustratively provides an even deeper recess within the forward corners of the deck 130. As shown, cross beams

116, 120 serve as the outer structure of deck 130 at the forward corners. Although cross beam 116 forms a right-angle attachment with side frame member 82, and cross beam 120 does the same with forward edge beam 88, frame member 82 does not attach to forward edge beam 88 to form a right-angled corner edge as disclosed in the prior art. Rather the right angle attachments disclosed in this illustrative embodiment are directed inwardly toward the interior of compartment 4. Similar to the previous embodiments, forward end cap 24 is shown attached to upper deck 130 in FIG. 13. It is, again, appreciated that the recessed corner edges can be of any useful depth and may be formed to conform to the shape of the cavities created by cross beams 116, 120. Conversely, as shown herein, recessed corner edges 28, 30 may also take a differing recess shape than the cavities formed by cross beams 116, 120.

Perspective views of another illustrative embodiment of upper deck 140 of a trailer are shown in FIGS. 14 and 15. As shown in FIG. 14, upper deck 140 is similar in several respects to the prior embodiments, including side frame members 82, 84, as well as cross beams 86 extending there across. The distinction from the previous embodiments is arcuate braces 142, 144. As shown, cross beams 116 and 120 still serve as structural supports adjacent the forward corners. Arcuate braces 142, 144, however, serve as the outer frame members at the forward corners, each attached to their respective frame members 82, 84, and both attached to forward edge beam 88. The forward corners are still recessed as indicated by reference numerals 146, 148 which depict conventional forward frame corners. (See, also, FIG. 9a.) Similar to the previous embodiments, forward end cap 24 is shown attached to upper deck 140 in FIG. 15. It is, again, appreciated that the recessed corner edges 28, 30 can be of any useful depth and may be configured to conform to the shape of the cavities created by arcuate braces 142, 144. Conversely, as shown herein, recessed corner edges 28, 30 may also take a differing recess shape than the cavities formed by cross beams 116, 120.

Although the present disclosure has been described with reference to particular means, materials and embodiments, from the foregoing description, one skilled in the art can easily ascertain the essential characteristics of the present disclosure and various changes and modifications may be made to adapt the various uses and characteristics without departing from the spirit and scope of the present invention as set forth in the following claims.

What is claimed is:

1. A travel trailer chassis comprising:
    a forward edge beam having a first end;
    an outer side frame member substantially perpendicular to the forward edge beam, the outer side frame member having a forward end;
    a first cross beam substantially perpendicular to the side frame member and connected to the forward end of the side frame member at a location rearward of the forward edge beam; and
    a second cross beam substantially parallel to the outer side frame member and connected to the first cross beam and the first end of the forward edge beam.

2. The chassis according to claim 1, wherein the outer side frame member, first cross beam, second cross beam and forward edge beam form an inwardly directed recess.

3. The chassis according to claim 2, wherein the inwardly directed recess is a right angle.

* * * * *

# Tab I

1    travel-trailer.

2         And, I really deferred to those guys to help me in

3    that regards.

4         But, if you were to -- then I can't give you

5    specifics, but if you were to go back and look at

6    Damon's Sales during that period of time, you would see

7    that we were reasonably effective in Motorized Sales

8    and we weren't very effective in Towables at all.

9  Q  Do you consider yourself someone who is mechanically

10   inclined?

11 A  No.

12 Q  Have you ever built anything?

13 A  Anything?

14 Q  Yes.

15 A  Built models when I was a little kid.

16 Q  Anything else?

17 A  No.

18 Q  Do you know how to weld?

19 A  No.

20 Q  Have you ever repaired a kitchen sink?

21 A  No.

22 Q  Have you ever installed a light fixture?

23 A  No.

24 Q  When is the last time you picked up a saw?

25 A  I could recall sawing off a tree branch at my house

1            THE VIDEOGRAPHER:  We're back on the record

2        at 2:14 p.m.

3   MR. RYAN M. FOUNTAIN:

4   Q    Who at Heartland do you think is the most knowledgeable

5        person concerning Prior-Art with regard to the

6        invention of the Patent in this lawsuit?

7   A    I don't know if there was anybody that has expertise in

8        that area.

9            But, if there was somebody that would have any

10       expertise in that -- it would be John Rhymer in

11       Engineering.

12  Q    You understand that when a Patent Application is filed

13       with the United States Patent and Trademark Office it

14       goes through a process called "Patent Prosecution"?

15  A    No.

16  Q    Well, let's step back then.

17           Before the Application for the Patent of Exhibit 1

18       was filed -- ?

19  A    Okay.

20  Q    (Continuing)  -- did you review that Application?

21  A    No.

22  Q    Okay.

23           After the Application for that Patent was filed,

24       did you participate in any of the communications with

25       the Patent Office to get that Patent?

1    A    Yes.

2    BY MR. RYAN M. FOUNTAIN:

3    Q    That's your signature, isn't it?

4    A    Yes.

5    Q    You said you "...hereby covenant not to sue Forest

6         River...," et cetera, et cetera.

7              "...With respect to Forest River Inc's currently

8         existing products, whether such products are currently

9         existing or manufactured in the future..."

10             What did you mean by that?

11   A    Well, I'm not an Attorney.

12             So, really, in all candor, Baker and Daniels

13        created the document, and asked me to sign it.

14             And I did.

15   Q    Well, at the time you signed it, what did you

16        understand that to mean?

17   A    My understanding was is that:  The frame that Forest

18        River is currently producing is -- does not violate our

19        Patent."

20             Consequently, in light of that, Heartland

21        agrees -- so really the common-sense thing to do, which

22        is to say, "Okay..."

23             Because of new information that we didn't have in

24        the past, the common sense thing would be say, "Look:

25        we're not going to sue you."

1    Q    Did anyone at Heartland?

2    A    Yes.

3    Q    What did they see?

4    A    I can't tell you what they saw.

5    Q    Who was it that saw it?

6    A    Either somebody in Sales, John Rhymer or somebody.

7    Q    You don't know for sure who seen it?

8    A    I don't, no.

9    Q    Do you know when they saw it?

10   A    I don't.

11   Q    Okay.

12        Have you ever seen the frame of Exhibit 11 before?

13   A    No (Indicating).

14        I mean, I could see it's a frame.  But beyond that

15        I'm not an Engineer.  I don't have expertise in this

16        area.

17   Q    Are you aware of that this frame was shown to Heartland

18        or its Attorneys before the lawsuit began?

19   A    I'm not aware of that.

20        I don't know.

21   Q    Okay.

22        Well, you said something about new information

23        that you didn't know before?

24   A    Yes.

25   Q    What "new information" was that?

1   A   I believe that this Winter when I was out of town, my

2       Attorneys contacted me and said that, I believe you had

3       shared with them -- I think you called it "Prior-Art"

4       --

5   Q   Yes.

6   A   -- that our Attorneys did not Discover in the process.

7           And, said, "Here's the deal.  This is Prior-Art."

8           And, I what to be careful here because I'm not an

9       Attorney.  So I don't know if I'm going to use the

10      right words or not.

11          But, it "invalidated" or -- I'm going to use the

12      word "invalidated" only in the -- not as a legal-term.

13          But, what I understand -- it just invalidated our

14      Patent.

15          And, said, in light of this, Forest River is okay

16      doing that.

17          I said, "Well, if that's the case, that's the

18      case."

19  Q   Okay.

20          Just so we're clear on a couple of things.

21          Were you aware that prior to filing the lawsuit,

22      your Attorneys met at a Forest River Manufacturing

23      Facility and looked at some Prior-Art?

24  A   No.

25  Q   Okay.

1         that was the right thing to do?

2    A    Again, I don't have any expertise in this area.  I have

3         to trust my Professional Advisers.

4    Q    Okay.

5              Let's look at Exhibit 11, again.

6    A    Okay (Indicating).

7    Q    Does that frame include the invention that was the

8         subject of the Patent in this lawsuit?

