# Tab L



"Roadmaster" frame

# Tab M



PENGAD 800-631-698

EXHIBIT

4C



# Tab N

1    which one did it the most, but -- but Scott is --

2    you know, he's a creative marketing guy.  And,

3    you know, he's the one that had to make it look

4    good.

5         I mean, the bottom line is you can just --

6    you know, a perfect example is the Shadow Cruiser

7    one with just a blunt-cut cap.  But we had to

8    put -- we had to make it look good.  And that was

9    Scott's -- one of Scott's jobs was to make that

10   cap have some appeal to it and then lay out all

11   the graphics to fit into it.

12   Q  That was done by whom?

13   A  Scott would've laid out all the graphics.

14   Q  Do you consider yourself an inventor with respect

15      to the improved turning radius patent?

16                  MR. FOUNTAIN:  Object to the form

17              of the question.

18   BY MR. IRMSCHER:

19   Q  You can answer.

20   A  I'm sorry.  Ask me that again.

21                  MR. IRMSCHER:  Could you read it

22              back?

23                  (A portion of the record was

24              read back by the court

25              reporter.)

1    A  Yeah.  Yeah, I do.  I do.  I do.

2    BY MR. IRMSCHER:

3    Q  What was -- what do you consider to be your

4       inventive contribution?

5                    MR. FOUNTAIN:  Again, we'll

6                 object to the form of that question.

7    A  Well, when you sat in as many meetings as I had

8       to and discussed this thing with as many people

9       and have, you know, input as to -- I mean, I'm 25

10      percent of the input.

11         So, I mean, you know, I'm -- there's four of

12      us there, and we're all talking about this thing.

13      I'm part of that input on what we should do, how

14      we -- I mean, again, you know, I sold fifth

15      wheels for years.  It wasn't like any of these

16      concepts were -- were, you know -- you know,

17      completely uncommon to me.

18         I was aware of the short-bed trucks.  I was

19      aware of extended hitches.  I was aware of some,

20      you know, issues out there, that people had to

21      buy special hitches to -- to allow the fifth

22      wheel to move backwards in order to make turns.

23         I think -- I think the group saw me and I

24      think even today -- I mean, I've done product

25      development ever since and have been.  And I

1    was -- some of those special projects that I was

2    telling you about at -- at Gulf Stream before I

3    got there were all product development projects.

4         And, so, I was very knowledgeable in fifth

5    wheel, fifth wheel market, towing, concepts,

6    ideas, what we were trying to achieve.  I mean,

7    so, I -- I'd say I was very helpful in discussing

8    certain items and issues and trying to overcome

9    what we needed to do.  So --

10   Q  Can you describe more specifically what ideas or

11      conceptions that you brought to the group that

12      ended up in this patent application?

13   A  I can't right now, no.  I don't -- I can't.  I

14      suppose if I gave it some thought maybe at some

15      point, but --

16   Q  Do you have an understanding of what prior art

17      is?

18   A  Yes, I do.

19   Q  And what's your understanding of what that is?

20   A  It would be some of the concepts or ideas or art

21      or drawings of previous products, competitive

22      products or like products, I guess you could say.

23   Q  And did you provide any prior art to anyone in

24      connection with the filing of these patent

25      applications?

1    became the turning radius patent.  Do you recall

2    that?

3  A  Yes.

4  Q  And can you tell us specifically any particular

5    contribution that you believe you made?

6  A  Yeah.  I sure can.  How about $50,000 investment

7    to start the company?

8  Q  Okay.

9  A  How about getting the building so they could

10    build the fifth wheels or how about getting the

11    computer equipment so that they could make the

12    drawings on the computers or how about the

13    insurance so that they could sit there and

14    function or the bill of materials so they knew

15    how to build this fifth wheel, or the vendors,

16    dealing with Global Glass, and so -- and all of

17    the discussions that took place.

18        And had I known at the time that this was

19    gonna be an issue, I would've documented all of

20    those conversations.  But I can't tell you that I

21    pulled out a piece of paper and a pencil and drew

22    a turning radius design, because I'm not very

23    long at drawing, nor do I know how to operate a

24    CAD system.

25        But I am smart enough to understand the

1    concept. And I knew that there was a

2    differentiator there and I knew that we were on

3    to something and I put in my two cents worth on a

4    regular basis. And I reviewed things as they

5    came up, and we all had discussions.

6        But it was not my position, by design, to

7    physically fill out paperwork in the application

8    and/or draw anything for anybody except for maybe

9    sketches on a piece of paper or something, the

10    concepts.

11        But, so, by the act that I with this group

12    had put in my money and did my portion of the job

13    and, you know -- I believe that I was part of the

14    invention. Absolutely.

15  Q Did you take any measurements as to how to change

16    the configuration of the front end of a fifth

17    wheel to improve the turning radius?

18  A I believe that I was involved in going out and

19    measuring a truck and measuring the cap and, you

20    know, taking tape measures and discussion of, you

21    know, "We need to get out here and get this kind

22    of clearance and --" and I remember we

23    specifically decided to get a short-bed, extended

24    cab, three-quarter-ton truck.

25        So, I had to get that. I procured that. I

1   A   Yes.

2   Q   -- done by the inventors?

3   A   I'm aware of that.

4   Q   Okay. Did you withhold any prior art from the

5       patent office intentionally?

6   A   Not intentionally, I did not, no.

7   Q   Okay. And did you misrepresent any prior art to

8       the patent office intentionally?

9   A   No. I didn't even know I was supposed to even --

10      had I had any, I -- I didn't even know I was

11      supposed to give it to them or show it to them or

12      go over it or anything.

13   Q   Okay. Would it be fair to say that you don't

14      believe you've misrepresented anything to the

15      patent office or lied to the patent office or

16      committed inequitable conduct? Is that true?

17   A   I don't think it's true. I -- I -- I think I did

18      inadvertently. I think I did -- now that I have

19      knowledge of it, now that it's been explained to

20      me what I signed and what the requirements were,

21      unfortunately, I believe that -- you know, I

22      wasn't aware of that stuff when I signed it.

23      But --

24   Q   What stuff weren't you aware of? What are you

25      referring to?

1  A  I have not.  But if you'd like to provide me a

2     copy of it, I would certainly be glad to.

3  Q  What's your understanding of why the five

4     inventors were -- how many inventors were on the

5     original application?  Five?

6  A  I don't know.

7  Q  Well, there's you, correct?

8  A  (Nods head.)

9  Q  Mr. Hoffman, correct?

10 A  Uh-huh.

11 Q  John Rhymer?

12 A  Right.  Scott.

13 Q  Scott and Brian Brady?

14 A  So, five.  Yeah.

15 Q  Okay.  What's your understanding of why each of

16    those people was named as an inventor, if you

17    have one?

18 A  Yeah.  I don't -- I don't -- I don't know or have

19    an opinion.  I really don't.  I don't know.

20 Q  Okay.  Do you have any information that any of

21    the inventors were named as investors to deceive

22    anyone?

23 A  No.  But the -- the fact that Brian was on there,

24    I mean, he had absolutely nothing to do with any

25    part of it.  I mean, he -- he wasn't even around

1    you here?

2         Is it your testimony that this bottom

3    photo on the first page of Exhibit 104 -- you'd

4    agree with me that doesn't show the same notched

5    front end as on the Landmark, correct?

6  A  It does not show the exact same notch, no.

7  Q  And do any of the other photographs in Exhibit

8    104 show the notched invention that you've

9    identified on Exhibit 127?

10 A  Wait a second here.  I thought -- I thought the

11   invention was the -- was the frame itself.  I

12   thought that was what we --

13 Q  Did your lawyer ever tell you that there are --

14   there are claims directed to the cap that are on

15   file at the patent office?

16 A  I don't -- at which time?  Which lawyer?

17 Q  Ever.

18 A  Have any of the lawyers, including --

19 Q  Like Mr. Fountain.  Has he ever told you that?

20 A  I'm not sure he knows what exactly all the claims

21   were.

22 Q  That's not my question.  Has Mr. Fountain or

23   anybody else, any other lawyer, ever told you

24   that there are claims pending at the patent

25   office that are directed to the cap?

1   A   No, not to my knowledge.  I don't remember.

2   Q   Don't you think that somebody should've told you

3       that?

