59
1  A.  Um, Mike Elkind at Fulwider, Patton in LA.
2  Q.  Uh-huh.  You provided a report in that case, didn't
3     you?
4  A.  Yeah.
5  Q.  Do you still have a copy of that report?
6  A.  I don't think so.
7  Q.  Did you -- did you prepare that report on a computer?
8  A.  Yes, but it was -- that was while I was still at
9     Ice, Miller.
10  Q.  You didn't keep a copy of that?
11  A.  No.
12  Q.  Was that report used at trial?
13  A.  No.
14  Q.  Was that report filed with the court?
15  A.  No.
16  Q.  Was that report given to the opposing party?
17  A.  Yes.
18  Q.  Who was the opposing party?
19  A.  Barnes & Thornburg, Don Knebel.
20  Q.  Uh-huh.  And in that case, who is the attorney
21     accused of inequitable conduct?
22  A.  Um, the attorneys -- trying to remember their names.
23     Um, two of the Indianapolis attorneys and one in DC,
24     and their names escape me right now.
25  Q.  For which firm?

60
1  A.  Barnes & Thornburg.
2  Q.  Did you find that they had committed inequitable
3     conduct in that case, in your opinion?
4  A.  I found there was sufficient evidence to support it,
5     yeah.
6  Q.  Okay.  But you don't remember the names of the
7     Barnes & Thornburg attorneys?
8  A.  If you showed me a list of the attorneys, I could
9     pick them out.  I think, um -- one was no longer
10     there.  I have -- I believe that was, um, oh, what is
11     his name?  Trevor --
12  Q.  Trevor Carter?
13  A.  Trevor Carter was an associate.  Then there were two
14     partners, um, involved.  And basically, as I recall,
15     I concluded that Trevor was merely the scrivener.
16     And neither of the other two attorneys could remember
17     a thing about it.  And, um, so it wasn't quite clear

18    exactly who had done what from the deposition
19    testimony.  All you had was the results of what had
20    happened.
21  Q.  Now, what had happened?
22  A.  Um, they had misrepresented a prior art product that
23    they had.
24  Q.  When you say misrepresented a prior art product they
25    had, what do you mean?

61

1  A.  Well, they provided incomplete information and
2    misrepresented the content of what was there.
3  Q.  To the Patent Office?
4  A.  Yeah.

61

5  Q.  Did you believe that the attorneys had that missing
6    information?
7  A.  I -- it was a very complicated case.  I think it was
8    an instance where, yeah, I think they knew what the
9    prior art really disclosed.  They only disclosed a
10    portion.  It was a, what they called a -- a printed
11    publication, which was really a blueprint of the
12    prior product, that only showed one aspect of the
13    product, and that was a favorable aspect.  And
14    testimony at trial was that when they developed these
15    products, they had a full set of drawings that would
16    have shown all views and everything, but that was not
17    disclosed to the Patent Office.

--------------

93

3  Q.  Okay.  Now, this case that you were an expert on,
4    where you found, in your opinion, there was
5    inequitable conduct, right --
6  A.  Uh-huh.
7  Q.  -- did you find there was any deceptive intent there?
8  A.  I -- that was the weakness of the case.  There was --
9    there was circumstantial evidence to suggest that
10    they knew, or should have known, and -- and withheld
11    it intentionally, particularly after the testimony at
12    trial.
13  Q.  But you concluded it was inequitable conduct, right?
14  A.  I reached that conclusion, yes.
15  Q.  Even if you didn't have evidence of deceptive intent?

16    A.  I had evidence of deceptive intent.
17    Q.  What evidence of deceptive intent did you have in
18        that case?
19    A.  I forget all the exact circumstances at this point in
20        time, but you know, as is always the case, you have
21        to look at all the evidence, and -- and, um, the
22        inferences to be drawn from that evidence and arrive
23        at a conclusion.
24    Q.  To the best of your ability, what evidence did you
25        have of deceptive intent in that case?

94

1    A.  Best that I can recall, um, there were statements
2        made with respect to the -- what the prior art was,
3        and, um, they had had the opportunity to discuss it
4        with their clients and review precisely what they
5        were going to say.  And you know, ultimately that
6        turned out not to be, um, accurate, um, so the
7        conclusion was that -- that they had discussed it
8        with their client, they had misrepresented to the
9        Patent Office, and there was no other logical
10       explanation, other than they had intentionally done
11       so.
12   Q.  No other logical explanation for that omission?
13   A.  Uh-huh.