10

16  Q.  Is there any other file that Barnes & Thornburg
17      maintains related to the prosecution of that
18      provisional application, or the utility application?
19   A.  What do you mean relates to?
20   Q.  Well, is there any other file that deals with the
21      topic of the prosecution of those -- of those two
22      applications?
23          MR. LADUE:  When you say any other, you mean
24      besides what was produced?
25  BY MR. IRMSCHER:


11

1   Q.  Yeah, right, besides what is here.  I'm just trying
2      to ask you if that is the complete set of materials
3      that Barnes & Thornburg maintains in its records with
4      respect to the prosecution of this -- of the, what
5      ultimately became the 650 patent?
6   A.  You know, why I'm getting confused, there are like
7      bills and accounting things.  That's not in there,
8      and I'm sure those exist somewhere.
9   Q.  Okay.  So that was your problem with the question
10      related to?
11   A.  Right.


----------------

90

13  Q.  Any old diary sheets, the physical, tangible ones.
14   A.  There would be books from years ago.
15  Q.  And these books would be bound and compiled according
16      to the attorney involved, right?
17   A.  Right.
18  Q.  So if we wanted to get the diary sheets as you had
19      for writing these patent applications, presumably
20      they're somewhere in this building, right?
21   A.  That I do not know.
22  Q.  If you wanted to know, how would you find out?
23   A.  I would probably find out from accounting.
24  Q.  And who in accounting?
25   A.  I would probably start with Pam Brown and find out.


91

1   Q.  Is Pam Brown in this building?
2   A.  No.

3   Q.  Do you know of any reason why those diary sheets were
4      not turned over in this case?
5   A.  They were not asked for.
6   Q.  They relate to the patent applications, don't they?
7   A.  They relate to the client.
8   Q.  They also relate to the patent applications, don't
9      they?
10         MR. LADUE:  Objection, vague.
11         THE WITNESS:  Don't know what you mean by
12      relate.
13  BY MR. FOUNTAIN:
14   Q.  The time sheets would be a record of the work you did
15      with regard to these patent applications, wouldn't
16      they?
17   A.  It would be a record of the time spent, yes.
18   Q.  And a description of what you did in that period of
19      time, right?
20   A.  Correct.
21   Q.  And that work was done with regard to these patent
22      applications, right?
23   A.  Correct.
24   Q.  So they would in fact relate to these patent
25      applications, wouldn't they?

                              92
1   A.  From that line of thinking, yes.
2   Q.  Okay.  So from that line of thinking, do you know of
3      any reason why those time sheets were not turned over
4      to us?
5   A.  No.

--------------
                             180
12  BY MR. FOUNTAIN:
13   Q.  Okay.  Well, I asked you before about the -- before
14      about the billing statements, about your diaries, and
15      I think those are relevant and related to the patent
16      applications.  And until I receive those, um, I'm not
17      going to be able to conclude my questioning of you.
18      But at this point, I will pass it back to Dave, if he
19      has anything he would like to follow up with at this
20      point.  Otherwise, we will seek to get those
21      documents and ask to talk to you again.
22   A.  Okay.  You can talk to John about that.
23         MR. LADUE:  Whatever.  I just -- send the

24    subpoena my way.
25        MR. FOUNTAIN:  I think it was covered by the

1    existing subpoena.
2        MR. LADUE:  I don't know.  If you want --
3        MR. FOUNTAIN:  You want another one?
4        MR. LADUE:  -- something specific, I think
5    it's a good idea.
6        MR. FOUNTAIN:  All right.
7            REDIRECT EXAMINATION
8  BY MR. IRMSCHER: