UNITED STATES DISTRICT COURT

Northern District of Indiana

South Bend Division

| | |
|---|---|
| HEARTLAND RECREATIONAL ) | |
| VEHICLES, LLC, ) | |
|     Plaintiff, ) | |
| ) | CASE NO.:3:08-cv-490 TLS |
| v. ) | |
| ) | |
| FOREST RIVER, INC., ) | JURY DEMAND |
|     Defendant. | |

**FOREST RIVER'S REPLY TO HEARTLAND AND BAKER & DANIELS RESPONSE TO FOREST RIVER'S MOTION TO COMPEL DOCUMENT PRODUCTION FROM HEARTLAND AND BAKER & DANIELS**

Summary of the Reply:

Considering that we know about the prior art investigation that was done by Heartland and what we know we do not know about that investigation, the single most reasonable inference to be drawn is that Heartland was not merely cultivating ignorance, it was harvesting it. The knowledge of the person who conducted the "search" seals that inference to reality, and is highly relevant to this case. Accordingly, the information sought to identify that person and the documents involved in the search are also highly relevant and, since the burden is minimal in producing those records, the motion should be granted.

Analysis of Heartland's Response:

Heartland argues that the information sought is of "little importance" and stresses that "a

1

patent applicant has no duty to perform a prior art search." That latter point is misleading. **The undisputed fact is, Heartland (or someone acting on its behalf) actually did perform a prior art search.** Having done that, it was bound to disclose any relevant and material information that it found to the USPTO. It is also an undisputed fact that some of the information, in the form of 14 recent patents, was disclosed to the USPTO. Two questions remain: 1.) was all of the relevant and material information from that search disclosed, and 2.) was the search intentionally curtailed so that no relevant and material information would be found that would invalidate the claims being sought - in other words was the search merely *pro forma*, but in reality ignorance was being cultivated? Forest River was entitled to receive this information at least since its production Request No. 9, which stated:

> To the extent not otherwise requested herein, all documents and things which describe, refer to, discuss, or relate to any investigation by or on behalf of Heartland into the patentability of the invention(s) of the patent in this lawsuit or the validity of the patent in this lawsuit, including the identity of any prior art which is "material" to the claims of the patents in this lawsuit, as that term is meant in 37 C.F.R. §1.56.

Exhibit H. This request was served on December 14, 2008. In response to this request Heartland produced nothing about a search or prior art investigation itself. Heartland has repeatedly argued that is has no "Search Report" about this investigation. Instead, the 14 patents just "appeared" in Mr. Cooper's file. Perhaps the search report, a normal document created whenever such an investigation is done, no longer exists in Heartland's files. Certainly, however, the bill for that work does exist. If the bill can be found and the person who did the investigation identified, then that person may have a copy of the search report or the instructions received indicating what the scope of the investigation was to be. That is what this motion is all about - tracking down who and what he/she did in terms of the prior art investigation that actually was done.

Heartland argues that is of "little importance." Nothing could be further from the truth. The Amended Answer asserts specifically that "fraud and inequitable conduct" render the '650 patent unenforceable. DE#21-2, ¶67. The concept of "fraud upon the USPTO" finds its modern root in *Precision Instr. Mfg. Co. v. Auto. Maint. Mach. Co.,* 324 U.S 806, 816 (1945), where the Court noted that "a patent by its very nature is affected with a public interest . . is an exception to the general rule against monopolies . . [and] therefore, give the public a paramount interest in seeing that patent monopolies spring from backgrounds free from fraud or other inequitable conduct."

A wide variety of Courts and laws have defined what constitutes "fraud." Using Indiana law, since the present case arose entirely between Indiana participants who are all bound by Indiana law, there are two basic types of fraud: actual fraud and constructive fraud. The essential elements of actual fraud are:

1. A representation of material past or existing facts,
2. Which representation is false,
3. Which was made with knowledge or reckless ignorance of the falsity, and
4. Which causes reliance to the detriment of the person relying upon it.
5. Moreover, the false statement must have been made intentionally.