9    A    I don't know.

10   Q    Well, why don't you know?

11   A    I don't have expertise in that area.

12   Q    In your own words, what is the invention of the Patent

13        of Exhibit 1?

14   A    In my own words, it is a frame that enables the owner

15        of a 5th-wheel to turn the truck tightly (Indicating).

16   Q    Okay.

17             But, you know that there have been many other

18        frames for many years that have enabled someone to turn

19        a trailer tightly.

20             Right?

21   A    No.

22   Q    You have never seen that before?

23   A    I didn't say that.

24             I said, I don't -- I can't recall that.

25   Q    You've seen horse trailers.

Olmsted & Associates, Ltd
402 E. Mishawaka Ave.,
Mishawaka, Indiana 46545
(800) 439-4478
Olmsted@Olmstedreporting.com

1           Right?

2    A    I've seen horse trailers.

3    Q    Yeah.

4           They turn tightly, don't they?

5    A    I don't know.

6    Q    You've never seen a horse trailer turn?

7    A    No.

8    Q    Have you seen snowmobile trailers?  Haven't you?

9    A    I have.

10   Q    Have you ever seen them turn?

11   A    No.

12   Q    You were aware of Cobra Industries.

13          Right?

14   A    Sure.

15   Q    And, you were aware of some of Cobra's products.

16          Right?

17   A    I -- I know they built recreational vehicles.

18   Q    Okay.

19          Do you ever hear of a product called "Shadow

20   Cruiser"?

21   A    Yes.

22   Q    And, do you know roughly what that looks like?

23   A    Small travel-trailers and small 5th-wheels.

24   Q    Yeah.

25          Had a tapered front-end, didn't it?

1    A    I don't recall that.

2    Q    The "Shadow Cruiser" product competed with some of

3         Holiday Rambler's trailers when you were there, didn't

4         it?

5    A    I don't know that.

6    Q    What is it about the invention of Exhibit 1 that

7         enables a tight turning radius?

8    A    I defer to my Engineer on that, John Rhymer.

9              It would stand to reason that the -- the bed of

10        the pickup or the cab of the pickup truck has to get

11        around the cap.

12        But, as I said before, right from the beginning, I

13        really didn't have any interest in this.

14             So, I really can't answer that.

15             I don't know.

16                   (PAUSE IN THE PROCEEDINGS.)

17                   **(WHEREUPON, DOCUMENT WAS MARKED**

18                   **BY COUNSEL FOR I.D. AS NO. 12.)**

19   BY MR. RYAN M. FOUNTAIN:

20   Q    Looking at Exhibit 12.

21   A    (Indicating).

22   Q    Have you ever seen that frame before?

23   A    No.

24   Q    Looking at it, do you think that incorporates the

25        invention of the Patent in this lawsuit?

1        And, that shows up in the Daily Sales Log, doesn't

2        it?

3   A    It would eventually show up in the Daily Sales Log when

4        the Purchase-Orders were actually written.

5            And, those orders could have been written at that

6        time.

7            Or they may have been written -- or the Sales

8        Order may have been written that day.

9            It may have been a week later.

10  Q    Okay.

11  A    It may have been -- it may have been a month later at

12       the Louisville Show.

13  Q    Okay.

14           Well, at the time you wrote this letter, the

15       October 28, what were the total number of trailers,

16       5th-wheel or travel-trailers --

17  A    Right.

18  Q    (Continuing)  -- that you were referring to by this

19       "unexpected number of orders"?

20  A    I don't recall the number.

21           It wasn't a large number.

22           But, it was unexpected in the sense that, again,

23       let's go back and look at that time of year.

24           One:  You were may be a month away from the

25       Louisville Show.

1          So, typically in any year, dealers aren't buying a

2     lot of product prior to the Louisville Show.

3          Second of all:  You had an economic melt-down.

4          Maybe the worst economic crisis in the United

5     States since the Great Depression.

6          So, to be honest with you:  We didn't expect to

7     write anything.

8          We expected to show some products.

9          Maybe attract a dealer's interest to come back at

10    the Louisville Show.

11         So, for a dealer to -- for us to write six, eight,

12    ten orders, that would have been "pleasantly surprising

13    and unexpected."

14         Because we didn't expect to write anybody.

15  Q  So, the unexpected number of orders would be on the

16    nature of ten or so?

17  A  Maybe.

18  Q  Would it be larger?

19  A  No.

20  Q  If you wanted to know for sure, how would you find out?

21  A  I would ask Tim Hoffman to go back and try to research

22    that, the records.

23  Q  Which records would he have to look at?

24  A  Whatever Sales-records they keep.

25         I'm not quite sure how they log those orders.

1    THE VIDEOGRAPHER:  We're going off the record

2        at 3:53 p.m.

3                (FOLLOWING A BRIEF RECESS THESE

4                PROCEEDINGS WERE HAD:)

5        THE VIDEOGRAPHER:  We're back on the record

6        at 4:07 p.m.

7  BY MR. RYAN M. FOUNTAIN:

8  Q    I asked you earlier about gathering up or providing any

9        information to your Attorneys for participation in the

10       Patent Prosecution process.

11           And, you indicated you did not do that.

12           But, just so that we're clear:

13           Did you gather any information at all for anybody

14       else to pass on to the Attorneys to aid in the Patent

15       Prosecution process?

16  A    I don't recall doing that.

17           Again, this is a process that I thought was going

18       to be -- that a positive outcome was highly unlikely.

19           So...

20           And, no, I just -- I don't recall having any

21       involvement in that whatsoever.

22  Q    So, there was never a point in time when you sat down

23       with the guys and discussed all the Prior-Art you were

24       aware of with regard to this invention?

25  A    I don't recall doing that.

1    A    Information in response to a question.

2    Q    You mean, a question in the Complaint?

3    A    Any question.

4    Q    I see.

5         Okay.  Please turn to page six of the Answer.

6    A    (Indicating).

7    Q    There's a reproduction of a frame on that page.

8         Have you ever seen that frame like that before?

9    A    I don't recall having seen a frame like this.

10   Q    Have you seen any cargo trailer frames recently?

11   A    I don't know that I've seen a cargo trailer frame since

12        I was at Utilimaster.

13   Q    Does this frame shown in that picture resemble -- in

14        any way -- any cargo trailer frames you've ever seen?

15   A    Well, I can't -- I don't know.

16   Q    Does it's differ in any way?

17   A    I can't answer that.

18   Q    Turn to the next page, page seven.

19   A    (Indicating).

20   Q    Have you ever seen a frame that resembles what's shown

21        in that sketch?

22   A    I don't recall seeing a frame like this.

23   Q    Have you ever seen a frame that looked different than

24        that?

25         MR. DAVID P. IRMSCHER:  Objection.  Form.

1           THE WITNESS:

2   A   Just -- the nature of my -- of my experience would help

3       me really not study engineering principles of frames.

4           So, no.  I don't recall seeing a frame like this

5       before.

6   BY MR. RYAN M. FOUNTAIN:

7   Q   Did you ever hear of a Company called "Roadmaster"?

8   A   Yes.

9   Q   Are you aware that they make travel-travelers?

10  A   No. I've heard the name.

11          But, I don't know what Roadmaster is.

12  Q   Were they ever a competitor of any Company you worked

13      for?

14  A   I don't recall.

15  Q   Do you recall seeing any trailers made by Roadmaster?

16  A   No, I don't.

17  Q   Okay.

18          Does the frame shown on page seven resemble in any

19      way the frames that Heartland uses?

20  A   I would have to -- I don't know.

21          I would have to look it up.

22  Q   Well, you've actually seen Heartland's frames.

23          Right?

24  A   Have I seen a Heartland frame?

25  Q   Yes.

1   A   I think so.

2   Q   Okay.

3           MR. RYAN M. FOUNTAIN:  We'll label that

4       Exhibit 17.

5   A   Okay.

6           **(WHEREUPON, DOCUMENT WAS MARKED**

7           **FOR I.D. BY COUNSEL AS NO. 17.)**

8   BY MR. RYAN M. FOUNTAIN:

9   Q   If you would, turn to page ten of the Answer?

10  A   (Indicating).

11  Q   Exhibit 16?

12  A   Okay.

13  Q   That was a photograph of a Holiday Rambler trailer.

14      Have you ever seen that before?

15  A   I don't recall having seen this.

16  Q   Have you ever seen a trailer that looks like that

17      before?