4   A   Don't you think that your firm should've told me

5       upfront what the original patent was for and what

6       we were doing?  So --

7   Q   Do you know what were -- what claims were in the

8       original patent as filed?

9   A   No, I don't.

10  Q   Okay.  Did anybody ever tell you that some of the

11      claims were allowed and some of them were not

12      allowed and went on to a continuation

13      application?  Did you ever hear anything like

14      that?

15  A   He's told me that there has been a continuation,

16      but he didn't know specifically what it was.

17  Q   Were you aware that the claims as originally

18      filed included some claims that were directed to

19      more than just the frame?

20  A   No.

21  Q   Didn't know that?

22  A   No.  Remember I told you nobody has -- has

23      discussed anything with me --

24  Q   Okay.

25  A   -- up until --

1 Q But I just thought maybe Mr. Fountain had given

2 you the application and you'd take an opportunity

3 to read it. Have you done it?

4 A Application for what? The claim of --

5 Q The patent. The original patent.

6 A The original patent, no, I don't have it.

7 Q Mr. Fountain never gave it to you, never asked

8 you to read it?

9 A No.

10 Q Okay. And do you have any idea of what prior art

11 was -- was actually provided to the patent

12 office?

13 A No. I've already testified to that. I already

14 said I wasn't aware of any prior art that was

15 given to them.

16 Q You have no idea what was provided?

17 A None.

18 Q Okay. So, if there was a series of ten or

19 fifteen patents that were provided, you have no

20 idea what -- what they show or anything else,

21 right?

22 A A series of ten or fifteen patents?

23 Q Yeah.

24 A I'm not sure I understand the question.

25 Q Well, the lawyers who were prosecuting the patent

1    for Heartland provided information to the patent

2    office, including a number of patents.

3        No one's ever told you that; is that right?

4  A  No, not that I can recall.

5  Q  And you've never looked at any of those patents,

6    so you have no idea what any of that discloses?

7  A  No.  I don't even know when the patent was --

8    was -- I don't -- I told you before, I don't know

9    anything about it.

10 Q  Okay.

11 A  I mean --

12 Q  And Mr. Fountain, who's your lawyer, has -- has

13    never shown you any of that information, correct?

14 A  He has not shown me the original patent, no.

15 Q  Or any of the patents that were filed with the

16    patent office as prior art?

17        MR. FOUNTAIN:  Object to the form

18        of the question.

19 BY MR. IRMSCHER:

20 Q  You can answer.

21 A  Not to -- not that I remember.  But --

22 Q  Well, has he ever showed you any patents that you

23    can recall as you sit here today?

24 A  No.

25 Q  Okay.  And has he ever told you that the lawyers

1      thing and --

2    Q  Well, let's -- let's -- let's stick to the

3       questions that are asked, if we can, so we can

4       try and finish this up.

5          And I think the record is pretty clear right

6       now that you don't know what claims were

7       originally filed for or what claims were filed

8       for at any time; is that true?

9    A  What claims were filed for at any time?  Well, I

10      mean, at some point I became aware of the fact

11      that it -- that the claim was the cut back,

12      chamfered, cornered frame.  But I don't -- I

13      can't tell you when --

14   Q  Okay.

15   A  -- I was in knowledge of that information.

16   Q  Do you have an understanding that there were

17      claims that were directed to the frame and then

18      there were claims that were directed to other

19      aspects of the invention?

20         Do you have any understanding of that?

21   A  No.

22   Q  Okay.

23   A  I would've liked to have, though.

24   Q  And Mr. Fountain has never given you any of the

25      patent applications that are currently pending,

1   not aware of any prior art.

2 Q   Well, for example, you -- Mr. Fountain wrote in

3   this document on Page -- the page that's got a

4   Number 2 at the bottom of it, "That that has

5   caused important information to be withheld from

6   the USPTO and has caused the '650 Patent to issue

7   with and the '214 application to be prosecuted

8   with the wrong claimed invention."

9       Did you give him that information?

10 A   What, that information was withheld from the

11   patent office?

12 Q   Right.  What important information was withheld

13   from the patent office?

14 A   I didn't give him that information.  But I think

15   he was able to draw the conclusion based on the

16   information that we had and how it was handled

17   and -- and how we did it that --

18 Q   Well, what important information was withheld

19   from the patent office?

20 A   Any knowledge of any prior art.  I mean --

21 Q   What prior art?  What are you referring to?

22 A   I don't know.  No one asked me.  So, I never -- I

23   don't know.

24 Q   So you're saying prior art was withheld, but you

25   don't know what prior art was withheld; is that

# Tab O

1   Q   Just so we're clear on terminology:  Is there a

2       difference between a "travel-trailer" and "Fifth Wheel"

3       in your mind?

4   A   Yes.

5   Q   Okay.

6           What is that difference?

7   A   A "travel-trailer" is pulled by a bumper pull.

8           Is pulled from the rear of the unit.

9           Where a "Fifth Wheel" is pulled from inside the

10      truck-bed over the axle.

11  Q   Okay.

12          You say, "inside the truck-bed."

13          You mean on a pickup truck bed?

14  A   Mm-mm.

15          Yes.

16  Q   Okay.

17          Now, getting back to some of your background

18      skills:

19          Have you ever built a travel-trailer?

20  A   No.

21  Q   Did you ever work on a travel-trailer Production

22      Facility?

23  A   Be more specific?

24  Q   Did you ever help someone build a travel-trailer?

25  A   I might have handed them a tool or a wrench.

1    A    No.  Basically those two.

2    Q    You said, "basically."

3         But --

4    A    Those two.

5    Q    Okay.

6         And, when did you hear that?

7    A    Probably two days later.

8         Probably the 23rd, 24th, October.

9    Q    And, how did that come up?

10   A    Walking in the halls and walking in the rooms asking

11        them what's going on?

12        And, they mentioned that they heard that Forest

13        River was mad about them delivering -- or Walczek

14        delivering packets to the hotels.

15   Q    And what was your response?

16   A    My response was -- I didn't have much of a response.

17        I don't find that as a problem.

18        A guy delivering packets to a hotel is normal

19        business in Elkhart, and anywhere in the RV-Industry.

20   Q    You say "delivering packets to a hotel."

21        What do you mean?

22   A    Well, like at Louisville every year we get information

23        put underneath our door from every competitor, for the

24        dealers and competitors alike.

25        Giving information is a normal way of doing

1

2                    **CROSS EXAMINATION**

3  BY MR. DAVID P. IRMSCHER:

4  Q    You've mentioned a number of times that -- I believe

5       it's Loveall's and Race Track -- purchased products

6       from Heartland after the Forest River show.

7            Is that correct?

8  A    Yes.

9  Q    Okay.

10           What did you do to figure out that they did that?

11           How did you go about generating the list that's in

12      front of you?

13  A    I asked the Office Personnel to pull all orders up

14      between the month of October and November.

15           And, who was the dealers.

16           And, we matched them up, also, against the Forest

17      River list was, too.

18           So, we double-checked that.

19  Q    Okay.

20           And, the only two that purchased that were on the

21      Forest River list, Lovealls and Race Track.

22           Correct?

23  A    Yes, sir.

24  Q    And, Race Track was a pre-existing customer.

25           Is that right?

1   A   Yes.

2   Q   Did Race Track get a packet under its door?

3           Or do you know?

4   A   Race Track did get a packet.

5   Q   Okay.

6           How do you know that?

7   A   They mentioned it to me when they stopped in and saw

8       us.

9   Q   Did they buy their -- the products that they bought as

10      a result of getting a packet under the door?

11  A   No.

12  Q   Why do you say that?

13  A   They were a current dealer.  We prospected them before

14      on the new product-line, the Eagle Ridge.

15          And, he was a very happy customer with us.  And he

16      indicated to us that he wanted to do more business with

17      Heartland.

18  Q   So, he was already a customer of Heartland's and he

19      just bought a new product, the "Eagle Ridge" product.

20          Is that right?

21  A   Yes, sir.

22  Q   And, that happened in October after the Forest River

23      event?

24  A   That's correct.

25  Q   What about "Race Track?"

1          Did "Race Track" get a packet under their door, to

2      your knowledge?

3   A   "Race Track" did.

4   Q   I'm sorry.

5          "Loveall."