The essential elements of constructive fraud are the same except that a remedy is provided regardless of the intent if the behavior provides one party with an "unconscionable advantage." *Henkin v. Skane-Gripen, A.B.,* 986 F. 2d 1424, 1993 WL 36870, *5-7 (7th Cir. 1993)(unpublished but containing useful analysis and citing extensive authority therein, as articulated by Judge Miller of this Court). Further, it has been recognized in Indiana that "a reckless indifference to the truth is "the functional equivalent" of fraud." *In re Jongsma* , 402 B.R. 858, 874 (Bkrtcy, N.D. Ind. 2009). Similarly, liability can exist at common law for fraudulent non-disclosure where a duty to disclose exists. *See, e.g. Restatement (Second) of Torts §551 (1977).*

Furthermore, 37 C.F.R. §1.56 states, in pertinent part:

> (a) A patent by its very nature is affected with a public interest. <u>Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office</u>, which includes a duty to disclose to the Office all information known to that individual to be material to patentability . . .The duty to disclose information exists with respect to each pending claim until that claim is cancelled or withdrawn from consideration, or the application becomes abandoned. . . .However, <u>no patent will be granted on an application in connection with which fraud on the Office was practiced or attempted or the duty of disclosure was violated through bad faith or intentional misconduct</u>. . .
> © Individuals associated with the filing or prosecution of a patent application within the meaning of this section are:
> > (1) Each inventor named in the application.;
> > (2) Each attorney or agent who prepared or prosecutes the application; and
> > (3) Every other person who is substantively involved in the preparation or prosecution of the application <u>and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application.</u>
> (d) Individuals other than the attorney, agent or inventor may comply with this section by disclosing information to the attorney, agent or inventor.

Emphasis added. Thus, while Mr. Cooper may have been the person filing the 14 patents with the USPTO because at the time he was the "prosecution attorney," since Baker & Daniels was "associated with the assignee" (Heartland) as litigation counsel, see Exhibit L and M, if they, or anyone else did a prior art investigation for purposes of litigation preparation, that prior art should also have been disclosed.[1] It is also abundantly clear from case law that in the context of patent prosecution, because there is an affirmative duty to disclose material information under Rule 1.56, the "misrepresentation" aspect of common law fraud can arise either where there are affirmative misstatements of material fact and where material facts have been withheld.

---

[1] Similarly, if a prior art investigation was done in connection with valuing the patent application for purposes of a bank loan, any relevant and material information found by the accounting firm in that regard is attributed to Heartland and was required to be disclosed as well. This is in part the basis for the opposition of Forest River to Heartland's co-pending motion for protective order, DE#74.

Getting back to defining the full scope of prohibited conduct, the *Precision* court did not, however, specifically define the scope of what constitutes the "other inequitable conduct" which should bar a patent. It is well recognized that "inequitable conduct" encompassing something broader than common law fraud. *See, e.g. Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F. 3d 1312, 1326 (Fed. Cir. 2009). And while there is no general duty to conduct a prior art search, "one should not be able to cultivate ignorance . . . merely to avoid actual knowledge of that information or prior art." *FMC Corp. v. Hennessy Inds., Inc.*, 836 F. 2d. 521, 526 n. 6 (Fed Cir. 1987). Once on notice of a likelihood that material information exists and if it can be ascertained with reasonable inquiry, there is a duty to inquire - you cannot intentionally avoid learning about it even through gross negligence, especially where the information needed is in the hands of your own client. *Brasseler U.S.A. I, L.P. v. Stryker Sales Corp.*, 267 F. 3d 1370, 1380 (Fed. Cir. 2001).

It has been said that "gross negligence" alone is not always enough to infer an intent to deceive. *Kingsdown Med. Consultants, Ltd. v. Hollister, Inc.,* 863 F. 2d 867, 873 (Fed. Cir. 1988). Addressing the issue further, that court explained that "gross negligence has been used as a label for various patterns of conduct. It is definable, however, only in terms of a particular at or acts viewed in light of all the circumstances." *Id*, at 876. And therein lies the problem, the use of broad labels to attempt to define what is essentially just something that is "not equitable" under all the circumstances of the case.

Similarly vague, is Rule 1.56. The portion therein which states that: "no patent will be granted on an application in connection with which fraud was practiced or attempted or the duty of disclosure was violated through bad faith or intentional misconduct," then literally gives four alternative bars to patentability:

5

1. Fraud,
2. Attempted fraud,
3. Violation of the duty of disclosure through bad faith, or
4. Violation of the duty of disclosure through intentional misconduct.