18  A   I don't recall having seen a trailer that looks like

19      this, no (Indicating).

20  Q   Can you tell -- looking at that -- if it would also

21      have an improved turning radius?

22  A   Improved from what?

23  Q   A traditional travel-trailer?

24  A   No, I can't.

25  Q   Well, you notice that there is a front of the

1      travel-trailer that is notched at the corners.

2         Right?

3  A   I don't know that I would use the words "notched".

4         I wouldn't --

5  Q   How would you describe the front corners?

6  A   Well, it's difficult to say from this picture.

7         But, it looks like they're behind the protrusion

8      of the middle of the cab.

9  Q   Okay.

10        And, since the corners are behind the protrusion

11     of the cab, wouldn't it inherently have a better

12     turning radius than if that corner was not behind the

13     frame?

14  A  I -- I have no expertise in that area.

15        I can't answer that.

16        For example, I don't know whether that protrusion

17     would hit the pickup truck -- I just don't.

18        I'm not qualified to answer that.

19  Q   Have you ever hauled a fifth-wheel trailer?

20  A  No.

21  Q   Ever used one?

22  A  No.

23  Q   Page 15, please.

24  A  Sure (Indicating).

25  Q   Have you ever seen a trailer frame that resembles

1      what's shown on the photograph on page 15?

2  A   I'm not sure what I'm looking at here (Indicating).

3  Q   Okay.

4        The underside of a fifth-wheel trailer made by

5      Cherokee Industries.

6  A   No.

7        I mean, it's just a generic frame to me.

8  Q   When you say, "generic frame," what do you mean?

9  A   Looks just like a frame.

10      I mean, you're asking me if I have ever seen this

11    before.

12      No, I haven't.

13      It just looks like any other frame to me.

14  Q   Have you ever heard of "Cherokee Industries"?

15  A   Yes.

16  Q   In what context have you heard of them?

17  A   I think Cherokee makes cargo trailers.

18  Q   Do they make cargo trailers with living quarters?

19  A   I don't know.

20  Q   Have you ever been in competition with any Cherokee

21    trailers?

22  A   Not that I'm aware of.

23  Q   When is the last time you saw a Cherokee trailer?

24  A   I don't know if I have ever seen a Cherokee trailer.

25  Q   You go to the Louisville Show.

# Tab J



"Eliminator" frame by Forest River



Holiday Rambler Crown Imperial model trailer

EXHIBIT

104

9-2-09  88

PENGAD 800-631-6989

# Tab K

# UNITED STATES DISTRICT COURT
Northern District of Indiana
South Bend Division

| | | |
|---|---|---|
| HEARTLAND RECREATIONAL VEHICLES, LLC, | ) ) | |
| Plaintiff, | ) | |
| | ) | CASE NO.:3:08-cv-490 RLM CAN |
| v. | ) | |
| | ) | |
| FOREST RIVER, INC., | ) | JURY DEMAND |
| Defendant. | | |

## AMENDED ANSWER, DEFENSES, AND COUNTERCLAIMS

Defendant, Forest River, Inc. ("Forest River"), herein further responds to the Complaint of Heartland by answering the allegations of the Complaint and setting forth its defenses to the claims of Heartland based upon information and belief . Forest River then presents three Counterclaims against Heartland herein, also by allegations based upon information and belief:

ANSWERS TO HEARTLAND'S ALLEGATIONS:

1. Heartland is a company organized and existing under the laws of the State of Indiana and has its principle place of business at 1001 All-Pro Drive, Elkhart, Indiana 46514.

   **Response:** Admitted.

2. Heartland is the assignee of record of United States Patent No. 7,278,650.

   **Response:** Admitted that the face of the patent states that assertion, but Forest River is without knowledge or information sufficient to form a belief as to the present ownership of the patent.

1

3. Heartland is a leading manufacturer of travel trailers.

      **Response:** Admitted that Heartland is a manufacturer of travel trailers. However, the term "leading" is self laudatory and imprecisely defined. Forest River is without knowledge or information sufficient to form a belief as to what the actual status of Heartland is in terms of "leadership" within the industry.

4. Upon information and belief, Defendant Forest River, Inc. ("Forest River" or "Defendant") is a corporation, organized and existing under the laws of the State of Indiana and has its principle place of business at 55470 County Road 1, Elkhart, Indiana 46514.

      **Response:** Admitted.

5. This Court has original jurisdiction over the subject matter of this action pursuant to the provisions of Title 28, United States Code ("U.S.C.") §§1331 and 1338(a), because the action arises under the Patent Laws of the United States, Title 35 U.S.C. §100, et seq.

      **Response:** Admitted.

6. Upon information and belief, Forest River is subject to personal jurisdiction in this district because, *inter alia*, it directly and through its agents regularly does, solicits, and transacts business in the Northern District of Indiana.

      **Response:** Admitted.

7. Venue is proper in this district pursuant to 28 U.S.C. §§1391(b) and c) and §1400(b).

**Response:** Admitted.

8. Heartland hereby incorporates by reference the allegations set forth in paragraphs 1 through 7 as if fully set forth herein.

**Response:** That Heartland has so incorporated its prior allegations is admitted, but the response of Forest River to the content of those prior allegations remains as stated above and need not be repeated here.

9. On October 8, 2007, United States Patent No. 7,278,650 (the "650Patent"), entitled "Travel Trailer Having Improved Turning Radius" was duly and legally issued to Heartland, as assignee. A copy of the '650 patent is attached hereto as Exhibit A.

**Response:** Forest River denies that the '650 Patent was duly and legally issued. That the '650 Patent was issued on that date, that Heartland was indicated to be the assignee on the face of the patent, and that Heartland attached a copy of the patent as Exhibit A are admitted.

10. Possessing all substantive rights to the '650 Patent and the '650 patent being in full force and effect, Heartland has the right to sue for any infringement thereof.

**Response:** Forest River is without sufficient knowledge or information sufficient to form a belief as to who presently owns the '650 patent and/or rights to any actions for infringement. Forest River denies that the '650 Patent is in full force and effect. Forest River denies that Heartland has the right to sue for infringement of the '650 since, among other things, Heartland's fraudulent conduct in obtaining the patent preclude enforcement of the patent by Heartland.

3

11.  Upon information and belief, Forest River is infringing upon the '650 patent, either directly or contributorily, by making, using, selling, offering for sale, or supplying travel trailers, including Forest River's Silverback product, all in violation of 35 U.S.C. §271 et seq., and will continue to do so unless enjoined by this Court.

**Response:** Denied.

12.  By reason of Forest River's acts of infringement, Heartland has suffered and is suffering damages, including impairment of the value of the '650 patent, in an amount yet to be determined.

**Response:** Denied.

13.  Forest River's acts of infringement are causing irreparable harm to Heartland and will continue to cause irreparable harm unless enjoined by this Court.

**Response:** Denied.

14.  Upon information and belief, Forest River's continued infringement of the '650 Patent is willful and justifies a trebling of damages pursuant to 35 U.S.C. §284.  Further, this is an exceptional case supporting an award of reasonable attorneys' fees pursuant to 35 U.S.C. §285.

**Response:** As to the first sentence, denied.  As to the second sentence, agreed to the extent that attorneys' fees should be awarded to Forest River on account of the conduct of Heartland described herein below.

## DEFENSES AGAINST PATENT INFRINGEMENT AND BASES FOR COUNTERCLAIMS:

4

15. Using the reference numbers of the patent for illustration, the claims of the '650 Patent require at least the following elements in a travel trailer chassis:

    a. a forward edge beam (88) having a first end,

    b. an outer side frame member (84) substantially perpendicular to the forward edge beam and having a forward end,

    c. a first cross beam (116) substantially perpendicular to the side frame member and connected to the forward end of the side frame member at a location rearward of the forward edge beam, and

    d. a second cross beam (120) substantially parallel to the outer side frame member and connected to the first cross beam and the first end of the forward edge beam.