6          Did Loveall's?

7   A   I do not know.

8   Q   Okay.

9          Did you talk with Loveall's -- that dealer at the

10      time of the Forest River show?

11  A   No.  I did not.

12  Q   Do you know if they came to your dealership?

13          Or to the Heartland facility during the Forest

14      River show?

15  A   Yes.

16          My Brand Manager said they came to the Heartland

17      Facility.

18  Q   Okay.

19          And, is it your opinion that they purchased the

20      products that they purchased as a result of getting a

21      packet under the door?

22  A   No.  They did not.

23  Q   How do you know that?

24  A   We had been prospecting them for quite some time.

25      Approximately six months.  We did repeated drive-bys.

1      We've been on their lot.

2              We've been pursuing them for quite sometime.

3              And, they showed strong/interest in buying

4      Heartland product.

5    Q  And, this was the first time they purchased any

6      Heartland product, would have been in October of 2008.

7              Is that right?

8    A  Yes.

9              That's correct.

10   Q  Okay.

11             Early today you had been asked some questions

12     about the Patent, Exhibit 1, in this case.

13             Is it your understanding that that Patent relates

14     to Fifth Wheels?

15             Or travel-trailers?

16             Or do you have an understanding?

17   A  My understanding is it relates to Fifth Wheels only.

18   Q  That's because the turning radius that's at issue there

19     is with respect to a Fifth Wheel.

20             Is that right?

21   A  That's correct.

22   Q  Okay.

23             You talked earlier today about a possible sale of

24     interest in the Patent.

25             Do you recall that testimony?

# Tab P

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

HEARTLAND RECREATIONAL VEHICLES, LLC )
)
)
Plaintiff, )
)
vs. )   Case No. 3:08-CV-490 AS CAN
)
)
FOREST RIVER, INC. )
)
Defendant. )

## HEARTLAND'S AMENDED NOTICE OF DEPOSITION TO FOREST RIVER, INC. PURSUANT TO RULE 30(b)(6)

Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, notice is hereby given that the plaintiff, Heartland Recreational Vehicles, LLC ("Heartland"), will take the deposition of Forest River, Inc. ("Forest River") on September 3, 2009, at 10:00 a.m., at the offices of Ryan M. Fountain, 228 West High Street, Elkhart, Indiana 46514.

The testimony at the deposition shall be recorded by sound, visual and/or stenographic means.

Heartland requests that Forest River designate one or more officers, directors, managing agents, or other persons duly authorized by Forest River to testify at the deposition, in accordance with Rule 30(b)(6), and who consent to testify on its behalf. Heartland also requests that, for each such person designated, Forest River also designate the matter(s) on which he or she will testify.

As used in this Notice, the term "Patent in Suit" refers to U.S. Patent No. 7,278,650, and the term "Hotel Action" refers to the factual scenario set forth in paragraphs 73-84 of Forest

River's Amended Answer, Counterclaims, and Defenses, and which is alleged to support Forest River's Lanham Act and Criminal Deception counterclaims against Heartland.

Examination is requested on the following matters:

1. All responses to Heartland's Interrogatories directed to Forest River.

2. All documents produced in response to Heartland's Requests For Production of Documents directed to Forest River.

3. Any basis that Forest River contends supports its defense that the Patent in Suit is invalid pursuant to the provisions of 35 U.S.C. §§ 101, 102, 103, and 112.

4. All documents or things that Forest River alleges are invalidating prior art to the Patent in Suit.

5. Any basis that Forest River contends supports it defense that the Patent in Suit is unenforceable as a result of inequitable conduct.

6. Whether Forest River requested any opinions of counsel that refer or relate to the issues of validity and/or enforceability of the subject matter of the Patent in Suit, and if so, the content of any such opinion communicated to Forest River.

7. All lost sales or damages that Forest River alleges were the result of the Hotel Action.

8. All misrepresentations or untruthful statements that Forest River alleges were made by Heartland in connection with the Hotel Action, including but not limited to, any misrepresentations or untruthful statements alleged to have been made by Heartland in an effort to obtain Forest River's customer list in connection with the Hotel Action.

9.     All communications with anyone about Forest River's customer list, including but not limited to, communications with Mike Creech, Brad Whitehead, Brian Brady, or Tim Hoffman.

10.     All communications with any hotel personnel regarding the Hotel Action.

11.     All evidence of any disruption or confusion (including initial interest confusion) of any Forest River guest alleged to have been caused by the Hotel Action.

12.     All information or documents that support Forest River's counterclaim against Heartland for criminal deception.

The deposition will continue from day to day thereafter, holidays and weekends excepted, until completed. The deposition will be by oral examination, with a written record made thereof before a notary public or before such other officer authorized by law to administer oaths, and may be videotaped.

BAKER & DANIELS LLP

By: _____
David P. Irmscher (#15026-02)
Abigail M. Butler (#22295-02)
111 East Wayne, Suite 800
Fort Wayne, Indiana 46802
Tel: 260.424.8000
Fax: 260.460.1700
david.irmscher@bakerd.com
abigail.butler@bakerd.com

ATTORNEYS FOR PLAINTIFF,
HEARTLAND RECREATIONAL
VEHICLES, LLC

## CERTIFICATE OF SERVICE

The undersigned counsel for plaintiff Heartland Recreational Vehicles, LLC, hereby certifies that a copy of the foregoing HEARTLAND'S AMENDED NOTICE OF DEPOSITION TO FOREST RIVER, INC. PURSUANT TO RULE 30(b)(6) was served, via U.S. Mail, upon the following, this 19th day of August, 2009:

Ryan M. Fountain
420 Lincoln Way West
Mishawaka, Indiana 46544-1902

ATTORNEY FOR DEFENDANT
FOREST RIVER, INC.

BAKER & DANIELS

# Tab Q

by entering the guests rooms, and then contacted hotel management about the incident and called to

warn another hotel involved in the Forest River trade show. See also Trial Exhibit 42. Also, various

Forest River employees were told stories and comments about the Hotel Action while the Forest

River trade show was in progress. Further, as noted above, Mr. Brady testified that six to ten dealers

were drawn from the Forest River event to Heartland as a result of the Hotel Action. That only one

(as far as Heartland will admit) such dealer ended up buying products still means that the remaining

five to nine dealers were at least also distracted from the Forest River trade show in progress

Interrogatory No. 11: Identify all information or documents that support Forest River's counterclaim

against Heartland for Criminal Deception.

Response: See the responses to Interrogatory Nos. 8 - 10. Beyond that, no calculation has

been made as yet for the special damages permitted by this claim, although it is inherent that such

damages will exist in terms of the Forest River employee time involvement. Accordingly, further

detail is objected to at this time.

I, Jeff Babcock, Vice President of Forest River, Inc., hereby declare that the facts set forth in the

foregoing Responses are true and correct based upon my knowledge, information, and belief.

Dated: _8-16-09_

Dated: August 10, 2009                                  Respectfully submitted as to objections,

 

 

 

 
_____
Ryan M. Fountain (#8544-71)

13

# Tab R

1      you say you spent preparing to testify today,

2      total?

3  A  More gathering than preparing.

4  Q  Okay.  Well, about how much time did you spend

5      gathering and preparing then?

6  A  50 hours.

7                    MR. IRMSCHER:  What number are we

8              up to?

9              THE COURT REPORTER:  116.

10             MR. IRMSCHER:  Mark this, please.

11             (Deposition Exhibit 116 marked

12              for identification.)

13  BY MR. IRMSCHER:

14  Q  Mr. Babcock, let me show you what's been marked

15     for identification as Exhibit 116 and ask if

16     that's the deposition notice that you are

17     prepared to testify under today.

18  A  It looks familiar, yes.

19  Q  Does that appear to be the notice that you're

20     prepared to testify about?

21  A  Yes.

22  Q  Okay.  And is it your understanding that you are

23     to provide information on behalf of Forest River

24     for all of the topics that are identified in

25     there?

1          MR. FOUNTAIN:  Let me answer at

2          least in part.  It's my understanding

3          that Topics 3, 4, and 6 are off the

4          table.  Is that correct?

5          MR. IRMSCHER:  I believe 3, 4,

6          and 6 are off the table to the extent

7          we're talking about invalidity.

8          To the extent we're talking about

9          inequitable conduct, they're not.