Beyond that, the rule provides no guidance as to what specific conduct is barred, and the MPEP (Manual of Patent Examining Procedure - published by the USPTO as a guide) similarly provides no detailed description of the extent of conduct which constitutes a violation. Instead, MPEP Chapter 2000 addresses at length the risks of non-compliance and, at §2004, provides a variety of "aides" to compliance. If followed, presumably those guides give the practitioner a "safe harbor." Given the MPEP's warnings about the risks of an inequitable conduct ruling and the oft-lamented "plague" of inequitable conduct claims being made in patent litigation,[2] would any reasonable practitioner NOT use those aides?[3]

Searching for additional guidance in the case law of the Court of Appeals for the Federal Circuit since *Precision*, we see the growth of the "sliding scale" rule of materiality vs. intent. Materiality, for the most part is more readily understood, especially since 37 C.F.R. §1.56(b) sets an express standard for it. The various panels of that Court have struggled, however, with consistently defining what constitutes sufficient "bad intent" or "intent to deceive," particularly when dealing with acts of omission, such as is the subject of the present motion. Depending upon the particular

---

[2] As often as Courts lament the abundance of inequitable conduct claims in patent litigation, one cannot also help but notice that those claims are still often upheld by the evidence when the trier of fact examines the evidence and credibility of the witnesses. Somehow, the message is not getting through to enough practitioners to "use candor and good faith" in patent prosecution.

[3] Mr. Cooper and Mr. Gallagher testified and the documents of record show that they did not fully utilize those aids and did not take advantage of the "safe harbor." The impact of this will be dealt with separately in response to Heartland's motion for pending summary judgment.

panel of the Court in a given case, a wide range of standards have been articulated, some of which are inherently conflicting. Without going into tremendous detail on the history of this issue herein, suffice to say that the situation has culminated in *Larson Mfg. Co. v. Aluminart Prods. Ltd.*, 559 F. 3d 1317 (Fed. Cir. 2009).

That particular panel of the Court held that inequitable conduct must be shown by clear and convincing evidence, *Id,* at 1326, but that intent to deceive can be inferred from circumstantial evidence where the inference is the single most reasonable inference able to be drawn from the totality of the evidence, *Id,* at 1340, and the trier of fact is required to balance the "levels of materiality and intent, with a greater showing of one factor allowing a lessor showing of the other," *Id,* at 1327. However, in that case Judge Linn's concurring opinion explained that other panels of the Court have "set a standard even lower than gross negligence, " down to "simple negligence," citing *Praxair, Inc. v. ATMI, Inc.* 543 F. 3d 1306 (Fed. Cir. 2008), *Id,* at 1343-44, and in the end he expressly called for the Court to resolve the entire inequitable conduct doctrine as matter for the Court en banc. *Id,* at 1344.

In the context of the present motion, however, we do not have to peer into "crystal ball" and determine precisely what an en banc Court of Appeals would do in articulating a "unified theory" of inequitable conduct, or, for that matter, even precisely what a trier of fact would actually do in these circumstances. This is merely a discovery dispute, not the ultimate determination of unenforceability. The scope and purpose of discovery is to obtain information "regarding any non-privileged matter that is relevant to any party's claim or defense" and relevance is defined as that which is "reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). Generally, broad discovery is available under the Federal Rules of Civil Procedure. *See*

*Blancha v. Raymark Industries*, 972 F. 2d 507, 514 (3d Cir. 1992)("Thus the rule, while giving judges great freedom to admit evidence, diminishes substantially their authority to exclude evidence as irrelevant"). Privileges excluding relevant evidence are to be construed narrowly because the they constrict the fact-finding process. *Ryan v. Commissioner of Internal Revenue,* 568 F. 2d 531, 542-3 (7th Cir. 1977), *cert. denied,* 439 U.S. 820 (1978).

In the context of the present case then, the inquiry is: would the billing statements or other records of Heartland indicating information about the prior art investigation lead to the discovery of information which tends to show (or disprove) the "single most reasonable inference" of intent to deceive, "cultivation of ignorance," "unconscionable advantage," or some other bad faith or circumstance which was "not equitable?" The evidence of record thus far, showing what we do know, suggests yes, it would. Specifically, we know:

    1. The 14 patents that were disclosed to the USPTO mysteriously appeared in Mr. Cooper's files, and he has no knowledge of how. Query: when was that last time that any attorney opened up his file and just "found" relevant and material evidence in it from an unknown source, so relevant and material in fact, that he felt compelled to file it with the USPTO? If any attorney just "found" such evidence in his file, would not the most single reasonable thing to do be to find where it came from?

    2. Mr. Cooper knew that Heartland wanted a "defensible" patent and that it intended to litigate that patent. Exhibit B. It is well established that the best way to make a patent "defensible" is to disclose to the USPTO all of the prior art known or knowable so as to obtain the full "presumption of validity" under 35 U.S.C. 282. See, e.g., MPEP §2001.5, "strengthen the patent," copy attached hereto as Exhibit O. Thus, Mr. Cooper had a

heightened responsibility to his client towards a prior art investigation.