16. Figure 14 of the '650 Patent, shown below, illustrates a top perspective view of one embodiment of the invention claimed by that patent, as set forth in Claim 1.



FIG. 14

5

17. The photograph below shows the underside view of the front of a type of travel trailer chassis made, used, and sold by Forest River more than one year before the priority date of the '650 Patent, March 29, 2004, and before the invention claimed by the '650 was conceived and reduced to practice by the named inventors of that patent.



18. The travel trailer chassis type shown in the photograph of ¶17 is "prior art" with respect to the '650 Patent, as that term is meant under the Patent Laws of the United States.

19. After Heartland accused Forest River of infringing the '650 Patent, Forest River informed Heartland of the trailer chassis type of ¶17 and of Forest River's assertions of the significance of that chassis type as prior art, and provided specimens of that trailer chassis type which were inspected

by Heartland's attorneys at one of Forest River's production facilities more than a month before this lawsuit began. At that inspection, Forest River also provided those attorneys with sample invoices showing that this travel trailer chassis type was on the market several years before the priority date of the '650 Patent.

20. Each and every element and combination of Claim 1 of the '650 Patent is found in the prior art travel trailer chassis type of ¶17.

21. The drawing below shows a top view of a travel trailer chassis made, used, and sold by Roadmaster at least as of October, 2000.



22. The travel trailer chassis of ¶21 is also prior art with respect to the '650 patent.

23. Using the reference letters shown in that drawing, the travel trailer chassis of ¶21 has:

    a. a forward edge beam (B) having a first end,

    b. an outer side frame member (A) substantially perpendicular to the forward edge beam and having a forward end,

    c. a first cross beam (C) substantially perpendicular to the side frame member and connected to the forward end of the side frame member at a location rearward of the forward edge beam, and

    d. a second cross beam (F) substantially parallel to the outer side frame member and connected to the first cross beam and the first end of the forward edge beam.

24. Roadmaster is a competitor of Heartland and was a competitor of Damon Corporation when Brian Brady was President of Damon Corporation.

24. At least one of the named inventors of the '650 Patent, including Brian Brady (the president of Heartland), was aware of the travel trailer chassis of ¶21 prior to filing the application for the '650 Patent.

25. The alleged "invention" of the '650 Patent is for a travel trailer having an improved turning radius. The actual effort of the named inventors in creating this invention was to create a travel trailer having an improved turning radius by altering the configuration of the front, exterior cap of

8

a fifth wheel travel trailer. As originally filed, the application for the '650 Patent included claims directed toward that front, exterior cap configuration. However, the frame design for the chassis which supports the front, exterior cap was actually created by at least in part by employees of Lippert Components, and not by all of the named inventors. During prosecution of that application, Heartland deleted those cap claims and amended its application to include only claims directed to the chassis frame. The application did not originally include and was not amended to include the identity of the employees of Lippert Components who created the frame design.

26. Accordingly, the '650 Patent is invalid under 35 U.S.C. §102(a), (b), and (f) since the invention claimed by that patent was anticipated by the prior art, including the prior art of Forest River and others and does not meet the conditions of patentability. That invention was known and used by others in this country before the "invention" thereof by the applicants for the '650 patent. That invention was described in printed publications, in public use, and on sale in this country more than a year prior to the date of the application for patent in the United States. Moreover, all of the named inventors did not themselves invent the subject matter claimed in the '650 Patent.

27. In addition to the prior art of ¶s 17 and 21, more than a year before the priority date of the '650 Patent there were a large number of travel trailers made, used, and publically sold in this country which included "V," "bull nose," or otherwise tapered front ends which would prevent the travel trailer from adversely affecting the turning radius of the towing vehicles. Manufacturers of such trailers included Cobra, Bison, Aluminum Trailer Co., Roadmaster, Cherokee, and Sundowner. These travel trailers are also prior art with respect to the '650 Patent. At least one of the named

9

inventors of the '650 Patent was well aware of at least some of these prior art travel trailers before and during the prosecution of the application for the '650 patent.  In addition, more than a year before the priority date of the '650 Patent, there were a number of travel trailers which included notched or cut out portions of the front, exterior cap which would prevent the travel trailer from adversely affecting the turning radius of the towing vehicles.  One example of such is the Holiday Rambler, Crown Imperial model, made between 1990 and 1992, a photograph of which is shown below:



28. The travel trailer shown in the photograph of ¶27 is prior art with respect to the '650 Patent.

29. Accordingly, the '650 Patent is invalid under 35 U.S.C. §103 since even if the "invention" is not identically disclosed or described as set forth in 35 U.S.C. §102, the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the "invention" was made to a person having ordinary skill in the art of creating travel trailers. The improvement suggested by the applicants for the '650 patent was no more than the predictable use of prior art elements according to their established functions. *KSR Int'l. v. Teleflex, Inc.*, 550 U.S. 398, 127 S. Ct. 1727, 167 L. Ed 2d 705 (2007).

30. Heartland is bound by the Patent Examiner's assessment of the level of ordinary skill in the art and "obviousness" under 35 U.S.C. §103 made during prosecution of the application for the '650 Patent and is barred under the Doctrine of File Wrapper Estoppel from now asserting a different level of ordinary skill in the art in defending against the allegations of ¶29. The Patent Examiner's assessment in that regard is reflected in the Office Action of July 24, 2007 when rejecting many of the claims under 35 U.S.C. §103. Heartland did not traverse that rejection in its Amendment of August 2, 2007. That failure to traverse was knowing and intentional by Heartland, made expressly "in order to passage quickly to issuance" so that Heartland could assert that patent against Forest River and attempt to divert sales from Forest River.

31. The '650 Patent was not validly issued in light of the requirements of 35 U.S.C. §112 (second

11

paragraph), in that one or more of the Claims do not particularly point out and distinctly claim the subject matter which the applicants regard as their invention. Instead, for example, certain terms and phrases in the Claims, such as "connected to the forward end" and "substantially" are made intentionally ambiguous. Further, the Claims are invalid under the "Missing Element" doctrine, as applied under §112.

32. The '650 Patent was not validly issued in light of the requirements of 35 U.S.C. §101 since the named inventorship is not accurate. No correction of that named inventorship was made during prosecution of the application for that patent as the scope and content of the claims sought was changed by Heartland's amendments to the application. Incorrect named inventorship inherently causes increased cost in enforcement litigation. Heartland failed to comply with this requirement of the patent laws in willful or reckless disregard of its adverse impact on accused infringers.

33. The Complaint did not indicate which of the Claims in the '650 Patent that Forest River is considered to infringe. Accordingly, Forest River specifically litigates herein against all of those Claims. Under 35 U.S.C. §288 (second sentence), Heartland is not entitled to recover costs in this litigation even if it prevails on one or more of the Claims of the '650 Patent because one or more other Claims of the '650 Patent are not valid and Plaintiff has filed no disclaimer of the invalid Claims with the United States Patent and Trademark Office ("USPTO") prior to commencing this lawsuit.

34. The Silverback travel trailer of Forest River was specifically designed by Forest River to avoid

12

infringement of the '650 Patent after Heartland informed Forest River of that patent.  A top,

perspective view of the chassis of the Silverback travel trailer is shown below:



35. Unlike with the '650 Patent, the Silverback trailer achieves a reduced turning radius not by an inward recess or notch in the frame, but rather by using outriggers (19), (22), (23), and (24) extending forward from the frame. The use of outriggers on travel trailers is very old in the art and well known. An example of prior art travel trailer chassis using outriggers is shown in the drawing of ¶21 (note elements I extending from the outer side frame members A). Forest River is not aware of any prior use of outriggers extending forward from the frame. However, that novel feature is not contemplated by '650 Patent.