10          They're still in the case.

11          MR. FOUNTAIN:  For 3 and 4, yes.

12          For 6, the content of opinion is off

13          the table.

14          MR. IRMSCHER:  Well, you can --

15          if there is -- I think we know you've

16          got one, and I think you've claimed

17          it's privileged.  So, I don't think --

18          MR. FOUNTAIN:  Right.

19          MR. IRMSCHER:  -- there's much

20          more to talk about.

21          MR. FOUNTAIN:  Okay.  Apart from

22          that, he is Forest River's designated

23          witness for these topics.

24          MR. IRMSCHER:  Okay.

25    BY MR. IRMSCHER:

1  Q  Did you review the Interrogatory Answers in

2     connection with preparing to testify today?

3  A  Yes.  I'm prepared to read the Interrogatory

4     Answers.

5  Q  Okay.  Did you sign the Interrogatory Answers?

6  A  Yes.

7  Q  Under oath?

8  A  No.

9  Q  Why not?

10 A  The attorney didn't swear me in to answer them.

11    I guess he gave me the last page.  I read them

12    all, went through them.  It's part of the time I

13    spent with Ryan, going through the answers, read

14    them, and I signed them and agreed.

15 Q  Okay.  So, you believe everything in there is

16    truthful and accurate?

17 A  I do believe so, yes.

18 Q  Okay.

19                MR. IRMSCHER:  Ryan, do I have a

20             signed copy of these?

21                MR. FOUNTAIN:  Yes.  It was faxed

22             to you.

23                MR. IRMSCHER:  Okay.  There it

24             is.

25                MR. FOUNTAIN:  It was a

1    it.

2  A  (Witness Complying.)

3  Q  I'll -- I'll represent to you it's the same

4    Interrogatories and signature page I just showed

5    it -- showed to you.  But you've just got to tell

6    me what -- you've got to say that you identify

7    what it is.

8  A  This is my signed statement on the Forest River's

9    Response to Heartland's First Interrogatories to

10    Forest River, Inc.

11  Q  Okay.  And these are the Interrogatory Answers

12    that you reviewed, and you've sworn on behalf of

13    the company that the information's true and

14    correct?

15  A  These are the answers I'm gonna state today.

16    That's correct.

17  Q  Yeah.  And it's your signature that's swearing

18    they're true and correct, correct?

19  A  They are -- they are true and correct.

20  Q  Okay.

21  A  You want me to say I swear, that I swear to you

22    they're true and correct?

23  Q  Yes.

24  A  Yes.

25  Q  And that's your signature at the back?

1   A   Yes.

2   Q   Okay.  And I think I asked you this, but I've

3       forgotten.  What's your title presently at Forest

4       River?

5   A   Vice-president of sales.

6   Q   Okay.  I want to try and take some time here and

7       kind of go through the hotel incident, as it's

8       been called in the -- in the case.

9           And let's start out first of all by, Forest

10      River was having a dealer show in October of last

11      year; is that right?

12  A   That is correct.

13  Q   Was that the first dealer show that Forest River

14      had held in Elkhart?

15  A   No.

16  Q   Can you -- can you tell me when was the -- what I

17      want to understand, and just so you can

18      understand this, I was understanding the show

19      that you had was a unique event last year.  Is

20      that true or not?

21  A   We had one prior, about ten years prior to that,

22      in Elkhart.  But we hadn't done it for ten years.

23  Q   Okay.  So, the event that happened last October

24      here in Elkhart was the first time you had done a

25      show like that in ten years?

1  Q  Did you pay for them to travel there?

2  A  We did not.

3  Q  And how many dealers came, approximately?

4  A  Roughly, 350.

5  Q  Okay.  And how many dealers do you have

6     nationwide, roughly?

7  A  In the RV division?

8  Q  Yes.

9  A  Active current dealers, probably 800 to a

10    thousand.

11 Q  Okay.  What I -- what I was trying to ask you is

12    how many of the ones that you invited came.  So,

13    it's about 40 percent or so?

14 A  If you're asking me how many actually RSVP'd and

15    how many showed up, I think we probably had a

16    attrition rate of -- I'm gonna say 15 percent of

17    the dealers that registered probably didn't show.

18 Q  So, in rough percentages, you thought you were

19    going to get about half of your dealers, and you

20    had a little less than half that showed?  Is

21    that -- is that about right?

22 A  We invited them all.

23 Q  Yep.

24 A  And we invited every dealer we had.  And we had

25    about 350 basically RSVP and probably 10 to 15

1    percent that registered to say they were gonna

2    show up that didn't.  The rest came.  So, we had

3    probably close to an 80 percent turnout of the

4    350.

5  Q  So, you had -- doing the math in my head, that's

6    about 300 dealers?

7  A  About 260, I think, probably showed up.

8  Q  260 dealers out of how -- how many that you

9    invited?  That's all I was trying to ask.

10  A  There was probably -- we invited them all.

11    Probably 800 to a thousand.

12  Q  Okay.  And 260 showed up; is that right?

13  A  Roughly.

14  Q  Okay.  And of these dealers, how many of them

15    sold other products besides just Forest River of

16    the ones that showed up?

17  A  Are you asking how many are exclusive?

18  Q  Yes.

19  A  To Forest River?

20  Q  Yes.

21  A  Very few dealers are exclusive.  I'd say a small

22    percentage.

23  Q  Just so we can understand, of the 260 dealers

24    that sowed up, you'd say what percentage,

25    roughly, would've been exclusive to you folks?

1    A    3, 4, 5 percent maybe.

2    Q    Okay.  And why is that rare in the industry or

3         rare for your company, I guess?

4    A    So many different products.  I think that a

5         dealer likes to balance out his inventory as

6         well.  I think that a dealer doesn't necessarily

7         want to be exclusive.  If you were an exclusive

8         Fleetwood dealer last year, it's not probably

9         very good.  If you were an exclusive Monaco

10        dealer, it probably didn't work out too good for

11        you.

12             I think that the dealers are now starting to

13        realize they have to align themselves with

14        stronger manufacturers just because the cost of a

15        manufacturer going out of business is a huge cost

16        on a dealer.

17   Q    And of the dealers that came to your show, do you

18        know which ones of them or which percentage of

19        them were selling your competitors' products?

20        Have you tracked that?

21   A    Well, it would be -- be the opposite number I

22        gave you.  I mean, if they're not exclusive,

23        they'd be selling other people's stuff.  So, it

24        would be --

25   Q    I asked a bad question.  What I was trying to get

 1      Fountain, our attorney.

 2   Q  And did that envelope, in fact, indicate -- have

 3      a big old Heartland logo in the upper corner?

 4   A  I do believe it did.

 5   Q  And is it your understanding that all of the

 6      envelopes had Heartland logos on them?

 7   A  I don't know if they all had Heartland --

 8   Q  Okay.

 9   A  -- envelopes (Sic) on them.

10   Q  Are you aware of --

11   A  However --

12   Q  I'm sorry.

13   A  -- Heartland could be -- it could be a Forest

14      River brand as far as the lady at the front desk

15      knows.  How would she actually know the

16      difference?  She -- he was -- his case was he was

17      making her feel like he was part of Forest River.

18      Who was she to know the difference on what --

19      what the envelope said?

20          You're assuming she knows this industry and

21      knows these two companies.  She does not.  She

22      only knows that Forest River is -- is -- is

23      paying for the hotel.  So, he played on probably

24      her naiveness, in my opinion.

25   Q  Okay.  Well, where's -- where's the evidence of

1  Q  -- or did he report --

2  A  At that time, he reported to Pete.

3  Q  To Pete Liegl?

4  A  Yeah.

5  Q  And in the corporate organization while John was

6     there, were you above him, equal to him, or is

7     that something --

8  A  I was -- yeah.  I was in charge of sales.  I

9     mean, I -- I worked with John.  But he didn't

10    have to necessarily report to me.

11  Q  And you were responsible for the sales of the

12    products that John was general manager of; is

13    that right?

14  A  Yeah.  He's -- he's the first guy there that he's

15    gotta -- you know, anything we can do, we -- I

16    approve all the price sheets for the product, go

17    through the pricing exercises with him.  It's

18    kind of his job to day to day be watching over

19    the salespeople and trying to gain the sales.

20  Q  And did John leave to go to Heartland under good

21    circumstances?