      3.  The usual practice of Mr. Cooper's firm in dealing with RV patents, given the extensive prior art readily known in the industry, was to conduct detailed prior art investigations and disclose to the USPTO prior art extending as far back in time as could be readily found.  See, e.g., Exhibit A.  This was Mr. Cooper's practice as well.  Exhibit S; page 99, line 5 - page 100, line 4.  This practice of Barnes & Thornburg's is not limited to RV patents.  See, e.g., Exhibit P.  This practice is usual with other firms dealing with RV patents. See, e.g., Exhibits Q and R.  Thus, both Mr. Cooper and Mr. Gallagher (his successor as prosecution attorney) could be expected to follow their firms' established practices, especially as they were partners in those firms.

      4.  Mr. Cooper's firm had been recently alerted to the need for careful prior art investigation in the RV industry by losing the Damon patent case before this same court,[4] and having to reimburse Forest River its attorneys fees and costs in that lawsuit.  Further, just prior to the filing of Heartland's patent application, in the case of *Stant Mfg., Inc. v. Gerdes, GmbH*, Case No. 1:02-cv-1653 in the U.S. District Court for the Southern District of Indiana, Mr. Taylor, the same expert witness Heartland employed in this lawsuit, found that Mr. Cooper's firm had committed inequitable conduct in connection with another patent!  See, e.g., Exhibit D to DE#89 in the present case.  Thus, Mr. Cooper and Mr. Gallagher could be expected to be especially sensitive to not repeating the embarrassments their firm has

---

[4] Damon Corporation v. Forest River, Civil Action No. 3:99-cv-123 - RLM-RDP.  Mr. Gallagher testified that he participated in that case while at Barnes & Thornburg.  The case ended when a 1977 Scamper advertisement showing virtually the same "invention" was found to have been in Barnes & Thornburg's files since prior to the lawsuit.

suffered from past misconduct.

5. As mentioned in the present motion papers, DE#88, the patents that were disclosed went back only 20 years, clearly indicating to any practitioner that only an infringement search, at best, had been conducted or that only part of the patentability search was conducted.

6. Seven of the 14 patents rested upon the work of two inventors, Crean and Ingram (both of whom are well known in the RV industry, one being associated with Teton Homes and the other Alpha Leisure). Also as indicated in DE#88, the usual practice of looking a the cited references in these patents would have instantly revealed U.S. 2,322,841, Exhibit C. This '841 is highly material evidence because it completely anticipates the Heartland patent (compare Fig.14 of the '841 patent, for example, with Fig. 8 of the Heartland patent).

7. Barnes & Thornburg's billing records were only a portion of the bills that Heartland received in connection with the patent. Baker & Daniels sent bills concerning the patent, and possibly the "professional searcher" that Mr. Cooper referred to sent bills. See, Exhibit S; page 103, line 5 - page 104, line 14. As Heartland emphasizes in its response, the potential sources of the mysteriously appearing 14 patents could be "either a formal search, which I don't think I saw any notification, or reporting out letter that one was done." Formal searches are often done by professional searchers. Reporting letters or notifications or search reports are common when those are done. But Mr. Cooper claims not to have seen any, which would be explained if: 1.) the person who put those patents in Mr. Cooper's files only passed on part of the information received from the search, or 2.) Mr. Cooper was not telling the truth. There is corroboration in Barnes & Thornburg's billing records that no search was

done by that firm, so Mr. Cooper may have been telling the truth, and we come back to the first alternative. Someone else did the search and passed on at least part of it to Mr. Cooper.

8. It has repeatedly been pointed out to this Court elsewhere that in 2005 when Forest River first was accused of patent infringement by Baker & Daniels, it responded by informing those attorneys that the patent could not be infringed because of the prior art in the industry. Accordingly, it is reasonable to assume that law firm, as part of its pre-litigation investigation, did some investigation to find out if Forest River's allegation was correct. Nothing, however, was produced in that regard in response to Request No. 9 or, according to Mr. Cooper's records, nothing was given to him in that regard. Having been put on notice, did that large law firm simply ignore the possibility that the patent would be invalid? That is not the most likely reasonable inference in light of the prohibitions of *FMC Corp.*, *supra,* and the fact that Mr. Gallagher had personally seen the devastating results of insufficient pre-litigation investigation against Forest River previously.