36. Heartland alleges that the Silverback trailer infringes the '650 patent because that chassis has:

    a. a forward edge beam (8) having a first end,

    b. an outer side frame member (4) substantially perpendicular to the forward edge beam and having a forward end (25),

    c. a first cross beam (5) substantially perpendicular to the side frame member and connected to the forward end of the side frame member at a location rearward of the forward edge beam, and

    d. a second cross beam (7) substantially parallel to the outer side frame member and connected to the first cross beam and the first end of the forward edge beam.

37. To the extent that the Silverback trailer has the chassis elements and combination of elements which form the basis for Heartland's allegation of infringement, those same chassis elements in that same combination and for that same purpose are found in the prior art with respect to the '650 Patent. Examples of such are the Roadmaster trailer shown in the drawing of ¶21 and the Cherokee

14

trailer shown in the front end underside view below:



38. The trailer shown in the photograph of ¶37 was made on June 5, 2000, according to its VIN plate, by Cherokee Industries, Inc., of Oklahoma City, OK. That trailer is prior art with respect to the '650 patent.

39. Based upon the teachings of the unpatented prior art, Forest River has a right to use the chassis elements and combination of elements which form the basis for Heartland's allegations of infringement. Accordingly, Forest River does not infringe the '650 Patent.

40. Heartland has accused Forest River of "willful" infringement, and on that basis seeks to obtain treble damages and attorneys fees. However, Heartland has made that accusation in bad faith and

without evidentiary support and without a likelihood that evidentiary support will exist after a reasonable opportunity for further investigation or discovery.

41. Specifically, prior to the issuance of the '650 Patent, the application for that patent was published by the USPTO. That publication included substantially different claims that those which were ultimately issued in the patent. Those original claims primarily focused upon the configuration of the travel trailer cap which provided an improved turning radius. When Heartland informed Forest River of the application for the '650 Patent and warned Forest River about patent infringement, Forest River responded by conducting an investigation into the scope and content of the prior art relevant to the original claims in the application and then informing Heartland that the claims of that application were considered invalid in light of the prior art. See Exhibit A hereto. Thereafter, the Patent Examiner did in fact reject most of the claims of the patent application in light of certain prior art, even though Forest River was not permitted to participate in the prosecution of that application. The Patent Examiner's rejection of those claims was not based upon the unpatented industry prior art which was known to Forest River. Prosecution of the application for the '650 Patent was in fact kept secret from Forest River by the USPTO and by Heartland even though Heartland had accused Forest River of infringement and expected Forest River to avoid infringement of the claims not yet allowed by the USPTO.

42. In September, 2007, after the '650 Patent was amended by Heartland to delete the claims referring to the improved turning radius front cap and after the frame claims were allowed by the USPTO but before the patent issued, Heartland falsely represented to various suppliers of Forest

16

River that Heartland had a patent on the "turning radius cap" and threatened those suppliers with patent infringement litigation if they continued to assist and sell products to Forest River which related to a prototype Surveyor model then being considered by Forest River, but not yet in production. Forest River was informed of those threats by suppliers and conducted a more extensive investigation into unpatented prior art of travel trailers having a front end which facilitates an improved turning radius. The Roadmaster and Cherokee prior art referred to in ¶s 21 and 37, for example, were discovered by Forest River at that time. The results of that investigation confirmed Forest River's prior assessment about the invalidity of the patent claims sought by Heartland.

43. After the '650 Patent issued, Heartland again contacted Forest River and accused it of patent infringement, even though at that time Forest River did not have any accused product on the market. Heartland's claim was based upon discovering a Cedar Creek prototype travel trailer frame which Forest River had entrusted to one of its suppliers pending completion of the new frame design. Thereafter, Forest River and Heartland engaged in extensive discussions about the patent validity, Heartland's fraud, and patent infringement issues, with Forest River providing detailed information about the bases for its belief that Heartland had no legitimate claim against Forest River. See, for example, Exhibits B and C hereto.

44. Ultimately, the Cedar Creek prototype evolved into the Silverback model, and Forest River began production and sales of that product. In doing so, Forest River did not disregard or ignore Heartland's patent or act in bad faith toward it. Instead, Forest River did so in the good faith belief, based upon its detailed investigation, that the '650 Patent was not validly issued in light of the prior

art unknown to the USPTO, not enforceable due to Heartland's fraud during patent prosecution, and in any event, not infringed by the Silverback product because of the substantial differences in the chassis design.

45. Accordingly, even if it turns out that the '650 Patent is valid and enforceable and infringed by Forest River, that infringement is not "willful" within the meaning of the Patent Laws, and Heartland is not entitled to treble damages or attorneys fees.

46. Regardless of the validity of the '650 Patent, and regardless of the infringement of that patent if it was validly issued, the '650 Patent is not enforceable by Heartland against Forest River because of fraud and inequitable conduct committed by Heartland during the prosecution of the application for that patent.

47. Heartland made false or misleading statements of pre-existing fact to the USPTO in its application for the '650 Patent. Specifically and for example, in the "Background" portion of the specification Heartland asserted as to the scope and content of the prior art: "Conventionally, the upper deck of a typical fifth wheel has a rectangular or parallelogram-shape footprint whose forward corners form right angles." Further on, the specification includes Figure 9A and a description of that as prior art. Heartland knew these statements were false and incomplete and were misleading at the time they were made. Heartland was aware at the time the application was filed with the USPTO that many typical prior art travel trailers included "V," "bull nose," or otherwise tapered front ends. Heartland knew these typical prior art trailers had forward corners which were not right angles and

18

which would prevent the travel trailer from adversely affecting the turning radius of the towing vehicles. Heartland knew these prior art trailers would provide the same benefits of the claimed invention and in the same manner. Heartland had this knowledge as a result of its direct competition with some of the manufacturers of this prior art and because one or more of the named inventors was aware of this prior art from their many years of experience in the travel trailer industry. Heartland knew or should have known that the undisclosed information was material to the patentability of the claims of the application for the '650 Patent

48. Under 37 C.F.R. §1.56 Heartland, its attorneys before the USPTO, and each of the named inventors personally had "a duty of candor and good faith" to the USPTO and were required to disclose to the USPTO "all information known to" them which was material to the patentability of "each pending claim." Neither Heartland nor the named inventors complied with this duty. For example, on June 27, 2005, Heartland filed an Information Disclosure Statement with the USPTO which listed certain patents, but Heartland expressly refused to admit to the USPTO that any of those patents was material to the patentability of any pending claim or even qualified as prior art (see Exhibit D hereto), and failed to ever identify any prior art to the USPTO which it considered to be material to the patentability of any claim, and especially failed to inform the USPTO of any of the unpatented prior art frames actually made and sold within the industry, despite having actual knowledge of frames which were material to the examination of its patent claims, such as is referred to in ¶s 24 and 27.

49. Further, after initially accusing Forest River of expected patent infringement and while the

application for the '650 Patent was still pending, on July 11, 2005, Forest River responded to that

accusation in writing with information about the "Eliminator" travel trailer prior art which

"anticipated" at least some of Heartland's pending claims and rendered them unpatentable under the

patent laws. Heartland failed to disclose that information to the USPTO during the entire pendency

of the patent application. Heartland knew or should have known that the undisclosed information

was material to the patentability of the claims of the application for the '650 Patent. Heartland failed

to make that disclosure because it wanted the '650 Patent to be allowed and issued by the USPTO

with as broad a set of patent claims as it could get and as soon as possible (see ¶30 above, last

sentence). Heartland wanted the patent to issue as soon as possible so that it could use the issued

patent as a colorable claim of exclusionary power in the market for travel trailers. Heartland

intended to and did use the issued patent to threaten and intimidate its competitors, the competitors'

suppliers, and the competitors' customers so as to increase Heartland's own sales, market share, and

economic power within the travel trailer market. Heartland was doing so pursuant to a "five year

plan" entered into with Catterton Partners to artificially increase the market share in a manner which

was intended to allow Brian Brady and Catterton to sell off equity interest in Heartland.