22  A  Yeah.  He said he had another opportunity.

23  Q  Would you say you're friends with John?

24  A  Yeah.  I'm not -- I'm not -- when I say friends,

25    I see him out for lunch and stuff like that,

1    always talk to him.  I think John's a very

2    personable, nice guy, very honest.

3  Q  I'm glad you mentioned that because that was

4    gonna be my next question.  You don't think he's

5    a liar, do you?

6  A  I do not personally have any experience of John

7    ever lying to me or I do not believe he's lied to

8    Forest River.

9  Q  Okay.  And you don't have any information that

10   tells you that John Rhymer lied to the patent

11   office, do you?

12 A  I don't know what John did at the patent office.

13 Q  Okay.

14 A  I --

15 Q  Well --

16 A  Again, I would --

17 Q  Let's -- let's ask the question a little

18   differently.

19       You don't know what he did, right?  Is that

20   what you said?

21 A  I don't know what he did at the patent office.

22 Q  That's what you said, right?

23 A  Yeah.  I said I don't know what -- I don't know

24   how he -- I don't know how he filed his patent.

25 Q  Okay.  And then you don't have any information

1    that John Rhymer lied to the patent office then,

2    do you?

3  A  I never said he did lie to the patent office.

4    I --

5  Q  Okay.

6  A  I guess that's the, you know --

7  Q  Do you know Doug Lantz?

8  A  No.

9  Q  Okay.  Never met the man, that you know of?

10  A  No.

11  Q  And do you know Scott Tuttle?

12  A  Yes.

13  Q  How do you know Scott Tuttle?

14  A  He did work for us at Cornerstone Designs.

15  Q  Work for us?  Was that Forest River then?

16  A  Yeah, it was Forest River.

17  Q  Okay.  And how long have you known Mr. Tuttle?

18  A  I'd probably say 12, 13 years.

19  Q  Okay.  You friends?

20  A  Again, yeah.  I mean, I guess we're friends.  I

21    mean, we don't see other, never have, outside

22    work socially.  I mean, we cross paths and I

23    think Scott's a -- Scott's a nice guy.

24  Q  Truthful?

25  A  I would say truthful.

1 Q You understand that you're here to talk on behalf

2   of Forest River.  And, again, I'm looking at the

3   Notice, which is, I think, this one.

4    Look at Deposition Exhibit 116, if you

5   would.  And take a look at the second page, I

6   believe it is.  Yeah.  There you go.

7 A Which page?

8 Q Second page.  You're here to talk about Topic

9   Number 5.  And that is that any basis that Forest

10  River contends supports its defense that the

11  Patent in Suit is unenforceable as a result of

12  inequitable conduct.  Do you see that?

13 A Which one again?  Could you read that one again?

14 Q Sure.  Number 5.  Any basis that Forest River

15  contends supports its defense that the Patent in

16  Suit is unenforceable as a result of inequitable

17  conduct.

18   You're here to testify about those topics;

19  is that right?

20 A Yes.

21 Q Okay.  What information do you have about

22  inequitable conduct and how did you get it?

23 A Okay.  Ask your question you're asking.

24 Q Yeah.  What information do you have about

25  inequitable conduct and how did you get it?

1  A  I think what the -- our stances on it is that

2     they were trying to patent something that was

3     already produced prior to and they did not either

4     at the time know that they were doing it, but at

5     the same time they were still doing it, that

6     there was other products out there prior to their

7     patent that would actually not allow them to

8     actually get a patent if it was provided.

9  Q  What's your understanding of what inequitable

10    conduct is?

11 A  I'm gonna say that we were saying that they were

12    just outright lying on a patent is what you're

13    asking me.  Is that what you're asking me if I

14    think that that is?

15 Q  No.  I'm asking what your understanding of the

16    term inequitable conduct is.  You tell me what it

17    is, what you think it is otherwise.

18 A  I think it's passing something off that's

19    untruthful.

20 Q  Okay.  Which one of the inventors passed

21    something off as untruthful?

22 A  Again, I think that the inventors tried to patent

23    something -- again, after even listening to the

24    deposition of Scott yesterday, they were trying

25    to, not knowingly, however at the same time were

1      trying to get a patent for something that they

2      had no right in getting in simple laymen's terms,

3      I guess, is the --

4  Q  So, if I'm understanding what you're telling me

5      correctly, you believe that the patent that is at

6      issue in this case, the '650 Patent, should not

7      have been granted, right?

8  A  That is correct.

9  Q  And why do you believe that?

10  A  Because people were using that type of -- that

11      type of frame prior to that.

12  Q  Okay.  And which frame in particular are you

13      referring to?

14  A  Well, we --

15  Q  And I'm talking about the frame that you

16      mentioned.

17  A  And you said the prior frame?

18  Q  No.  You said the prior frame.  I -- let me back

19      up.

20          You just said you believe that people were

21      using a frame prior to their -- the patent; is

22      that right?

23  A  Yeah.  I mean, I think that --

24  Q  Which frame -- which frame are you referring to?

25  A  We had built some of those frames on the cargo

1    A   I hate to use the word intentional. That's for

2        sure.

3    Q   I -- you need to answer my question.

4    A   I think after listening to Scott's deposition

5        yesterday, I don't think people -- I kind of

6        think he was pointing towards the attorney firm

7        that was representing them and maybe they didn't

8        ask all the right questions.

9    Q   So, you don't think Scott Tuttle intentionally

10       lied to the patent office, do you?

11    A   I think that in the midst of everything there

12       that Scott didn't intentionally go out and say,

13       "We're gonna lie to the patent office here and

14       try to prove something here." I don't think that

15       their scope was broad enough --

16    Q   Okay.

17    A   -- prior to filing that. Then they should've and

18       their attorney should've probably caught that.

19    Q   And you don't have any information that John

20       Rhymer lied to the patent office, do you?

21    A   Just for making it shorter, I don't -- I think,

22       again, that would stand probably for John Rhymer

23       as well.

24    Q   Same answer?

25    A   Same answer for John.

1   Q  So, you don't believe he did lie.  You think he

2       got excited?

3   A  I think that there was not a broad enough scope

4       on that actual patent and it kind of got through

5       the system.

6   Q  I need a straight answer.  You don't have any

7       information that John Rhymer lied to the patent

8       office, do you?

9   A  I do not believe that they were outright trying

10      to lie to them.

11  Q  Okay.  You understand that you're -- you've made

12      a claim for criminal deception against Heartland;

13      is that correct?

14  A  Yes.

15  Q  Okay.  And can you tell us what you understand

16      the criminal deception to be and what the facts

17      are that support it?

18  A  I guess probably the biggest thing, you know, I

19      guess on the -- on the criminal side, they

20      probably should've known what they were -- what

21      they were filing, and they didn't.

22  Q  Okay.

23  A  Now, whether that's those individuals or their

24      law firm --

25  Q  Just so you can understand, the criminal

1    it's -- it's this Page 92 here, if you could

2    direct yourself to that part of it.

3  A  (Witness Complying.)

4  Q  So, now that you've looked at that, let me

5    rephrase my question.

6       Is it true that you had no idea of what was

7    said to the hotel clerks?

8  A  No.  That's not true.

9  Q  Is it true that you don't know the exact words

10    that were said to any given hotel clerk?

11  A  I wasn't there to actually hear the exact words.

12    I'm hearing, I guess, the version of the people

13    that heard at the hotel that were there.

14  Q  Okay.

15  A  I did not personally hear.  I'm hearing the story

16    from our people that heard, that had the -- that

17    heard the -- from the hotel people that actually

18    heard the conversation.

19  Q  And is that what you meant on Page 92?

20  A  That's what I meant.

21  Q  Okay.

22  A  Yeah.

23  Q  All right.  You described this conversation you

24    had with Mr. Esch, okay?  And you said at some

25    point you asked him was his name Scott or Eric;

1      some more.

2          You've got statements in these Interrogatory

3      Answers.  And they're in Paragraphs 5, 6, and 7

4      on Page 11 if you want to look at them.

5   A  I think I got the right one.  Do I?

6   Q  It's the Interrogatory Answers.  It's -- Page 11

7      of the Interrogatory Answers is where I want you

8      to look.