9. The alternatives then narrow to the so-called "informal search" or a professional search done by some other law firm (like Baker & Daniels) or business entity. Given that the Heartland inventors were not sophisticated patent investigators and that there is no correspondence in Mr. Cooper's files which refers to any search being done by them other than in regard to the one Canadian prior trailer, an informal search being done by Heartland itself seems implausible. It is most reasonable to assume therefore, that any formal or informal search done here was done by some entity other than Heartland, either a law firm like Baker & Daniels who was preparing for litigation and would have an incentive to determine the likely validity of the patent prior to incurring such expense, or an accounting

firm valuing the patent in the context of prior art, or some other entity assisting Heartland specially for the prior art investigation.  In those cases, it is also most likely that Heartland was billed for that work.  Accordingly, a record of that would be in the bills or invoices that Heartland received and in its payments of those bills, even if Heartland somehow "lost" all correspondence requesting that investigation or the correspondence transmitting at least the 14 patents to Heartland.

Therefore, as part of the "documents and things which describe, refer to, discuss, or relate to any investigation" from Request No. 9, Heartland should produce the requested billing records, even if it does not now have any correspondence about the search itself.  Those documents would show who actually did the prior art investigation.  It is reasonable to assume that whoever did the work has a record of the work that was done (the missing "Search Report") and correspondence showing what the parameters were of the search they were requested to perform.  If, for example, the professional searcher was told to stop at 20 years and go no further, that would be, for example, strong evidence of an "intent not to know" on the part of Heartland or someone acting on its behalf - the "cultivation of ignorance" prohibited by law.  Further, since shortly after this lawsuit began Heartland admitted that the patent was invalid and granted the Covenant Not to Sue, the prior art that was not disclosed to the USPTO was clearly highly material, something Mr. Cooper had at least been nominally instructed by Heartland to find to make the patent "defensible."  Given the high level of materiality, a relatively low level of deceptive intent may be sufficient to establish inequitable conduct or an unconscionable advantage.  Accordingly, contrary to Heartland's assertions, the information sought is highly important.

Heartland argues that it is overly burdensome to produce this information, but gives no evidence of why. Instead, Baker & Daniels argues in effect that its since it did not take over *prosecution* responsibility until after the 14 patents were in Mr. Cooper's files, what investigation into prior art that firm did before then was not relevant. That is false. If those patents were given to Mr. Cooper or obtained even indirectly from Baker & Daniels, then the knowledge of prior art is attributed to Heartland. Moreover, Request No. 9 was not limited to merely investigations for patent prosecution purposes. Specifically, Baker & Daniels argues that "its is simply impossible that the time records related to Baker & Daniels' prosecution of the '650 patent . . . could show how those patents ended up in Barnes & Thornburg's files." Response, DE#93, at page 7. Perhaps so, but Baker & Daniels' billing records *for its pre-litigation investigation*, which was by definition "by or on behalf of Heartland into the patentability of the invention(s) of the patent in this lawsuit or the validity of the patent in this lawsuit" (See Request No. 9), could easily show how those 14 patents ended up with Mr. Cooper. Such wordsmithing does not absolve Baker & Daniels of its obligations under 37 C.F.R. §1.56 or release Heartland from the penalties of "cultivating ignorance."

Therefore, no evidence of burden being shown, and evidence instead showing a high likelihood of materiality as well as being reasonably calculated to lead to the discovery of admissible evidence, the present motion should be granted.

Dated: February 28, 2010                           Respectfully submitted,

                                                   s/Ryan M. Fountain
                                                   _____
                                                   Ryan M. Fountain (8544-71)
                                                        *RyanFountain@aol.com*
                                                   420 Lincoln Way West

          Mishawaka, Indiana  46544
          Telephone: (574) 258-9296
          Telecopy: (574) 256-5137
          ATTORNEY FOR DEFENDANT

**Certificate of Service**

I certify that on February 28, 2010, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF system, which sent notification of such filing to all of the parties through at least the following counsel of record:

David P. Irmscher    david.irmscher@bakerd.com
Abigail M. Butler    abidgail.bulter@bakerd.com

          s/Ryan M. Fountain
          Ryan M. Fountain
          ATTORNEY FOR DEFENDANT

## EXHIBITS

Exhibit O    MPEP Section 2002.5

Exhibit P    Excerpt of US Patent 7,600,817

Exhibit Q    Excerpt of US Patent 6,983,979

Exhibit R    Excerpt of US Patent 7,350,850

Exhibit S    Excerpt of Greg Cooper Deposition Transcript