50. Later, after the present lawsuit began and the Heartland was informed that Forest River intended

to use the Eliminator reference in its defense against the '650 Patent, Heartland secretly disclosed

that reference to the USPTO in a continuation patent application, Serial Number 11/834,214, (see

Exhibit E, and the listed exhibits 1 - 5 therein) which was based upon the disclosure of the '650

patent and which was intended to serve as a "submarine patent" to be used against Forest River in

litigation. When confronted by the Patent Examiner in a personal interview at the USPTO (which

interview Forest River was not informed of in advance or permitted to attend) on December 4, 2008,

Heartland discussed the present litigation with the Patent Examiner and then admitted that the

Eliminator reference was prior art with respect to the claimed invention (see Exhibit F, middle

portion of page). However, immediately afterwards Heartland attempted to withdraw and conceal

that admission as well as the other arguments/admissions made to the Patents Examiner during that

interview.

51. For example, the next day, December 5, 2008 when Heartland filed the formal Information

Disclosure Statement, it retracted the admission that the Eliminator reference (and indeed any other

reference cited therein) was prior art or material information to the examination of the patent claims

(see Exhibit G, ¶2). Further, since Heartland is bound under the doctrine of "File Wrapper Estoppel"

to the explanations, interpretations, evidence, and arguments made before the Patent Examiner when

litigating any issued patent and since Heartland had requested the Patent Examiner to reconsider his

rejection of the continuation application at that interview, then under 37 CFR §1.133(b) after the

interview Heartland was required to file with the USPTO "a complete written statement of the

reasons presented at the interview as warranting favorable action." Heartland did not do so. Instead,

Heartland filed the summary remarks and "thank you" shown in Exhibit H hereto. Heartland ignored

this disclosure and recordation requirement despite being specifically reminded of its obligation to

do so by the USPTO (see Exhibit I, last parag., and Exhibit J, 7th parag.).

52. Heartland failed to make the disclosure required under 37 CFR §1.133(b) in order: a.) to conceal

from Forest River in this litigation the weaknesses in the arguments presented to the USPTO which

21

led to the Patent Examiner's agreement during the interview to issue a new set of claims for use in renewed litigation against Forest River and b.) to conceal the fact that Heartland is interpreting the scope of the patent claims differently in this litigation than it did before the USPTO. Heartland did this because a.) it wanted to strengthen its litigation posture by the statutory "presumption of validity" and b.) impose a greater litigation burden and uncertainty on Forest River regardless of the true merit of its patent claims and c.) prolong the overall litigation against Forest River so as to use the colorable claim of the patent to affect dealer purchasing decisions. Heartland's objective in that regard was to curtail Forest River's ability to effectively compete in the market for travel trailers, particularly the type of travel trailers referred to as "fifth wheels."

53. Heartland has filed two continuation patent applications based upon the '650 Patent, those applications being identified by the USPTO as Serial Nos.11/834,214 and 12/315,894 (referred to below as "the '214 case" and "the '894 case," respectively). Those patent applications are being used at least in part by Heartland as "submarine patents" in the present lawsuit to attempt to shift the burden of proof in this lawsuit and to ensure that litigation between the parties continues over the subject matter of the '650 Patent even if Heartland dismisses its claims under the '650 Patent. At least some of the patent claims of the pending patent applications are so similar to the scope of the patent claims in the '650 Patent that the USPTO considers them to be patentably indistinct. To overcome rejection of the '214 case under the doctrine of "double patenting" because of that lack of distinction, Heartland filed a Terminal Disclaimer on December 5, 2008, and admitted thereby that at least some of patent claims were patentably indistinct.

54. The '894 case was filed after Forest River filed and served its Answer in this lawsuit. The '214 case and '894 case include patent claims asserting scope of invention which significantly exceeds what the inventors considered to be their invention. The newly asserted claims were presented only after Heartland saw products which its competitors invented to avoid infringement of the '650 Patent and/or to obtain similar or better turning radius results for fifth wheels. Such information would be material to the patentability examination of the '214 and '894 cases by the USPTO. Heartland knew or should have known that the undisclosed information was material to the patentability of the claims of the application for the '650 Patent. Heartland did not inform the USPTO of these facts, despite its obligation to do so under 37 CFR §1.56.

55. The named inventors of the '650 Patent and the '214 and '894 cases are not "co-inventors" within the meaning of the patent laws. Certain of those persons, Mr. Brady in particular, is not an inventor of the subject matter claimed in the '650 Patent and/or the '214 and '894 cases. Instead, the five named inventors were merely the original shareholders of Heartland. The error in designation of inventorship did not arise without deceptive intent. Naming the shareholders rather than the true inventors was done intentionally for business control, ownership and/or operational purposes. Such information would be and have been material to the patentability examination of the '650 Patent application and/or the '214 and '894 cases by the USPTO. Heartland knew or should have known that the undisclosed information was material to the patentability of the claims of the application for the '650 Patent. Heartland did not inform the USPTO of these facts, despite its obligation to do so under 37 CFR §1.56.

56. The actions of Heartland referred to in ¶s 47 - 55 were made with the specific intent that the Patent Examiner rely upon the lack of material prior art references in the patent application record and the accuracy of the application information provided by Heartland in making his decision to allow some or all of the original claims presented by Heartland.

57. The Patent Examiner of the '650 Patent was justified in relying upon a patent applicant to comply with its duty under 37 C.F.R. §1.56. The Patent Examiner did in fact rely upon the lack of material prior art in the patent application record with regard to the subject matter of Claims 1 - 3 of the '650 Patent in making his decision to allow those claims.

58. The present lawsuit against Forest River could not have been brought by Heartland if the Patent Examiner had decided not to allow the claims of the '650 Patent.

59. The present lawsuit against Forest River has and will cause Forest River to incur costs and expenses.

60. The actions of Heartland referred to in ¶s 47 - 55 constitute "inequitable conduct" within the meaning of the Patent Laws and fraud.

61. Accordingly, Heartland's fraudulent and inequitable conduct referred to in ¶s 47 - 55 has caused damage to Forest River and warrants a finding both that this case is "exceptional" within the meaning of 35 U.S.C. §285 such that Forest River should be awarded its reasonable attorneys' fees,

*see, e.g., A.B. Chance Co. v. RTE Corp.*, 854 F. 2d 1307, 1312 (Fed. Cir. 1988)(inequitable conduct before the USPTO can support an award of attorneys' fees) and that Heartland is barred from enforcing the '650 Patent under long established principles of equity and patent law, *see, e.g., Precision Instrument Mfg., Inc. v. Automotive Maintenance Mach., Co.*, 324 U.S. 806, 65 S. Ct. 933, 89 L. Ed. 1381 (1945)(traditional doctrine of "Unclean Hands" bars enforcement if patent obtained through fraud or inequitable conduct); *J.P. Stevens & Co., Inc., v. Lex Tex Ltd., Inc.*, 747 F. F2 1553, 1560-61 (Fed. Cir. 1984)(inequitable conduct with respect to any claim prevents enforceability of all claims of the patent - the so-called "All Claims Rule"), *cert. denied,* 474 U.S. 822 (1985).

## COUNTERCLAIMS AGAINST HEARTLAND:

### A. Declaratory Judgement of Invalidity, Non-infringement and Unenforceability

62. As shown by the Complaint, Heartland has brought a lawsuit against Forest River in this Court, and Forest River's continued sale of the accused products is put at substantial risk of liability. Forest River has, by conferences with Heartland prior to and after the filing of this lawsuit, attempted to resolve this matter without litigation and/or without further litigation, but has been unsuccessful. Accordingly, a case of actual controversy exists between the parties and within the jurisdiction of this Court that is now ripe for a declaration of the rights of the parties by this Court under 28 U.S.C. §2201 as to the following allegations of Forest River:

63. One or more of the Claims of the '650 Patent was not validly issued in light of the requirements of 35 U.S.C. §§101, 102, 103, and/or 112, including, but not limited to, for the

reasons set forth more fully above.