9   A  Yep.  Okay.  I think I got the right one.

10  Q  You see there it says Paragraphs 5, 6, and 7?

11  A  Yeah.

12  Q  Read Paragraph 5 for me and let me know when

13     you've done that.  You don't have to read it out

14     loud.  Just read it to yourself.

15  A  (Witness Complying.)  Okay.

16  Q  What's the source for that information?  Where

17     did that come from?

18  A  I can't remember the girl's name from the -- from

19     the hotel.  But she had told our people that she

20     was told that that person was from Forest River

21     and needed to get that information out.

22  Q  Okay.  And who's that person?  Who was told that?

23  A  Lisel.

24  Q  Okay.  And she doesn't have the name of the

25     person?  She can't tell us which person it was?

1    A    Well, I think we gave you a whole list of

2         people's names.  I don't know which ones --

3    Q    Yeah.  But you're trying to accuse my client of

4         stealing something here and doing -- and criminal

5         conduct, and you can't even tell me who it was

6         that was told this.  Is that right?

7    A    We gave you the names of the people at the Hyatt

8         Hotel.  Call them.

9    Q    Who was told that?  Who was told that in

10        Paragraph 5?

11   A    Who was the -- who was --

12   Q    Who was the employee at the hotel that was told

13        these things?

14   A    You need to do your own investigation on that.

15        We told you --

16   Q    No, I don't.  That's what I'm doing right now.

17        This is discovery.  You're supposed to tell me.

18   A    I can't -- I can't tell you who it is.  But I

19        told you that -- that -- we identified the people

20        at the Hyatt Hotel.  We gave you their names

21        and -- and who they were.  So, you're gonna have

22        to find out.

23   Q    No.  You have to tell us.

24   A    Where's that list that says the Hyatt Hotel

25        employees?  And I'll tell you which three you can

1 choose from.

2 Q But you can't tell me as you sit here today --

3 A I can't. No, I can't.

4 Q -- which person was told these alleged things in

5  Paragraph 5, correct?

6 A I can't tell you. No. I can't tell you. I can

7  just tell you what was told.

8 Q Okay. And all you know that from -- again, I'm

9  not trying to put words in your mouth -- is Lisel

10  told you this?

11 A Through an investigation, yes.

12 Q No. That's not what I asked you. Is Lisel the

13  only person that told you about what happened,

14  allegedly, at the Hyatt?

15 A Yes.

16 Q Okay. Read Paragraph 6. Let me know when you've

17  finished it.

18 A (Witness Complying.) Okay.

19 Q What person at the Country Inn & Suites was told

20  this information?

21 A Same answer.

22 Q You don't know?

23 A I don't know. We gave you a list of the people's

24  names.

25 Q Do you have it someplace written down that

1      "So-and-so has told me this."?

2   A  I'm sure we do somewhere.

3   Q  Where?

4   A  Probably back at the office.

5   Q  Where back at the office?

6   A  Probably back at the office, probably at the --

7      probably at Lisel's desk.

8   Q  Well, why didn't you put the name in these

9      Interrogatory Answers?

10  A  Didn't think that we had to.  I mean, we gave you

11     a -- we gave you a list of all the people at the

12     hotels and where they worked at and what their

13     names were and their phone -- and their cell

14     phone numbers.

15  Q  And you think that's all you've got to do?

16  A  Yeah.

17  Q  You think it's unfair for us to specifically ask

18     you which person do you claim was told these

19     things and you don't have to tell us?

20  A  We gave you the information we had.

21  Q  You didn't give us the name of the person that

22     was told these things in Paragraph 6, did you?

23  A  We -- we can certainly try to get you the name.

24  Q  But you haven't tried to yet, have you?

25  A  Did you ask me last time to get you the name?

1   Q  Yes.

2   A  I don't remember you asking me.  I --

3   Q  You said you could get us these names.

4   A  Okay.

5   Q  And you haven't done that, have you?

6   A  Just give me a time, and I'll make sure you get

7      the names.

8   Q  Well, how about in your deposition, which has

9      been going on for two weeks now?  I mean, didn't

10     you understand --

11  A  One -- one -- one day.

12  Q  No.  But you've had --

13  A  Let's be -- let's be clear.

14  Q  You've had two weeks.

15  A  Did you ask me to bring those names back here

16     today?

17  Q  I -- I believe that you said you were going to

18     supplement this information.

19  A  You didn't say bring them back today, Dave.

20  Q  I don't think I did say that.  I --

21  A  You did not.

22  Q  I agree with that.

23  A  Yeah.

24  Q  But I thought you agreed you were gonna tell us

25     who these people were.

1 A   Did you tell me when I needed to get that

2     information back to you?  Don't I have a certain

3     amount of time?

4 Q   Have you done that yet?  Let's just -- let me ask

5     you this question.

6         With respect to the person at the Country

7     Inn & Suites, you can't tell me who that was that

8     was allegedly told these things, correct?

9 A   I think we can, yes.

10 Q   Well, do it now.  Go ahead.

11 A   I can't -- I can't -- what do you want me to do,

12     go back to the office right now?

13 Q   Can you tell me who that person was at the

14     Country Inn & Suites that was told -- allegedly

15     told these things?

16 A   I can give you the -- I can give you probably a

17     few people at the Country Inn that were -- that

18     are on that list that we can choose from.  I can

19     probably narrow it down for you.

20 Q   Can you tell me the name?

21 A   I can't tell you the name.

22 Q   Okay.  Same question for Paragraph 7.  Can you

23     tell me who was told those things?

24 A   Same answer.

25 Q   Okay.  Where is it -- what's the source for the

1      characterizations of the communications in 5, 6,

2      and 7?  Is that Lisel?

3  A  Yes.

4  Q  Okay.  And does she have written records of these

5      things?

6  A  Well --

7  Q  Did I understand you to say you now have written

8      records and now you know about written records

9      when you said before you didn't?

10  A  No.  That's not necessarily true.  Lisel has

11      information.  Scott Richgruber has information.

12      He was also at the hotel.  He's the one who gave

13      me Scott Esch's name, Eric Esch's name.

14  Q  Where is this written information?

15  A  We have it back at the office.

16  Q  And you haven't given it to us?

17  A  No.

18  Q  Why not?

19  A  Have you -- do we have to?  I mean, what are

20      we -- you didn't tell me to bring it.

21  Q  Okay.  So, but you have written information?

22  A  Yes.

23  Q  Even though you said last time you didn't, you do

24      have some?

25  A  I think what you asked is do I have it personally

1      myself.  No, I don't personally have it.  Lisel

2      personally has it.

3   Q  Okay.  And what does she have?

4   A  She has -- she has names and investigations that

5      she's -- that she's had in this -- in this

6      investigation on the hotel.

7   Q  Have you seen this stuff before?

8   A  Have I had it in my hand?

9   Q  Yes.

10  A  Yes.  I have had it in my hand.

11  Q  Okay.  What's it look like?

12  A  It looks like a piece of paper with information

13     written on it.

14  Q  Is it handwriting or typed?

15  A  It's handwriting.

16  Q  Whose handwriting is it?

17  A  Hers.

18  Q  How many pages?

19  A  I don't know.  Probably three pages.

20  Q  Does it say the name of the hotel person she was

21     talking to?

22  A  I'm sure it does identify them.  How else would

23     we get the names?

24  Q  And, yet, you don't think you need to tell us

25     that in your Interrogatory Answers?

1  A  I think if you give us enough time here, I think

2      we can get that information back to you.

3  Q  Well, why are you hiding the names of these

4      people?

5  A  Not trying to hide the names.

6  Q  So, you do have written records.  Forest River

7      has written records of what was said by these --

8      by these hotel employees, correct?

9  A  Yes.  That is correct.

10  Q  And you've not -- you've refused to provide them

11      to us so far; is that right?

12  A  We haven't been asked, "Bring them at this date,"

13      Dave.

14  Q  Okay.  So, that's your excuse?  You just haven't

15      been asked?

16  A  Not an excuse.  It's just you didn't say bring

17      them.

18  Q  And last time when I --

19  A  If you would've --

20  Q  When I asked you in your deposition before about

21      written records, you thought I was asking you

22      personally?

23  A  Yeah.  I didn't have them in my personal --

24  Q  And, so, if you didn't have them in your hands,

25      you didn't have to respond?

1   A  Exactly.

2   Q  I see.  You understood, though, that you were

3       speaking for Forest River, its representative in

4       this deposition.  You recall testifying to that,

5       don't you?