64. The products of Forest River do not infringe upon the Claims of the '650 Patent since those products do not have one or more of the required elements of the patent claims or the equivalent of those required elements, including, but not limited to, for the reasons set forth more fully above.

65. The '650 Patent is not enforceable by Heartland in whole or part, including, but not limited to, for the reasons set forth above and the reasons set forth below.

66. Further, even if Heartland dismisses the infringement claims against Forest River based upon the '650 Patent itself, that action would be a sham since an actual case in controversy would still exist between these parties. Heartland intends to assert additional claims of patent infringement against Forest River based upon a patent issuing from at least the '214 case. In that '214 case, among the allowable patent claims which Heartland intends to assert, there are patent claims which are patentably indistinct from those patent claims asserted against Forest River in the '650 Patent. Accordingly, litigation is likely to continue involving patent claims which are patentably indistinct from those presently before the Court.

67. The fraud and inequitable conduct and prior art which renders the '650 Patent unenforceable is directly related to the subject matter of the allowed claims in the '214 case. Further, Heartland used the '650 Patent as a vehicle for obtaining additional prior art information in litigation which it attempted to neutralize via the Patent Examiner interview process in the '214 case without disclosure of evidence binding it under the Doctrine of Equivalents. Accordingly, any patent issuing from the

26

'214 case is also unenforceable. *See Consolidated Aluminum Corp. v. Foseco Intern. Ltd.*, 910 F. 2d 804 (Fed. Cir. 1990).

68. Forest River has a reasonable apprehension that litigation will continue with respect to patent claims which are patentably indistinct from those in the '650 Patent and through patents continuing from and claiming patent "priority" based upon the disclosure of the '650 Patent. Some of the bases for this apprehension are:

  a. After this lawsuit began based upon the "650 Patent, Heartland took the prior art disclosed by Forest River in this patent application back to the USPTO and sought to obtain allowance of a new set of claims with which Heartland intends to sue and/or threaten to sue Forest River when a patent issues from the '214 case.

  b. After Forest River filed its Answer in this case, Heartland filed a third patent application, the '894 case, based upon the disclosure of the '650 patent which it intends to use as a further submarine patent to sue or threaten to sue Forest River if additional prior art is disclosed after issuance of a patent from the '214 case.

  c. Heartland failed to provide the required disclosure under 37 CFR §1.133(b) when overcoming the prior art during the Dec. 4, 2008 private interview with the Patent Examiner. Such a disclosure would have committed Heartland to interpretations of the prior art and claims scope which are inconsistent with the arguments made to Forest River in this litigation. Such a disclosure would limit Heartland's ability to alter its legal arguments under the Doctrine of File Wrapper Estoppel in any future litigation based upon the '214 case.

27

d.  Heartland has targeted Forest River as its principle competitor in recent advertisements and promotional materials. This has happened at a time when Forest River is one of the few RV manufacturers that has been able to ride out the current severe economic downturn in the RV market.

e.  Heartland has sought to maximize the marketing advantages of a colorable claim for patent infringement against Forest River, regardless of the known infirmities of the '650 Patent, by coupling it with other deceitful actions. For example, the "hotel action" described more fully below took place only two days before Heartland filed this lawsuit. At the time of the "hotel action," Heartland knew that it was going to file this lawsuit and had already instructed its attorneys to do so. It was Heartland's intent that the lawsuit happen at the same time as the "hotel action" so as to have a detrimental effect upon Forest River's private trade show by also embarrassing Forest River to the dealers present at that trade show.

f.  Prior to this litigation, Forest River offered to identify all of the prior art it had against the '650 Patent if Heartland would agree that any litigation involving the disclosure of the '650 Patent would only be through the '650 Patent (i.e., there would be no subsequent litigation involving any patent continuing from that disclosure, no submarine patents). Heartland refused to do so.

g.  During the Preliminary Pre-trial Conference of January 7, 2009, Heartland suggested that the prior art Forest River cited in its Answer, particularly the Roadmaster trailer, may render the '650 Patent invalid and that Heartland may seek to dismiss this lawsuit. Forest River indicated, among other things, that it would oppose that dismissal unless Heartland was willing to enter into a judgment which would prevent future litigation

28

over the continuation cases. Heartland refused that offer.

69. Accordingly, a case in controversy also exists, and remains between Forest River and Heartland regardless of whether the infringement claims under the '650 Patent are dismissed, for so long as there is a dispute based upon any other patent issuing therefrom and for so long as those patent claims are tainted by the inequitable conduct and fraud of Heartland which also tainted the parent patent case. *See, e.g., Mobile Oil Corp. v. Advanced Environmental Recycling Technologies, Inc.,* 28 USPQ 2d 1075 (D.Del. 1993)(reasonableness of apprehension of litigation continues when patent owner refuses to accept a judgment of non-infringement or grant a covenant not to sue).

70. There is a strong public interest in our community in resolving the issue of the validity and enforceability of the '650 Patent and any other patent based upon the disclosure of that patent. Heartland has threatened to sue Global Glass, Lippert Components, and Keystone for infringement of its patent rights under the '650 Patent and its progeny.

B. Infringement of Forest River's Trademark Rights under 15 U.S.C. §1125

71. This counterclaim is an action for infringement of federal trademark rights under 15 U.S.C. §1125. This Court has jurisdiction over this claim pursuant to 15 U.S.C. §1121 and 28 U.S.C. §1331. Venue is proper in this district under 28 U.S.C. §13391(b) and (c) since the accused party, Heartland, is an Indiana corporation which has its principle place of business in this district and is subject to personal jurisdiction in this district.

29

72. Under 15 U.S.C. §1125(a)(1)(A), "any person who, on or in connection with any goods or services, . . . uses in commerce any word, term, name . . . or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, . . or commercial activities by another person, . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."

73. On October 22 and 23, 2008, Forest River hosted a private trade show next to its corporate offices in Elkhart, Indiana. On display were nearly the full range of product types manufactured and sold by the various divisions of Forest River, including boats, portable toilets, cargo trailers, travel trailers, motor homes, and modular buildings. More than 700 guests were invited to attend, representing approximately 350 RV dealerships from across North America and as far away as Australia. This event was briefly featured on the evening news of WSBT-TV in South Bend on October 22, 2008. However, this was not a public showing of Forest River products; the facilities were surrounded by a chain link fence, and there were gate attendants at the entrance to ensure that only invited guests and other persons given specific permission by Forest River could attend.

74. A theme of this trade show was "Pick Your Partner," referring to the business relationships that can develop between an RV manufacturer and an RV dealer. One of the purposes of this event was to encourage sales of various Forest River products to new and existing RV dealers. However, there were also presentations made and information given to those dealers about methods of coping with and remaining profitable during the current economic downturn in the RV industry, as well as

30

presentations made and information given to dealers by related businesses involved in RV financing and insurance, such as GEICO (like Forest River, another subsidiary corporation of Berkshire Hathaway, Inc.).

75. To provide overnight accommodations for its guests, Forest River reserved several hotels in Mishawaka, Indiana, including the Hyatt Place, Country Inn & Suites, Residence Inn, Courtyard Marriott, Springhill Suites, Holiday Inn Express, Hampton Inn, and Varsity Club. Forest River created an internal business document, called a "Master List," identifying each guest who would be attending the private trade show and which hotel that guest would be staying at. Forest River paid for its guests' accommodations at these hotels.

76. On Wednesday, October 22, at approximately 3:30 p.m., while most of Forest River's guests were in attendance at the private trade show, Heartland had several of its employees enter into each of the hotels reserved by Forest River. Those Heartland employees were carrying stacks of envelopes, each labeled with the name of a Forest River guest and an identification of which hotel that guest was staying at. Those Heartland employees went to the front desks of the hotels and then falsely stated and represented to the hotel attendants present that they were "from Forest River" and had envelopes which needed to be delivered to the Forest River guests. The contents of those envelopes were falsely described and represented to the hotel attendants as "important" and "needed for a Forest River dealer meeting the next day." Those Heartland employees induced the hotel attendants to immediately deliver the envelopes to the rooms of each named guest in their respective hotels, such as by slipping the envelopes under the guests' room doors. Security video cameras

monitoring the front desks in at least two of these hotels recorded this event and the Heartland employees doing it.