6   A  I do remember that I am the -- the person.  That

7       is correct.

8   Q  Okay.  Well, what is -- tell me -- do you

9       remember what any of these records that Lisel's

10      got -- what do they say specifically?

11  A  It basically just gives you the information that

12      we put in our Interrogatory Answers, is that

13      these people were misled by people from Heartland

14      on information that's not accurate.

15  Q  Okay.  Well, like Number 6, "Misled the

16      receptionist at Country Inn & Suites," that's

17      what you say.

18  A  Uh-huh.

19  Q  "Into thinking the packages were to go along with

20      the Forest River party in part by his mannerisms

21      and in part by having the specific dealer's name

22      on the cover."

23         What's -- what's misleading about that?

24  A  Well, it's easy to have the dealer's name on the

25      cover, Dave.  They stoled our dealer list.  They

1      got our dealer list from a -- from a third party.

2   Q  Well, what's misleading about that?

3   A  They made it sound like they were from Forest

4      River. Hey, here's -- this dealer's here. He's

5      got his name on the dealer pack. He's staying at

6      the hotel. Put one and one together. Oh, okay.

7      Yeah. Yep. Okay. What do you think they're

8      gonna do?

9           These people don't know. They don't know

10     if that's a division of Forest River. They don't

11     know if it's a different company. They don't

12     know. They played on their -- their innocence.

13   Q  Okay. So, what -- can you tell any specific

14     statements that anybody from Heartland made to

15     any hotel person?

16   A  I -- obviously, I wasn't was not there.

17   Q  Right.

18   A  We're going off of the investigation work, the

19     investigation work that we did after going to the

20     hotels --

21   Q  Okay.

22   A  -- to get information.

23   Q  But tell me what -- tell me what you believe was

24     said.

25   A  This is what we told you we believe was said,

1    right here, 5, 6, 7.

2  Q  Is there anything else?

3  A  You're only asking me 5, 6, 7.  I'm only saying

4    5, 6, 7.

5  Q  Well, let me ask you this.  Do you have records

6    of what was said at every one of the hotels?

7  A  She may have more records than -- than these that

8    are identified here.  I don't know.  We'd have to

9    go back through and look at them.

10  Q  So, for example, if somebody was staying at the

11    Varsity Club, you can't sit here and tell us what

12    was said to them, right?

13  A  Not right here, not right now, no.

14  Q  Okay.  But you understood this was one of the

15    topics for your deposition, didn't you, what

16    happened in the hotel incident, what was said,

17    all those things?

18  A  We gave you -- we gave you plenty of information

19    there, what was said.

20  Q  Well, no, you didn't.  All you gave us was these

21    Interrogatory Answers and talk to Lisel.

22  A  Yeah.

23  Q  That's all you have?

24  A  That's all I have here today.

25  Q  All right.  Who made -- can you tell me who from

1      Heartland was at the Hyatt Place?

2  A   I don't know which guy was identified there.

3  Q   Okay.  But you --

4  A   No.  But I do know we can identify him.

5  Q   Okay.  How are you gonna do that?

6  A   Well, we got a picture of him at the front desk.

7  Q   So, you got that from the Hyatt?

8  A   Yes, we did.

9  Q   Okay.  And who was at the Country Inn & Suites?

10 A   Again, we're gonna have to go off the tape.

11 Q   Okay.  And who was at the Residence Inn?

12 A   Off the tape.

13 Q   Would it be the same answer if I asked you any of

14     the other hotels?

15 A   I'm sure it would be.

16 Q   Okay.  In Number 6, you say he misled the

17     receptionist in part by his mannerisms and in

18     part by having the specific dealer's name on the

19     cover and asking for a call back to pick up the

20     undeliverable packages.

21         What else did he do that was misleading?

22 A   I think the only thing I can speak for is what we

23     put down here in the Interrogatories.

24 Q   Okay.  And there's nothing misleading about any

25     of that, is there?

1　A　Well, he made it sound like, hey, you know, he

2　　　had the dealer's name on there.  He said, "Hey,

3　　　you know, I gotta get these things to the party,

4　　　the Forest River party, and I gotta get this

5　　　material out."

6　　　　　What is she to assume?  She made -- she did

7　　　it on an assumption.  She assumed that he was

8　　　from Forest River, thought he had to have this

9　　　information.

10　Q　Why do you -- why do you believe she assumed he

11　　　was from Forest River?

12　A　Well, he was there.  He had packets.  He made

13　　　it -- he made it -- made it sound as if he worked

14　　　for Forest River.

15　Q　What did he do that made it sound as if he worked

16　　　for Forest River?

17　A　I mean, the Heartland -- they were from Forest

18　　　River, needed to be delivered right away.

19　Q　I want you to tell me specifically, as

20　　　specifically as you can, what anybody from

21　　　Heartland did to indicate they were from Forest

22　　　River.

23　A　The receptionists at the hotel --

24　Q　Yeah.

25　A　-- in our investigation said they said they were

1    from Forest River and they need to get these

2    packets. That's what it says here. That's what

3    they told them.

4  Q  And which hotel did that happen at?

5  A  The Hyatt.

6  Q  Okay. And you don't know if it happened at any

7    of the others, correct?

8  A  I think the County Inn & Suites. Says here

9    Heartland misled the receptionist at the Country

10    Inn into thinking the packages were to go along

11    with the Forest River party in part by his

12    mannerisms and by having the specific dealer's

13    name on the cover and asking for them to call --

14    call back and pick up the undeliverable packages.

15  Q  Okay. So, at the Country Inn & Suites, no one

16    said, "I'm from Forest River," correct?

17  A  I guess she was playing off of his mannerisms,

18    what he did to make her --

19  Q  You need to answer my question. At the Country

20    Inn & Suites, did somebody say, "I'm from Forest

21    River."?

22  A  I think she was -- she made -- she made us feel

23    that -- that he made her feel that he was with

24    Forest River.

25  Q  No. He had material -- he said he had materials

1   and he wanted them to be delivered to the guests,

2   right?

3   A   Uh-huh.

4   Q   Is that your basis for your statement that he

5   said he was from Forest River or he indicated he

6   was from Forest River?

7   A   It said the mannerisms.  Now, exactly what --

8   what he did is, "I gotta get these to the RV -- I

9   gotta get these to the -- I gotta get these to

10   the dealers here for the show."

11       He had -- they had their name -- he had

12   their names on there.  They knew they were RV

13   dealers.

14   Q   But what's --

15   A   That's an assumption.

16   Q   That's true, isn't it?  Those were RV dealers.

17   They did have their names on the envelope.

18   Correct?

19   A   That is correct.

20   Q   That was all true, wasn't it?

21   A   That they are dealers and they had names on it,

22   yes, that's correct.

23   Q   And the Heart -- and Heartland's all over -- all

24   over the envelopes, too, isn't it?

25   A   Heartland could be a division of Forest River.

1  Q  That's not what I asked you.  You need to answer

2     my questions.

3  A  Well, you're --

4  Q  Is Heartland on the envelopes that were

5     delivered?

6  A  I believe that Heartland's name is on the

7     envelope.

8  Q  Okay.  On all of them that you saw, right?

9  A  I only saw the one that we turned over.  Yes.

10  Q  Can you tell me, at any of the hotels, other than

11     the Hyatt, did anybody say they were from Forest

12     River or is this all just implied?

13  A  Obviously, the Hyatt said -- receptionist said

14     that they were from Forest River.  The

15     Heartland -- the receptionist at the Country Inn

16     & Suites said the mannerisms.  She thought they

17     were from -- from -- from --

18  Q  Mr. Babcock, we're gonna be here forever.  You

19     need to listen to my questions and answer them,

20     okay?  I'm asking you a very specific question.

21  A  I got all day, Dave.  I can go through this thing

22     as slow as I want.

23  Q  That's -- that's right.  But you need to listen

24     to what I'm trying to ask you, a very specific

25     question.

1          Did somebody tell a hotel employee other

2      than at the Hyatt that they were from Forest

3      River?

4   A  I'm just checking to make sure.  I want to make

5      sure I give you the right answer.

6   Q  Fair enough.

7   A  I don't want to get played on words here.

8   Q  I don't -- and I want you to give me the answer

9      that you have.  Exactly.