77.  The envelopes contained documents advertising Heartland's travel trailers and documents comparing several Flagstaff models of Forest River products with certain North Trail models of Heartland products.  The envelopes also contained a specific invitation to visit Heartland's place of business in Elkhart that same week, while the guests were in the area attending Forest River's private trade show, including a map showing how to get there.

78.  Several of Forest River's guests, who were RV dealers, were induced by the contents of those envelopes to visit Heartland's place of business that same week.  Several of those RV dealers were induced by Heartland to sign up as Heartland dealers and placed orders for Heartland travel trailers.  Brian Brady, the president of Heartland, informed other dealers of Heartland of these events in email correspondence sent by him at 7:36 p.m. on October 28, 2008.

79.  Heartland is a direct competitor of Forest River.  Sales of Heartland travel trailers can reduce sales of Forest River travel trailers.  The hotel action of Heartland resulted in some lost sales by Forest River.

80.  Accordingly, Heartland is liable to Forest River under 15 U.S.C. §1125(a)(1)(A) on account of the false statements and representations made to the hotel attendants which deceived those attendants into delivering Heartland advertisements to Forest River guests at a key time in the private trade

32

show event. Those actions of Heartland also resulted in disruption and confusion among several of Forest River's guests because of the incongruity and surprising manner in which the envelopes were delivered.

81. Heartland's actions in this regard were willful and deliberate, with several purposes in mind. One of Heartland's purposes was to obtain immediate financial gain by signing up new dealers and selling travel trailers to those dealers. Another of Heartland's purposes was to disrupt Forest River's private trade show, embarrass Forest River before its customer base, and thereby decrease Forest River's sales of travel trailers and other products. To a degree, that disruption and embarrassment did adversely affect Forest River's good will with its dealers and adversely affected Forest River's sales of its products. Coincident with the "hotel action" described in ¶s 63 and 64, Heartland has disparaged Forest River's private trade show by repeated correspondence with RV dealers which suggests Forest River as a "False Partner," a derogatory allusion to the "Pick Your Partner" theme. Heartland's actions exceed the pale of legitimate competition and instead demonstrate bad faith and actual malice toward Forest River. In that regard, Heartland has engaged in unfair competition against Forest River.

82. Heartland was motivated to that unfair competition, including the "hotel action," by the financial incentives offered by Catterton Partners, a Connecticut firm which obtained a controlling or equity security interest in Heartland in 2007 as a short term investment and who seeks to rapidly increase Heartland's market share in the RV industry so that Catterton can then quickly sell off ownership interest at a profit. When the recent economic downturn in the RV industry stunted the potential for

33

Heartland to obtain that rapid growth by legitimate competition, Heartland turned to illegal means, such as the "hotel action," to attempt to reach that investor's goal.

83.  Accordingly, Heartland is a willful infringer under the Lanham Act, justifying an award of damages, including treble damages, to Forest River, and this is an "exceptional case" within the meaning of 15 U.S.C. §1117, justifying an award of attorneys fees to Forest River.

84.  Accordingly, an injunction against Heartland is justified and properly entered under 15 U.S.C. §1116 for a period of time against any and all sales and business relationship with any dealer doing business with Heartland as a result, in whole or part, of the "hotel action."

C. Civil Action under Criminal Deception

85.  This counterclaim is an action under IC 34-24-3-1 on account of pecuniary losses suffered by Forest River as a result of criminal deception by or resulting from Heartland's acts in violation of IC 35-43-5-3 (6).  This Court has jurisdiction over this counterclaim under 28 U.S.C. §1367(a). Venue is proper in this district under 28 U.S.C. §1339l(b) and (c) since the accused party, Heartland, is an Indiana corporation which has its principle place of business in this district and is subject to personal jurisdiction in this district.

86.  The deception of Heartland in violation of IC 35-43-5-3 (6) is based upon the same "hotel action" event which gives rise to the Lanham Act counterclaim set forth above.

34

87. The actions of Heartland employees described above in ¶76 were intentional and were caused by Heartland. By the statements made to the hotel attendants, Heartland's employees intentionally misrepresented both their identities and the identity of the envelope property given to the hotel attendants. Heartland intended that misrepresentation to occur so as to defraud the hotel attendants into delivering Heartland advertisements to a select group of Forest River dealers. Heartland intended that delivery would also deprive Forest River of sales from those dealers receiving the envelopes. Heartland did this for both personal financial gain and maliciously so as to embarrass Forest River in the eyes of those dealers at an important time, during Forest River's private trade show.

88. Forest River has and will suffer pecuniary loss resulting from this deception by Heartland, including lost sales to its dealers and also at least some of the types of losses listed in IC 34-24-3-1.

89. Heartland has violated IC 35-43-5-3 and is liable to Forest River under IC 34-24-3-1.

## RELIEF REQUESTED

Forest River requests this Court enter Judgment against Heartland and dismiss Heartland's claim against Forest River, declaring that:

A. Forest River does not infringe upon the '650 patent,

B. Forest River is not a willful infringer even if it did infringe upon the '650 Patent,

C. The '650 Patent was not validly issued, and

D. The '650 Patent is not enforceable.

35

Forest River further requests this Court enter Judgment in favor of Forest River on the counterclaims, declaring that:

E. Heartland has infringed Forest River's rights under 15 U.S.C. §1125,

F. Heartland has violated IC 35-43-5-3, and Forest River is entitled to recovery of its losses under IC 34-24-3-1,

G. The '650 Patent and its progeny were procured as a result of fraud and inequitable conduct by Heartland which caused economic injury to Forest River,

H. This case is "exceptional" under 35 U.S.C. §285 and 15 U.S.C. §1117, and

I. Awarding Forest River all such damage recovery and such of the profits of Heartland as is appropriate,

J. Awarding Forest River treble damages and attorneys fees,

K. Awarding Forest River recovery of its losses under IC 34-24-3-1,

L. Entering an injunction sufficient to prevent Heartland from gaining further from its illegal conduct, and

M.. Awarding Forest River all such other relief as may be just and proper.


**DEMAND FOR JURY TRIAL UNDER FED. R. CIV. P. 38(b) BY FOREST RIVER, INC.**


Dated: January 12, 2009         Respectfully submitted,

s/Ryan M. Fountain

Ryan M. Fountain (#8544-71)
*RyanFountain@aol.com*
420 Lincoln Way West

Mishawaka, Indiana  46544
Telephone: (574) 258-9296
Telecopy: (574) 256-5137
Attorney for Defendant Forest River, Inc.

**Certificate of Service**

I certify that on January 12, 2009, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF system, which sent notification of such filing to all of the parties through at least the following counsel of record:

David P. Irmscher      david.irmscher@bakerd.com
Abigail M. Butler      abidgail.bulter@bakerd.com

s/Ryan M. Fountain
_____
Ryan M. Fountain
Attorney for Defendant Forest River, Inc.

37

## INDEX OF EXHIBITS

Exhibit A    Unsigned copy of February 12, 2007 letter to Heartland's attorney from Forest River's attorney.

Exhibit B    Unsigned copy of August 28, 2008 letter to Heartland's attorney from Forest River's attorney.

Exhibit C    Unsigned copy of October 2, 2008 letter to Heartland's attorney from Forest River's attorney.

Exhibit D    Copy of June 23, 2005 letter of Heartland's attorney to the USPTO.

Exhibit E    Copy of Heartland's Information Disclosure Statement Form of 12/05/2008

Exhibit F    Copy of USPTO Interview Summary, page 2

Exhibit G    Copy of Heartland's Information Disclosure Statement Letter of 12/5/2008 to USPTO

Exhibit H    Copy of Heartland's Remarks section of Amendment After Final of 12/5/2008

Exhibit I    Copy of USPTO Interview Summary, page 3

Exhibit J    Copy of USPTO Interview Summary, page 4