10  A  That is correct.

11  Q  Okay.  So, it's only the Hyatt where somebody

12     came in and said, "I'm from Forest River."?

13  A  That is correct.

14  Q  Okay.  Now, these hotel employees, all the

15     communications you're talking about was with the

16     receptionists; is that -- is that right?

17  A  Yes.

18  Q  Okay.  And then these packets of material were

19     just delivered to the dealers; is that right?

20  A  Who delivered them?

21  Q  The hotel employees.

22  A  I'm assuming that they had their names on them.

23     They -- they delivered them.  I don't think they

24     let them go back.  I mean, maybe they did.  I

25     don't -- I don't know specifically how they got

1   A  The ones that received the packets.

2   Q  Okay.  And who was -- which ones are those?

3   A  I can't tell you which ones.  I don't know which

4       ones Keystone -- I mean, Heartland put under

5       which doors.

6   Q  Okay.  And did you talk to any of yours dealers?

7       Last time, you said you were gonna perhaps

8       do that and get the names of the dealers that you

9       believe may have bought product from Heartland as

10      a result of this hotel incident.  Did you do

11      that?

12  A  Over the last two weeks, no, we have not done

13      that.

14  Q  Okay.  And you didn't talk to any of your

15      dealers?

16  A  We did.  We --

17  Q  About the hotel incident, I mean.

18  A  We did not talk about this whole incident

19      whatsoever.

20  Q  And why not?

21  A  We were busy with our own Forest River trade show

22      at the time and not gonna waste time on talking

23      about that in the past.

24  Q  And you said you talked to the Loveall's people

25      or not about the hotel incident?

1        Put that together with the fact that in the

2    deposition out at Catterton that they did say

3    that they did not make money on those trailers.

4    Specifically how much, I'm not privileged to

5    that.  But they did say that those trailers were

6    losers as far as profit goes.

7        So, that's why if I was a dealer and I could

8    buy a trailer the same length, same options, same

9    size, apples for apples comparisons, for $3,000

10    less, why wouldn't you?

11    Q  So, you believe -- your information is that the

12    reason Loveall's bought Heartland's products is

13    because the prices were very -- very good; is

14    that right?

15    A  Yes.  I do believe that's a big part of it, yes.

16    Q  Any other reasons why they bought them?

17    A  Price.

18    Q  Okay.  And price is what we just talked about,

19    right?

20    A  Price is what we just talked about, price value.

21    Q  And you seem to think there's something

22    inherently wrong with discounting to gain market

23    share.  Is that -- is that your opinion?

24    A  I think that when they're trying to discount and

25    not make profit on it on an ongoing basis

1    underneath the door if they weren't trying to get

2    them to come over?

3  Q  Do dealers buy inventory as a result of

4    promotional information?

5  A  Yes.  Dealers buy because of promotional

6    information.

7  Q  Okay.  So, it's your testimony that if a dealer

8    would receive a packet of information, that's all

9    you have to do to sell them additional inventory;

10    is that right?

11  A  No.  That's not all you have to do.

12  Q  Okay.  What else do you have to do?

13  A  You gotta sell them on the product.

14  Q  You have to talk to them, right?

15  A  You have to talk to the dealer.  You have to go

16    through the product.  You have to feature benefit

17    the product.  You gotta convince that dealer that

18    the product you have sitting in front of him is

19    gonna make him money on his lot.

20  Q  And that's what you do when you have these

21    meetings; is that right?

22  A  That's what you do every day in the sales world,

23    convince a dealer he can make money on our stuff.

24  Q  And the brochure itself doesn't do any of that.

25    It just -- it's just a tool to help, right?

1  A  The brochure can be a powerful thing.  People

2     read it.  And just like anything else; you hear

3     it on the news, you believe it's true.  If you

4     read it, you believe it's true.

5  Q  And these packets of information that was in the

6     envelopes, all of that was provided to dealers;

7     is that right?

8        And there was no consumers at this show?

9     There was all dealers; is that right?

10 A  I think sometimes the -- the packets -- the

11    information they put in those packets is some of

12    the same information they post on the internet,

13    which is very misleading.

14 Q  Well, let's back up a step.  I'm trying to

15    understand what -- your understanding of the

16    facts.

17 A  Uh-huh.

18 Q  And the people that were at your show --

19 A  Uh-huh.

20 Q  -- and the ones that you say got these packets of

21    information --

22 A  Uh-huh.

23 Q  -- those folks were all dealers, correct?

24 A  Yes.  They were all dealers.

25 Q  Okay.  And dealers, of course, are aware that

1    Heartland is not a division of Forest River; is

2    that true?

3  A  Dealers know that Heartland's not --

4  Q  Right.

5  A  -- part of Forest River.  But the hotel people

6    may not know that.

7  Q  Okay.  So, when the dealers got these packages of

8    information, they all knew it was from Heartland

9    and not from Forest River, correct?

10  A  That is correct.

11  Q  Okay.  And the dealers get lots of promotional

12    information like this, don't they?

13  A  I don't know.

14  Q  Well, you provide it to them, don't you?

15  A  If a dealer -- if we send out a dealer pack to

16    that dealer, we usually -- before we would send

17    out a price sheet and a brochure, we would

18    certainly have a conversation with that dealer,

19    know who we're sending -- we just don't send out

20    packets of information without knowing who we're

21    sending it to and why we're sending it to them.

22  Q  Okay.  And I -- I don't think that's responsive

23    to my question.

24    It's a normal business practice at Forest

25    River to send brochures and packages of

1   A  What else?

2   Q  Non-competes, goodwill, those kind of things.

3   A  Well, goodwill's one.

4   Q  How about trade names?  Do you depreciate those?

5   A  That's more on the accounting side, Dave, than

6      the sales side.

7   Q  Do you -- does that mean you don't know?

8   A  I don't know.

9   Q  Okay.  Have you ever valued a trade name or seen

10     a valuation of a trade name?

11  A  No.

12  Q  Okay.  Did you contact -- I think I may have

13     asked this.  I apologize if I did.

14        When we last met, you had said you hadn't

15     talked to any of the dealers about whether or not

16     they went over to Heartland or bought Heartland

17     products.

18        Is that still the case?  You've still not

19     talked to any of your dealers?

20  A  Yeah.  I think we talked about that this morning.

21     No, I haven't talked to -- I've talked to our

22     dealers, but I haven't talked to them

23     specifically about that.

24  Q  Right.  You haven't asked them, "Hey, did you go

25     over to Heartland and buy Heartland product," or

1    anything like that?

2    A  Not this time.

3    Q  Okay.  But not ever, right?

4    A  No.  We haven't talked about this last year's

5       incident, not at this last event we just had.

6    Q  I want to make sure I understand something.  Are

7       there two people named Richgruber in this case?

8    A  I think they have -- I think there's people who

9       have very similar names.  Are they identical?  I

10      don't know.  They sound identical; but I think

11      there might be something left out in the last

12      name.

13   Q  Well, was one of them Scott?  Is that right?

14   A  Scott Richgruber --

15   Q  And who is he?

16   A  -- works for us.

17   Q  Okay.

18   A  He's a sales guy --

19   Q  And --

20   A  -- who got a packet underneath his door.

21   Q  And how did he happen to get a packet under his

22      door?

23   A  Your client put it underneath there.

24   Q  Because his name was on it?

25   A  Was what?

1   A  Yeah.  It's somewhere around here in a deposition

2      somewhere.

3   Q  And have you contacted the two new dealers?

4   A  No.

5   Q  Why not?

6   A  Why should we?

7   Q  Because you're supposed to prove that somehow our

8      conduct caused you to lose sales.

9   A  I want to get all the information.  I want to do

10     it all at once.  I want to see all the dealers

11     you signed up and do it -- why do I want to do it

12     twice?

13         Let me have all the information.  We've been

14     trying to get the information.  You're not giving

15     it to us.

16   Q  Who's telling you we're not giving it to you?

17   A  Our attorney.

18   Q  Okay.  What dealers do you think we signed up we

19     didn't tell you about?

20   A  What about the five that are scratched off?  What

21     about the five -- the dealer numbers that they

22     had scratched off the five -- they only gave us

23     two.  It was a huge success.  Brian Brady said it

24     himself.  He was surprised.  He was amazed.  Is

25     that two?